## PLAYA DE FLOR LAND & IMPROVEMENT CO. v. UNITED STATES.

### Civ. No. 969.

District Court, D. Canal Zone.
Div. Cristobal.

March 20, 1945.

George R. Shields (of King & King) of Washington, D. C., and C. P. Fairman, of Cristobel, C. Z., for plaintiff.

Daniel E. McGrath, U. S. Atty., and Brice Toole, Atty. Department of Justice both of Washington, D. C. (Francis M. Shea, Joseph A. Fanalli, and William S. Ward, all of Washington, D. C., of counsel), for the United States.

GARDNER, Judge.

This case was filed on November 5, 1941, under the authority of and pursuant to the provisions of the Act of Congress approved May 21, 1934, 48 Stat. 1361, and the amendment thereto of August 10, 1939, 53 Stat. 1532. (Court's memorandum, p. 1 and 2.)

The complaint alleged that the Playa de Flor Land and Improvement Company was an unincorporated association of individuals, setting forth the names of the individuals and their interests, and stated that they were joint owners and had acquired title and rights of ownership to specific real property, which was described as Tracts Nos. 1, 2, 3, and 4. After alleging their muniments of title, there is a plea of prescription that the joint owners, under the name of the Playa de Flor Land and Improvement Company, their predecessors in interest and title and those under whom they claimed, had been and were in the actual open, notorious, and adverse possession, use, and cultivation of the lands described, without violence, concealment, or interruption, for a period of more than forty years prior to the Treaty between the United States of America and the Republic of Panama, which was ratified February 26, 1904, 33 Stat. 2234, and for a period of more than fifty years prior to their forcible dispossession on February 1, 1912.

It was further alleged that plaintiffs were forcibly and unlawfully evicted and dispossessed of the lands and improvements on the 1st day of February 1912, by the then duly-constituted authority of the representatives of the United States of America within the territory of the Canal Zone and that the joint owners had not been paid nor received compensation for the property taken from them.

The further allegation was made in the complaint that the lands described as fronting on the Bay of Limon and extending in depth eight hundred feet from the shoreline comprised an area of 228.2 acres and that the fair and average market value of said sea-front area at the time of taking was $298,942; that the balance of the lands described in the complaint as lying contiguous and adjacent to the area having sea frontage at the time of the taking thereof was of a total value of $91,461; that the improvements, including fruit

trees, on Tracts Nos. 1 and 2 were of the reasonable value of $24,500; and that the improvements, including fruit trees, on Tract No. 3 were of the reasonable value at the time of taking of $7,671.50. It was further alleged that the total value of the lands and improvements thereon, as set forth in the complaint, at the time of the taking thereof was the sum of $422,574.50, with interest on said sum at the rate of six per cent per annum from the 1st day of February 1912, and judgment was prayed against the United States of America for said sum. .

Summons was issued by the Clerk of Court and, on December 13, 1941, the acting United States District Attorney filed defendant's motion to quash summons, service, and return.

As previously set forth in the Court's statement herein, counsel for the plaintiffs, who had instituted the suit by mailing the complaint, etc., to the clerk of this court, was in Washington, D. C. There was some delay in the trial of this motion as a result, the case being continued from time to time in order that counsel might properly present the question and be heard.

The motion came on for trial on the 24th day of June, 1942, and, it appearing that counsel for plaintiffs and plaintiffs had attempted informal service on an assistant District Attorney in the Canal Zone and by delivering a copy to an attorney of the Claims Division of the Department of Justice in Washington, D. C., the motion was sustained. The Court might mention in this connection that, assuming that plaintiffs and their counsel were familiar with the history of this litigation, by attempting this informal service they convicted themselves of being incurable optimists.

The case was continued and alias summons awarded, and service was had on same, as the law required.

April 17, 1942, defendant filed its motion that the attorney of record for plaintiffs produce his authority to act in the name of the plaintiffs and to file suit and, in default of same, to dismiss the case.

Again there was delay because counsel for the plaintiffs had no counsel associated with them in the Canal Zone in the practicing of the case, and at that particular time, as set forth in the attached statement, not only were communications slow and uncertain between the Canal Zone and the United States but transportation was also in the same condition.

Counsel for plaintiffs submitted their brief, and, on the 20th day of November, 1942, the defendant appeared by the District Attorney and a special assistant to the District Attorney; the plaintiffs William E. Weigle and C. P. Fairman appeared and testified for the plaintiffs, and this motion was heard and was very promptly overruled on the same day.

The Court, realizing the difficulties of plaintiffs proceeding with the case in the absence of local counsel, made the suggestion as set forth in the Court's statement herein, and local associate counsel appeared.

December 22, 1942, the District Attorney moved the Court for an extension of time to plead, for the reasons and upon the grounds that he was awaiting instructions from the Attorney General of the United States. There was no objection to the motion, and it was sustained and the defendant was given until the 16th day of February 1943, to plead.

February 11, 1943, counsel for the defendant filed a demurrer to the complaint setting forth six grounds, as follows:

"1. That the allegations in said complaint do not show that plaintiffs had legal capacity to sue.

"2. That there is a defect of parties plaintiff.

"3. That the complaint does not state facts sufficient to constitute a cause of action.

"4. That the complaint is ambiguous.

"5. That the complaint is unintelligible.

"6. That the complaint is uncertain."

A voluminous brief was also filed on the same day in support of the demurrer, but only the first ground of the demurrer, as set forth above, was mentioned.

March 9, 1943, plaintiffs responded to defendant's demurrer and filed a brief in support of their response, or answer.

March 19, 1943, defendant filed a reply memorandum in support of its demurrer.

On the same day the demurrer came on regularly for trial. The plaintiffs appeared by associate counsel C. P. Fairman, and the defendant appeared by the District Attorney and Brice Toole, attorney of the Department of Justice, Washington, D. C. The Court heard the argument of counsel and, having in mind an order that it desired to formulate, deferred a decision on same until it could prepare the order. The demurrer was overruled for the reasons stated in the order, and plaintiffs were immediately ordered to prepare and file their amended complaint making parties plaintiff all the parties owning an interest in the land, as set forth in the complaint, not only for themselves but on behalf and for the benefit of all others who might have an interest or claim in the lands described and in controversy. The defendant was given sixty days to plead further.

April 22, 1943, defendant filed a demurrer to the amended complaint, and a memorandum in support of same, the grounds of which were the same as those urged in the demurrer to the complaint.

May 18, 1943, the demurrer to the amended complaint came on to be heard, was overruled, and counsel for defendant then moved that it be given thirty days to file an answer, which motion was sustained.

June 15, 1943, the defendant made another motion for an extension of time to file its answer; there being no objection, it was given until and including June 21, 1943, to file answer.

June 16, 1943, answer was filed controverting all the material allegations of the complaint. Practically all the denials were based on lack of information sufficient to form a belief.

Pursuant to agreement of counsel, the case was continued and set for trial on October 20, 1943; however, on August 17, 1943, by agreement of counsel, the trial was re-set for the 17th day of November, 1943.

Non-resident counsel were notified by the Court that we desired to have a meeting of the attorneys in the nature of a pre-trial conference a week before the trial. We fully expected by doing so to confine the issues, lessen the labors of the trial, and, most important of all, to straighten out the records and the exhibits.

Counsel being present in the Canal Zone, we met with them in Cristobal. After surveying the situation in informal conferences for a day or two, we realized it was a vain hope to dispose of any matters connected with the case until the trial. Nothing was accomplished.

November 9, 1943, counsel for defendant offered an amended answer in which was set forth the decision of the Supreme Court of the Canal Zone in the old case of Villalobos v. Foleston et al., No. 66 which case involved Tract No. 1 in plaintiffs' complaint herein, and pleaded same as res judicata. No reasons were given why this matter should not have been plead long before this nor as to why it should be offered just on the eve of the trial. There can be no question but that the Court would have been clearly justified in refusing to allow the amendment to be filed at that time, but the Court had already concluded that it wanted to dispose of this case and all matters connected with it upon the trial and therefore allowed the amendment to be filed.

November 17, 1943, the case came on regularly for trial and continued through the 17th, 18th, and the morning of the 19th of November. Necessarily, there were frequent recesses for the purpose of allowing counsel to procure, prepare, arrange, and introduce their exhibits. There was oral testimony of only four witnesses. (Evidence in full, Memo. p. 116.)

Upon the conclusion of the trial, counsel stated that they preferred to file written briefs instead of orally arguing the case. Plaintiffs were allowed sixty days to prepare and submit their brief; defendant was given forty days thereafter to file its brief; plaintiffs were given twen-

ty days thereafter to file a reply brief; and defendant was given, if required, ten days to file rejoinder brief. The Court deferred its decision and took the matter under advisement until said briefs could be filed.

January 20, 1944, plaintiffs' brief was filed, and, on February 2, 1944, counsel for defendant moved for further time to file its brief, and the time was extended thirty days.

March 29, 1944, defendant's brief was filed. On the same day defendant filed a motion to strike plaintiffs' exhibits and evidence from the record.

April 10, 1944, defendant filed a supplemental motion to strike certain evidence.

April 15, 1944, plaintiffs filed reply brief, and defendant filed answer to plaintiffs' reply brief on the same day.

April 20, 1944, we stated the situation and the history of the case and asked counsel to brief further. On June 20, 1944, memorandum was filed by counsel for plaintiffs in accordance with the Court's order. (Statement of Court, p. 9)

July 17, 1944, defendant filed a reply to memorandum on behalf of plaintiffs.

It will be observed that the last memorandum, or brief, was filed on July 17, 1944. Long before and since that time this Court, its law clerk and its secretary have been busy going over this record and trying to assemble it and identify it so that the Court could decide the case and give its reasons for its decision.

Situated as we are and knowing that the Court of Claims and other courts are grinding out decisions every day and that possibly the Court had overlooked some decision pertinent to this case, we directed a communication to counsel for both parties stating the situation and suggesting that, if they had additional authorities, we would be glad if they would informally submit same in a letter and that adversary counsel would be advised of any authorities submitted. Counsel for plaintiffs did submit a letter containing some authorities not cited in the brief, but they were not new authorities and, in our opinion, are not necessary to the decision in this case. Counsel for the defendant stated they had no other authorities to submit.

The Court has prepared a statement and a memorandum, which are attached hereto and will be adopted as a part of this opinion and decision by reference only. The memorandum gives a complete, comprehensive, and, we believe, accurate history of the litigation in which the lands in controversy herein were the subject of litigation. Many questions, both as to law and fact, are discussed, and the facts are found and the law decided in said memorandum. The exhibits and the evidence herein are set forth at length and described. The Acts of Congress, Executive Orders, proceedings of the Isthmian Canal Commission, opinions and decisions of Courts, and other pertinent matters are also included in the memorandum, and such matters appearing therein will not be restated again in this opinion except where it may become necessary.

The memorandum has been indexed, and the Acts of Congress, Executive Orders, laws of the Canal Zone, and opinions of Courts have been specifically set forth in said index.

References to the Court's memorandum will be hereinafter indicated in this opinion and decision as (Memo. p. ——).

Defendant's motion and supplemental motion to strike evidence and exhibits from the record of this case has heretofore been overruled, for the reasons stated on page 121 of the Court's memorandum.

The defendant contends that "plaintiff is not a proper party herein." The Court, in overruling the demurrer to the amended complaint and the complaint as amended, decided that the plaintiffs are proper parties, and has no reason to change that decision.

No contention is made in defendant's brief that, after the amendment was filed making all the parties owning an interest in the land plaintiffs, not only for themselves but on behalf and for the benefit of all others who might have an interest in the land, the plaintiffs did not have the right to prosecute this action nor that the Canal Zone Code, t. 4, sec. 138, did not apply to the situation.

Counsel for defendant, in his brief, re-argues the questions involved upon the trial of the demurrer, especially as to the status of the Playa de Flor Land and Improvement Company as to whether it is a de facto corporation and arrives at the conclusion that it is not.

 This Court has stated in its memorandum (memo. p. 113) that the Playa de Flor Land and Improvement Company is a de facto corporation and also a special partnership; however, since counsel is so insistent, the Court will again state that there was a law in effect in the Canal Zone, viz., chapter 2, title 7, of the Code of Commerce, and title 27 of the Civil Code providing for corporations and for special partnerships and that the plaintiffs complied in good faith with every requirement of said law. Furthermore, the Court is of the opinion that the plaintiffs had the right to institute and to prosecute this case, as set forth in the complaint, for the following reasons:

The applicable provisions of the Canal Zone Code, t. 4, secs. 132, 138, and 144, are literal adoptions from the California Code. In that state, long before the adoption of the present Canal Zone Code, the courts of California had decided that the statute authorizing suits against unincorporated associations by their common name recognized an unincorporated association as a distinct legal entity. 3 Cal.Jur. 358.

Where, under a statute, an association is recognized as a legal entity, it has the implicit right to sue in its association name. 7 C.J.S., Associations, § 35 p. 84. See Law et al. v. Crist et al., Cal.App., 107 P.2d 953.

Hansel et al. v. Purnell et al., 1 F.2d 266, 267, is an opinion of the Circuit Court of Appeals for the Sixth Circuit. In it the Court stated that "a voluntary association is a distinct entity, which may sue and be sued in a federal court, and where it has appeared and answered as a defendant it is subject to whatever decree may be entered in the suit."

In the case of Citizens' Loan & Savings Association et al. v. Krickenberger, 46 Ohio App. 228, 188 N.E. 396, in which the situation was very similar to the present one, the Ohio court held that the plaintiff was not a corporation and the only status it could assume was that of a special partnership, and, as such partnership, it could maintain the action, and the plaintiff was not precluded from maintaining an action under the circumstances disclosed by the record.

We have no doubt as to the plaintiffs' right to maintain this action, and we are certain that the Court can properly distribute the proceeds of any judgment to those whose interest may appear and fully protect the defendant from any future action. See Stearns Coal & Lbr. Co. v. Van Winkle et al., 6 Cir., 221 F. 590; Watts et al. v. Vanderbilt, 2 Cir., 45 F.2d 968. (Memo, p. 101.)

Before considering and deciding the issues of the case, we think it would clarify the situation to dispose of some questions and contentions raised by the defendant in its brief.

 It is stated on page 58 of brief submitted by defendant's counsel:

"* * * As the Court is aware, the Harrison-Arosemena map has long been recognized by the courts, and the interested governmental agencies in Panama, as an authentic delineation of the lands it covers. * * *"

In the defendant's reply brief to "Memorandum on behalf of plaintiffs," it is further stated:

"* * * What plaintiff asks the Court to do does violence to the well established rule that ancient documents are proper evidence of the matters therein set out, and this rule is of particular force in a case such as this where the ancient document in question has been relied upon by private parties, the general public, and Governmental Agencies for almost eighty years. The *accuracy of the Harrison-Arosemena map has never before been questioned, and the plaintiff is in no position to question it now* * * *" (Italics supplied.)

There is no evidence in this record to support the above statements, and they are certainly at variance with the history and

record of the map. On the other hand, this map, or plat or plan, has been the sub- ject of pronounced and prolonged conflict. (Memo, p. 106)

| No. 1 Feliciano Villalobos | The basis of the title to this tract is adverse possession of Villalobos. |
| --- | --- |
| Nos. 2, 3 and 4 De la Parra | The basis of these titles is the deed of 1852 reciting 10-year possession. |
| No. 3 José Villalobos | (Included in De la Parra Nos. 2, 3, and 4 above.) The possessory rights of José Villalobos have never been proved. |
| No. 2 Pedro Cerezo | (Included in De la Parra above.) The basis of this tract is same as above, plus the possessory rights of Cerezo. |

It is not difficult to trace the origin of the map and its history from the record of this case. (Memo, p. 25 et seq.)

As stated in the Court's memorandum, there is no record of the appointment of commissioners to make a map and no record of any report as to what they did while making it. But, on September 7, 1863, the representative of the Railroad Company addressed a communication to the President of the State of Panama in which it was stated that a map had been completed of the public lands which the Company had asked to have adjudicated to it. (Memo, p. 29.) Presumably, the map referred to was the Harrison-Arosemena map. There is a total absence of any evidence or even a suggestion that there was a survey made preparatory to the making of a map, but evidently some lines were measured or surveyed. There is not a scintilla of proof that any of the private lands included in the area were surveyed or measured, as the grant and concession required.

The Court's conclusions are that the map substantially sets forth the outside lines of the area of what is known as Lot No. 1, which area included a total of more than sixteen thousand acres. Both plaintiffs and defendant have introduced it in the instant and various related cases, and undoubtedly it has historical as well as geographical evidential value, but we are of the opinion that it is more of a diagram, a plan, or a chart than it is an accurate map.

The Court is of the opinion that, when taken with the other evidence and the record in this case, the map is historically and geographically helpful. For example, the following detached statements were made by counsel for the defendant in his brief:

"The description in plaintiffs' exhibit 7 bears no ascertainable relation to the description in the denouncement and in the claim filed with the map commissioners except that they start at a 'Playa de Flor.' But, according to Dr. Galindo, 'Playa de Flor' covered that whole district, and is so shown on the Harrison-Arosemena map. * * *

"As shown above, the whole area on the northwest side of the Bay of Limon was known as 'Playa de Flor,' *and that whole area is so designated on the Harrison-Arosemena map. * * *

"But the term 'Playa de Flor' could cover all the land on the point northwest of the Bay of Limon as shown on the Harrison-Arosemena map. * * *

"However, as shown above, the entire point northwest of Limon Bay was known as 'Playa de Flor' and was so denominated on the Harrison-Arosemena map. * * *"

Evidently these statements were made without a careful examination of the Harrison-Arosemena map, because it so happens that on all copies of the map, while the colors may be different, there is an exceedingly small spot appearing on the seashore, or beach, which bears the Spanish designation el lugar llamada Playa de Flor, which, translated, means "the place called Playa de Flor (Beach of Flowers)." It is true that there is another area on the map—but not connected with that mentioned above and a considerable distance from the seashore—which bears the designation "Playa de Flor 28 hectares."

The following statement is also made in the brief mentioned above:

"* * * The two instruments then conclude the attempted description 'to the land (place) known by the name of Santa Rita.' Where is the 'place called Santa Rita'? * * *" (Italics supplied.)

An examination of the Harrison-Arosemena map shows that, in a southwesterly direction from the little point designated as "the place called Playa de Flor," there is an area which counsel for defendant evidently overlooked and which bears the Spanish designation el lugar denominado Sta. Rita, which means literally "the place known by the name of Santa Rita."

We believe further that this record shows that there was never any intention on the part of those who prepared the Harrison-Arosemena map to show the quantities, areas, limitations, or boundaries of privately-owned or privately-claimed lands, because the proceedings instituted by the Panama Railroad Company to have the lands adjudicated to it shows conclusively that the Panamanian authorities, after receiving the denouncement of the Railroad

Company, requested that Company to furnish them a copy of the plat or plan the Company had suggested in its denouncement and that they would give public notice of same and that those appearing to claim lands would be required to present title to the property in due form, or present the testimony of witnesses to their claims and, after four months, that the agent of the Company would be informed as to individuals who claimed dominion to the lands situated within the area and as to the documents they might have presented. Furthermore, the proceeding shows that claimants did appear, and their appearance and the evidence they offered was set forth, and that on March 14, 1856, a representative of the Railroad Company was given a full copy of the report of the proceeding showing that thirty-one claimants had appeared and presented their muniments of title or their witnesses.

The whole proceeding was published in the Gaceta de Panama, No. 34, March 15, 1856. This was six years before the date of the Harrison-Arosemena map. The Railroad Company and the makers of that map had before them Claim No. 17 made by Feliciano Villalobos, and the description of the claim is so plain that no one could misunderstand it, to wit:

"17th. Feliciano Villalobos, as the possessor of the land called Playa de Flor, the boundaries of which are: *'By the sea front of Playa de Flor, in all its extension up to los Pescaderitos; and in its depth, a straight line from one to the other extreme to the place known by the name of Santa Rita.'* He has presented the testimony of four witnesses, taken before the Judge of the District of Colon, in December, 1855." (Italics supplied.)

The small area designated on the Harrison-Arosemena map as "the place called Playa de Flor" certainly could not have covered this area, and the makers of the map and the Railroad Company fully understood it.

In our opinion, any marks on that map indicating privately-owned lands are not evidence of the quantities, areas, limitations, or boundaries of such lands, and we fully agree with what was said by the

Court in the case of Morales et al. v. Arcia et al. (Memo, p. 110 et seq.)

In the brief of counsel for defendant the contention is made that the private landholders either caused to be plotted on the map the areas shown there, or that they failed to object to same and therefore they are limited in their claims by the areas designated on the map.

It will be observed that, while setting forth the number of hectares in some designations, the map does not give the metes, bounds, or distances or any other description of privately-owned or claimed lands. In this connection it must be remembered that it was the duty of the Railroad Company to measure these lands and to set forth correctly the areas of same and the limitations and to mark the boundaries, but there is not a scintilla of evidence to show that this was done.

It is also well to remember that the claimants appeared before the authorities of the State of Panama and on or before March 14, 1856, made their claims and furnished their proof, all of which was reported to the Railroad Company. The whole history of this alleged adjudication is set forth in the Court's Memorandum, page 28, et seq.

It will be remembered that the law of 1861 (defendant's exhibit 4), provided that the limits of the individual property would be traced in connection with the titles or other supplemental proof, but when the topographical position of the limits was not clearly expressed in the title or proofs, geometrical lines were to be traced on the map to permit the fixing of posts, fences, or other means of indicating the limitation or boundaries. (Memo, p. 28.)

It then set forth the time within which the map should be completed, where it would be kept for the examination of those interested, and that its purpose was to serve as a basis in all questions which might arise as to land limits. (Memo, p. 28.)

It was further stated that those who did not consider that the property had been traced exactly might appear before the commissioners during a certain period of time, and the commissioners would make

necessary corrections in the map, or plan. (Memo, p. 28.)

There certainly is nothing in this record to indicate that any such map, plan, survey, or measurement of the lands *as provided by the original grant, or as provided for in the law mentioned above,* was ever made, and there is a total absence of proof that those who made the map, chart, or plan, ever at any time made themselves available to any claimant who desired to call the commissioners' attention to any corrections; however, in Morales et al. v. Arcia et al., Civil No. 289 in the Third Circuit, it did appear that a protest had been made by a private land owner and that the same was ignored.

If there was ever anything done by the commissioners subsequent to the making of the map, this record does not disclose it. Furthermore, there is nothing in this record to show who these two men were; the Court does not even know whether they were surveyors, but whatever they did must have been complicated by the conflicting instructions they received, as this record will show.

In the communication of March 14, 1856, referred to, in which the Panamanian authorities transmitted to the representative of the Railroad Company information as to the persons who had appeared and claimed portions of the land which the Company had undertaken to denounce, appears the name of one Geronimo Bracho, Claim 10, whose lands were adjacent to and on the south of the lands involved in this action. His lands were generally described, but no boundaries, acreage, or distances were given in the description by the claimant. The makers of the map indicated the lands on their map by the designation "Rio Indio," and the lands are shown as comprising an area of 2,145 hectares, or 5,300 acres.

Afterwards, a suit was brought about this land, Third Circuit, Civil No. 289, (Memo, p. 111), and the Isthmian Canal Commission and the Panama Railroad Company entered their appearance and litigated the case, and, of course, they contended that the heirs of Geronimo Bracho were only entitled to the hectares or acres shown on the Harrison-Arosemena map.

They were not successful in this contention, however, and the Court, by its judgment, awarded to the heirs of Bracho a much larger area, which included a part of the village of Mount Hope, adjacent to the railroad tracks.

In a case before the Joint Land Commission, Docket No. 276, June 24, 1913, a portion of the land shown on the Harrison-Arosemena map as public lands was claimed by private persons, and the Commission upheld their claim, saying that the negative evidence of the map should not receive the same weight as positive evidence submitted and that, had the surveyors of 1862 been in possession of all the facts, they would undoubtedly have entertained doubt as to whether the lands in question were indisputably public lands, and the Commission took the position that the title to the lands had been perfected by the acts of the Colombian authorities, the decision of the Canal Zone courts, and the principle of prescriptive right. (See Interim Report, Joint Commission, p. 9, appendix Case 53.)

The decision of the Circuit Court of the Canal Zone referred to in the report of the Commission mentioned above was an opinion by Judge F. Mutis Duran, first chief justice of the Supreme Court of the Canal Zone, who was an outstanding authority on Spanish, Colombian, and Panamanian Laws, as this record shows, and who was thoroughly conversant with the history of the Harrison-Arosemena map.

The contention is made many times, and often repeated, in defendant's brief that the description, as shown by the title papers and the complaint herein, is vague and uncertain and that no exact boundaries are given and that the lands could not be properly identified from the descriptions. A sufficient answer to that argument is that the lands have been properly identified for about thirty-five years, and there is absolutely no proof to the contrary. It should be remembered, however, that, although these lands are now within the Canal Zone and under the dominion of the United States for more than three centuries prior to 1904 they had been under the dominion of Spain and other Spanish-

speaking sovereigns, whose systems of laws were entirely different from those of the United States or England, and that this was true in regard to land titles and to conveyances of land. (Memo, p. 3.) It would be unreasonable, therefore, to expect that precision in muniments of title with respect to these lands as would be found in the United States, where there have been surveys made and maps and atlases prepared which accurately fix the divisions of counties, townships, municipalities, and land boundaries of private parties. See Reavis v. Fianza, 215 U.S. 16, 30 S.Ct. 1, 54 L.Ed. 72.

The Court has examined the document referred to above in which the Secretary of State of Panama reported to the Railroad Company as to the thirty-one claimants and the proof submitted by same (Defendant's exhibit 2). In no instance was the quantity of land, nor the calls, courses, or distances mentioned, except in a general way. Furthermore, that report shows the custom long practiced in Spanish-speaking countries of the Western Hemisphere of transferring lands by deeds or title papers only by describing the local name attached to or used when referring to property. The setting forth of the calls, distances, and limitation of boundaries, as applied to conveyances in the United States, was practically unknown to the system of land transfers under the laws of Spain or Latin American countries.

We might add that, after examining the above mentioned report, we have arrived at the conclusion that, of the several descriptions of lands or claimants included in that report, the one by which the land could have been the most readily identified was that describing Claim No. 17 of Feliciano Villalobos, Tract No. 1 in controversy in this action.

The engineer who surveyed these lands was undoubtedly competent. He had long been employed on the Isthmus. He was thoroughly acquainted with the lands on Toro Point Peninsula. He had no difficulty—and no one would have—in finding the points designated in the Villalobos denouncement and the De la Parra title. Both of them stated how far the land extended back from the seashore, and the only possible uncertainty would be the north and the south boundaries.

It is to be remembered that the original claim of the plaintiffs consisted of Tracts 1 and 2, and the remainder of the land involved in this case was acquired at the instance and suggestion of those representing the Railroad Company. (Memo, p. 75.)

This is not an action in ejectment or to quiet title, but it is a compensatory action for taking the land. This is important when it is considered that the sea-front boundary is accurately described and that the sea-front land is by far the most valuable, and this would be the same in any event.

Having surveyed Tract No. 1 first under the circumstances as shown by the evidence, and when the adjoining landholders were there and when the engineer could see the lines that they had established between the lands, he could not go far astray, because he knew he had to run to a place called Santa Rita. After that survey and after surveying Cerezo's land, with his knowledge of the country and with the assistance of the natural objects shown, the only mistake an engineer could have made—since the depth of the land back from the seashore was known—would have been to have gone in the wrong direction or at the wrong angle. The area of the land would be approximately the same regardless of the angle at which the land extended back from the seashore, and this is true as to the De la Parra title.

There are no other claims or titles involved in the action, so that, in any event, the vagueness and uncertainty urged so confidently by counsel for the defendant could prejudice no one.

It has never been claimed that the surveys, as made, conflicted with the Railroad Company's lease to Hyatt to the north or with a purported lease of the Railroad Company to the south. It is somewhat significant that neither the United States nor its predecessors in title ever introduced those leases nor described the lands covered by same.

These lands have been in litigation for thirty-five years, and this is the first time that any contention has ever been made as

to the vagueness and uncertainty of the descriptions; however, contentions have been made that the claimants and their predecessors in title did not own any land, but if they did, that the descriptions included more land than they owned. The latter contention has largely been based on the grants to the Railroad Company and the Harrison-Arosemena map.

We assume that the Court has a right to take judicial knowledge of the fact that, since 1904, the Isthmus and the Canal Zone have been teeming with capable engineers employed by the Panama Railroad Company, the Isthmian Canal Commission, and the Government of the United States, but not one engineer has ever testified that an accurate survey of the lands could not have been made and established by the documents which have been in evidence since the beginning of the litigation involving the lands, and the Court has not overlooked the testimony of defendant's witness Jones, which will be referred to hereafter.

Counsel for defendant, on page 16 of his brief, directs the Court's attention to what he calls the "vague and inconclusive description" as contained and compared in plaintiffs' exhibits 7 and 7–A, also 8 and 9.

If we can understand counsel's contention, it is that these exhibits do not all give the same description. There is however, a very sufficient explanation as to why they do not: Exhibits 7 and 7–A are descriptions contained in deeds executed by the Villalobos family to some of the plaintiffs to what is known as Tract No. 1 in this action. While the descriptions in these conveyances describe the natural objects and boundaries of the land, they are more minute and specific as to the calls and distances. Exhibit 8 is a conveyance of but seven acres of the land, conveyed as mentioned above, by Fairman and Hyatt to Leo Erdwurm. Exhibit 9 is a deed to the same parcel of land from Erdwurm to Edward Bischoff. The parcel of land covered by exhibits 8 and 9 is described in the conveyances exactly and minutely by metes and bounds, and there can be no question about the specific description. This is the same land for which Bischoff brought suit against the plaintiffs to recover the purchase price.

■ While the description given in plaintiffs' title papers may not fully conform to the standards of the United States, we are of the opinion, after considering the situation, the nature of this action, and the custom and usage of the Countries which had sovereignty over these lands until 1904, that they furnish a sufficient description for the lands to be properly identified and valued.

While discussing defective descriptions, it would not be amiss to say that the defendant offered exhibits in this case, viz., the so-called "quitclaim deed" from the Panama Railroad Company to the defendant United States, that does not give any description of the property proposed to be conveyed, also certain leases and conveyances executed to the Panama Railroad Company and the United States in 1911 and 1914 which contain no description which the Court or anyone else could identify as having any connection with the lands in controversy.

■ Counsel for the defendant, in his brief, challenges the accuracy and authenticity of plaintiffs' exhibits 3½ and 4.

Plaintiffs' exhibit 3½ was made by the civil engineer Patterson in 1907 and is a map of the lands known in this action as Tracts 1 and 2.

Plaintiffs' exhibit 4 is a map prepared by an engineer named William Hull and is compiled from surveys made by Hull and Patterson and from all available maps and data. The property lines are as given in the original descriptions.

In the brief it is also stated that these maps have not been published and that they have no intrinsic evidential value.

We agree that maps, surveys, and plats are not necessarily of themselves independent evidence and are therefore to be received only so far as they are shown to be correct by other testimony in any case, furthermore, that ordinarily a map made anywhere at any time is only evidentially valuable when it is proved to be made by one competent to do so and present to verify his work. We also agree that maps should be simple enough to be understood by a plain, ordinary man, and that means not only a delineation of the lands included but

also such full and accurate notes and data as are necessary to this understanding.

As this Court understands the term "published," it means to "make public, to make known to people in general," as well as to publish in a newspaper. If it is meant by counsel for defendant that these maps have never been published in a newspaper or government document of which the Court takes judicial notice, that is true; but the same contention is true with regard to the Harrison-Arosemena map. Nothing in this record indicates that the Harrison-Arosemena map has ever been published in any newspaper or that it has ever been published or adopted in any public document of the United States. Many copies have been made of it, of course, and these copies, as the Court has seen, vary to some extent, but we believe it has been made public and that it is known to people in a general way.

Exhibit 3½ was filed in a court of the Canal Zone almost thirty-five years ago, exhibit 4, about seventeen years ago, and they have remained in the records of the Clerk's Office from that time, unless wrongfully removed with other papers by counsel for the Government in a former case. (Memo, p. 41) No. 3½ has been introduced in all related cases since it was made thirty-five years ago, and No. 4 has been introduced in all the related cases since 1928. The Court is therefore of the opinion that these maps have been made public and that they are known, at least to those who have been interested in the litigation.

So far as the Court has been able to discover from this record, there has never been any testimony offered to disprove that both of these exhibits accurately describe the lands shown on same.

We believe that it would be fair and reasonably safe, in order to establish the evidential value, the verity, and the integrity of these exhibits, to recite the evidence in this record as to the mapmakers and the maps identified as exhibits 3½ and 4 in the instant case.

Mr. Patterson, as heretofore stated, was a civil engineer, and he prepared exhibit 3½. He collaborated with Hull, another engineer, who prepared exhibit 4 from surveys made by himself and Patterson. This map (Ex. 4) included on it notes and data showing what it is and explaining it. Patterson came to the Isthmus in 1905 as an engineer and was employed in that capacity by the Panama Railroad Company or the United States for about eight years. Undoubtedly he was a competent engineer, for the record shows that his qualifications were admitted by opposing counsel in related cases. He was thoroughly familiar with the lands, and his testimony shows that he had made many surveys in the Toro Point Peninsula and the river areas. He was also thoroughly familiar with the locations of buildings or houses on the lands; the villages nearby; the site of old Fort San Lorenzo; the distances, marks, or points and places; the boundaries; the topography; the vegetation which grew on the lands and also the timber thereon; the amount of land under cultivation and the crops growing thereon, and the appearance of the land as to former cultivation or former timberlands.

A reviewing court might have some question as to why one working for the Government or the Railroad Company in 1907 would have made a map for the use of claimants to private lands within the Canal Zone, especially in such a fiercely-controverted matter as this has proven to be. There is some question in the Court's mind as to whether or not there was any controversy at that time; however, the explanation is that it has been the practice and custom in the Canal Zone from the earliest days of sovereignty by the United States for professional employees of the various governmental agencies, when not on duty or when on vacation locally, to accept temporary appointment with private parties. This custom and practice is also true as to the legal profession. Therefore, we have at this bar what is commonly known as the "sundown lawyer," who prepares and practices his cases when not engaged in his regular employment.

Patterson has appeared as a witness in the cases involving the lands in controversy on three occasions.

His first appearance as a witness was in 1908 in the old Circuit Court Case No. 66. What is now identified as exhibit 3½ was introduced and verified by him in that case. The accuracy of the map was not ques-

tioned, but, on the contrary, witnesses were able to identify the lands from same. Furthermore, there was positive and unequivocal testimony that he ascertained the landmarks and the points to start the survey from the description given in the denouncement of Feliciano Villalobos, which was published in the Gaceta de Panama in 1856. Upon that trial Dr. Galindo, a witness for the intervenor, when shown the petition giving the description of the land as it appeared from the denouncement published as mentioned, stated that the map was in accordance with the description.

Patterson next appeared in the abortive trial on January 29, 1910, in the old Circuit Court Case 118, afterwards designated as case No. 1 in the District Court. His qualification was admitted by opposing counsel. He testified in that proceeding as to the Villalobos and Cerezo lands, which he had mapped, being Tracts 1 and 2 in this case. He stated the circumstances of making the map, which was introduced, and described the lands included therein.

He next appeared as a witness in 1928 in the District Court cases 1 and 3 consolidated. Again his qualification was admitted by opposing counsel. He stated at that time that he had been employed by the Panama Railroad Company from 1905 to 1913 as a civil engineer, part of the time as land engineer for that Company, that he knew the parties and those interested in the litigation, and then explained the maps now identified as plaintiffs' exhibits 3½ and 4.

Counsel for the Railroad Company admitted the authenticity and the accuracy of the maps, his only objection being to the method of proving the issues in the case, namely, the title to lands. The objection was overruled, and the Court admitted the exhibits.

The statement is repeatedly made in the brief of counsel for defendant that the Court sustained an objection and refused to let the witness testify when the following question was asked:

"Direct Examination by Mr. Fairman:

"Q. Mr. Patterson, I exhibit to you a document marked Plaintiff's Exhibit No. 7, and ask you to read the description of the land contained therein. (Witness examines exhibit.) I refer you to plaintiff's Exhibit No. 3, being the map prepared by you and ask you to state whether or not the description contained in Exhibit No. 7 is a correct description of the land on this map marked 'property of the surviving heirs of Feliciano Villalobos'? A. It is." (Tr. Nos. 1 and 3, p. 17.)

While there is some confusion in the transcript, not only in this but in all other respects, a careful reading of it discloses that the witness was shown certain exhibits appearing in the case and then asked the question whether or not the descriptions contained in the exhibits were the correct descriptions of the land as shown on the maps which had been admitted in evidence.

When the question was asked, the witness answered without objection, but counsel for defendant did object immediately following a subsequent question and the objection was sustained and counsel for plaintiffs explained the question and the Court undertook to give its reasons for sustaining the objection. As we gather from the explanation in the transcript, the reason was that counsel was asking the witness to say that which it was the duty of the Court to ascertain. The Court stated in part, "You are asking him to state a conclusion which it is the province of the court to say from the facts."

We submit that it was about time someone was going to decide something in the ancient actions. The records show that the Court considering the case never did.

Counsel has also stated in the brief that this ruling of the Court was correct. We can not agree with him. The maker of the map, who was admittedly competent— in fact, it had been admitted in the litigation that he was an expert—was present and testifying. The question was simple and, after all, an engineering or surveying question of fact and not a question of law. Certainly the maker of the map, who was present to verify his work should have been allowed to answer that question.

The Court, in its memorandum and its reasons for overruling defendant's motion to strike, has set forth in full (p. 118

et seq.) the history of the weird proceeding as contained in the transcript of that trial and does not wish to repeat same. The Court is of the opinion that the question asked the witness was proper and that he should have been allowed to answer it, but, in any event, the maps which were identified by the witness are proper evidence in the instant case.

It is stated in brief for the defendant that it is apparent that Patterson made a *gross error* which ignored an applicable law limiting the area that could be acquired by cultivators and did not follow the description of the land as published by Villalobos in 1856, and that the maps are therefore valueless as an aid to the Court in determining the metes and bounds of the Villalobos tract of land.

We have no doubt that counsel has convinced himself of the correctness of his contentions, but he certainly has not convinced this Court that the descriptions of the lands as published in 1856 and as contained in the De la Farra deed were so vague and uncertain that the lands could not be identified, and he has not convinced the Court that the maps identified as plaintiffs' exhibits $3\frac{1}{2}$ and 4 are valueless as evidence in this case, and neither has he convinced the Court that an engineer making a survey should have been familiar with the applicable law limiting the land that could be acquired by cultivators. Not only would an engineer not be familiar with that law, but it can safely be stated that but few of the Isthmian lawyers would be familiar with the land laws applicable and current in this much-troubled and ever-changing country.

In this connection it may be remembered that, in all the cases involving the lands in controversy, the United States and the Railroad Company have never introduced but two expert witnesses as to the laws of Panama, Colombia, and Spain, both of whom are mentioned and quoted from in the brief of counsel for defendant. The first of these, Dr. Galindo, testifying in old case 66 (1908), stated plainly and emphatically that the Railroad Company never did own the lands, because it did not perfect its title in accordance with the laws. The second is Dr. Chiari, who testified in

1943 in the instant case and who stated just as emphatically that no one else except the Railroad Company had ever owned the land after the grant by the Colombian Government and the subsequent proceeding, as offered in evidence by the defendant, adjudicating the lands to it.

It is contended by counsel for defendant that Patterson, when he surveyed the boundaries of the lands as between the different tracts, merely accepted the statements of the parties and made the survey accordingly.

We do not belive the record will support this contention. The natural objects called for in the papers were easily accessible and could be identified and observed, and the distance the lands ran from the sea was set forth. Patterson testified that, when he surveyed the line between Tracts 1 and 2, all the claimants and others were there and showed him the point which they recognized as the dividing line of their lands. He further stated that they had an old boundary line they had cut out and cleared and that he followed the boundary line as it was shown. Practically the same thing occurred as to the survey when he surveyed the line between Tract 1 and the land on the north occupied by Hyatt under the lease from the Panama Railroad Company.

In defendant's reply brief to memorandum on behalf of plaintiffs, it is stated that counsel for plaintiffs would have the Court believe that Mr. Collins waived all objections to the Patterson-Hull map and to the accepting of it as evidence of plaintiffs' title and that it is inconceivable that Mr. Collins would have done such a thing and that he did not do so is proved by the fact that he vigorously defended the Government's interest in cases 1 and 3 as long as he had anything to do with them. It is suggested by counsel that a fair reading of the entire transcript in these cases—not the quoting of a few lines of testimony—would convince the Court that Mr. Collins had accepted the map only as a delineation of plaintiffs' claim and that he had made no admission that the map proved title in plaintiffs, that it was evidence of foundation of title, or that it was admissible for that purpose.

We have read not only the transcript in 1 and 3 but all those of the related cases, not once but many times. We have applied to them all the understanding and the acumen that we possess. We will agree with counsel that Mr. Collins made no admission that the map proved title in the plaintiffs, that it was evidence of foundation of title, or that it was admissible for that purpose; on the other hand, there can be no question, from reading the record, but that he affirmatively stated that he did not object to the accuracy or the authenticity of said maps. Furthermore, we think the record shows that he agreed that the maps were accurate and that they were authentic. Our reason for this statement is that, at the conclusion of the abortive trial of 1928, the following colloquy between Court and counsel occurred:

"Mr. Collins: The defendant would like permission to withdraw its Exhibit M, which is map 60 60-1. In looking it over last Saturday I found an error in there I would rather not have go into any permanent record.

"The Court: There being no objection, defendant's Exhibit M is withdrawn.

"Mr. Fairman: And you will adopt the map of the plaintiff?

"Mr. Collins: Yes, we have admitted your map is O.K." (Tr. 1 & 3, p. 64.)

Having withdrawn his map and having made the statement as quoted above, the Court considering the case and counsel for the plaintiffs were certainly justified in believing and accepting his statement and acting on same, and so is this Court.

The Court will state further that, although these maps have been admitted as exhibits in the related cases, as set forth above, and have been testified to by the witness Patterson, neither before the statement made Mr. Collins in his capacity as counsel for the Railroad Company nor since has a witness been called by the Railroad Company or the defendant United States to show that the maps were not accurate, authentic, or that they did not show what it was claimed they showed, and this in spite of the fact, as stated above, that the Government and the Railroad Company have many competent engineers in their employ and available as witnesses in the Canal Zone. Certainly this was a question of fact susceptible of proof, which would have been more convincing than argument.

The Court has also examined the decision in the case of Johnston v. Jones et al. 66 U.S. 209, Black 209, 17 L.Ed. 117, which has been cited by counsel for the defendant in support of his contentions, and the Court is of the opinion that there is nothing in the case that supports the contentions. The only reference in the whole decision that the Court finds is the following statement:

"The facts disclosed in the testimony show that Allen's map was not itself original and reliable evidence, *and calculation founded upon it was therefore clearly inadmissible.* * * *" (Italics supplied.)

In the instant case the defendant introduced Jones, a civil engineer employed by the Office Engineering Division, Section of Surveys, of the Panama Canal since 1928. Mr. Jones stated that he had not been rated as engineer during all this time, as he had not taken his final degree in engineering until 1932.

We have no hesitancy in saying that we believe Mr. Jones is a competent engineer. The Court has heretofore stated (Memo, p. 129) that, so far as the testimony connected with the evidence in this case is concerned, the evidence he gave was not important and that Exhibit 15 that he offered is very questionable, under the rules of evidence. The Court will, however, again state its reasons for these conclusions.

The witness stated that the documents which he examined were the descriptions in the complaint and the amended complaint herein, which showed the conveyance of the lands at various times, also Document 204, which is a deed of the De la Parra property, to which reference has heretofore been made.

He also stated that, considering the natural objects and measuring the lands accordingly, there would be 197 acres more than if he only considered the calls of courses and distances. (Memo, p. 129.)

This witness stated that he had never been on the land and had never made a survey of the land, but afterwards stated that he had been on the land, presumably not for the purpose of making any survey.

He stated that the exact location of the lands could be found from an actual survey on the ground and that Tracts 1 and 2 had adjacent boundaries and a natural object marking that boundary and that all descriptions in the complaint were hinged upon the plotting of Tract 1, and as much as Tract 1 was off, the other tracts were off correspondingly.

He next stated that he had used the Harrison-Arosemena map to get the natural objects, concerning some of which there could be no doubt.

He then presented defendant's exhibit 15, which was admitted and which has been referred to. (Memo, p. 129.)

When asked by the Court what map he had used in making this calculation he stated he had used the McClure map.

While the Court was interrogating the witness as to what map he had made his calculations from, the following occurred:

"By the Court:

"Q. But you made a calculation from the other maps? A. No, sir, from this map only.

"Q. And also from the Deed? A. Yes, sir.

"Mr. Toole: And he took the natural objects shown on this map which is Defendant's Exhibit 15 for identification, and from the old Harrison-Arosemena, which is in evidence. A. (Continued) I might say that this map, known as the McClure map of 1913, is considered fairly accurate as of 1913.

"Q. What map is that? A. McClure."

It will be observed that at no time in his evidence did he state that he used any map in making his calculations except Exhibit 15, the McClure map, and, further, notwithstanding the attempt of counsel to testify at the time the Court was interrogating the witness, that he at no time stated he had used the Harrison-Arosemena map as a basis for or in connection with his calculations.

The physical appearance of Exhibit 15 indicates that it is composed of two sections of a map which have been placed together on heavy paper and on the map the witness had superimposed lines, letters, and numerals.

The Court desired, in order properly to consider this testimony, to compare the exhibit with the original McClure map, as it assumed that the map was a part of the records of The Panama Canal. We discovered another copy of the McClure map among miscellaneous paper which presumably had been mingled with the record when it was returned to the Clerk's Office at Cristobal after having been removed. (Memo, pp. 41, 42.) We discovered that the map had been prepared in a manner similar to the map offered as Exhibit 15, and undoubtedly had been prepared for the purpose of being offered or used in the trial of civil case No. 772. Upon the map, an engineer by the name of Jones (but not the witness in the instant case) had superimposed certain lines, and it is stated on the face of the map that the lines were plotted from the Harrison-Arosemena map and the records of the Land Office, Ancon, Canal Zone.

After discovering the map among the papers, we requested the witness who had prepared and introduced Exhibit 15 to furnish a copy of the McClure map which did not bear lines or other matters superimposed upon it. He furnished us with the two sections of the map which composed the exhibit, which do not bear the improvisations made by the two engineers on the two copies of the map referred to above, and we have joined the two sections in the original map in the same manner as Exhibit 15 is joined and have attached it and the other copy of the map to Exhibit 15 and marked them "A" and "B" and have considered same in connection with the testimony of the witness and Exhibit 15.

It will be observed on the McClure map secured by the Court that the location of the lighthouse is not shown nor is the lighthouse mentioned. Presumably the witness Jones either arbitrarily placed the lighthouse where he thought it should be or used some other map for the purpose of locating same. It will further be noted that

the lighthouse is not shown on the Harrison-Arosemena map, and the Court is very doubtful that there was a lighthouse there at that time. The location of the lighthouse could have been changed from 1907 to 1943.

The starting point in delineating Tract No. 1 has been described by plaintiffs in deeds and in their complaint as:

"Beginning at a point on the beach or shore of the Bay of Limon, 4254 feet south, 18 degrees, 39 minutes west (magnetic bearings, year 1907) of the lighthouse located at the place called 'Punta Toro', on the west side of the entrance to said Bay of Limon."

At various places in the record the point referred to has been called "Playa de Flor."

In his testimony, C. R. Jones, the engineer introduced by the defendant, stated that calculations based on the McClure map of 1913, heretofore adverted to, showed that a point 4254 feet south, 18 degrees west of the lighthouse was not on the seashore but was some distance inland. He stated that he had made no actual measurements of the land so that if the map were incorrect his testimony would be valueless; or, since the lighthouse is not shown on the original McClure map, if he erred in his location of the lighthouse, his testimony would be valueless; further, the bearing given was taken on a magnetic compass and the witness stated that, in order for him to use it, it was necessary for him to correct it *up to date*. Since the map he was using as a basis for his calculations was made in 1913, it would seem to the Court that the bearing should only have been corrected up to 1913 in order to establish the relative position of the starting point of Tract No. 1.

The witness Jones, as will be seen on Exhibit 15, made several calculations based upon what he called various interpretations made of the descriptions given in the documents which he examined and the landmarks given in the Harrison-Arosemena map, and these interpretations appear to be calculations of the land considered from various angles extended from the seashore. He did not survey the lands and could not have taken into consideration all the facts which Patterson had before

him when he was on the land and was thoroughly familiar with it, viz, that the deed showed the following: In Tract No. 1, the Villalobos lands, the boundaries of the land ran in straight lines back from the seashore to a place called Santa Rita and that in Tracts 2, 3, and 4, the De la Parra lands, the lands were known as Nombre de Dios on the north of the Bay of Limon, the boundaries of which were comprised from Los Pescadoritos to the Morro de Limon in front of Colon, and in depth from those places to the Quebrada Honda (quebrada honda means a "deep brook") three miles in a southerly direction. It is to be considered in this connection that, by custom and usage, the lands were identified by name, and the Harrison-Arosemena map will show an area marked "Lands known as Nombre de Dios." The surveyor on the ground had the advantage of all these facts and could see the situation and the location.

While, of course, there might be some difference as to the angles of the north and the south boundaries of the land, the Court, after examining all the maps has arrived at the conclusion that plaintiffs' Exhibits 3½ and 4 depict the most reasonable and accurate survey that could have been made, considering the landmarks on the sea, the name and the location of the lands, and the distance to the terminals of the land inshore. As stated before, however, this is not a suit to quiet title or in ejectment; it is a compensatory action for the taking of lands, and the lands, as surveyed and as shown on the map, do not conflict with those of any other landholder, and the lines were made and the boundaries were surveyed as set forth heretofore.

Many maps have been introduced in these related cases, but, at the beginning of the trial of the instant case, all of them had been withdrawn with the exception of the Harrison-Arosemena map and plaintiffs' Exhibits 3½ and 4.

It might be noted that the witness Jones, although a competent engineer was never shown Exhibits 3½ and 4 (Patterson and Patterson-Hull maps), was never asked a single question about them, and never testified that they were not correct and did not

conform to the descriptions given in the instruments which he examined.

Counsel for the defendant contends as follows:

" * * * An examination of this map will show a small area colored purple, with the description '40 fanegadas para Dr. Ricardo de la Parra.' It is beyond dispute that this area must have been plotted on the map by de la Parra during the time it was posted as required by law. Otherwise, there would have been no plotting in de la Parra's name. The plot shown on the Harrison-Arosemena map bears no relation to the plot described in plaintiff's complaint, but it serves to show that plaintiff has attempted to expand an area of 40 fanegadas to 2,759.3 acres without even a shadow of foundation of facts or circumstances to justify such a procedure. * * *" (Brief, p. 53.)

The Court can not agree with counsel in this conclusion for many reasons most of which have heretofore been set forth in this opinion as to the Villalobos lands. The Court has been unable to find anything from the proceeding undertaken to adjudicate these lands to the Railroad Company to indicate that it was the duty of the private landowner to plot his lands on the Harrison-Arosemena map; but to the contrary, we do find in defendant's Exhibit 2 where the Panamanian authorities, replying to the agent in connection with the Railroad Company's proposed denouncement of the lands, stated what the Company should do in order to identify and have adjudicated the lands and, specifically, that public notice would be given and the agent of the Company informed as to individuals who claimed dominion to the lands situated in the area the Company was seeking to have adjudicated to it and as to what documents such individuals had presented and then:

"7th. If the Company should recognize the rights claimed, the lands so recognized shall be excepted from the adjudication asked for by said Company. If the claims are not recognized, the question shall be submitted for adjustment to the Tribunals."

Therefore, under the law and by the proceeding thereunder, it became the duty of the Railroad Company to do one of two things: First, to recognize the rights of the claimants, or, second, if the Company did not recognize such rights, to let it be known and to submit the dispute to the tribunals, which meant the courts or some other body that could properly decide the question. If the Railroad Company was claiming these lands, that would have been an excellent time right then and there to have followed the procedure as set forth above.

This record shows that, when the Panamanian authorities reported to the Railroad Company the claims to the lands, the report did not contain any claim for the De la Parra land. Notwithstanding this, however, the makers of the map plotted or planned or placed the designation on the map as set forth above of "40 fanegadas para Dr. Ricardo de la Parra." The question is: How did this happen? Why did they do it?

The Court has arrived at the conclusion that it was done because there was a deed of record showing that De la Parra owned these lands, and the reasons for its conclusions are:

1. Public Document 204, showing the deed and the proving of this deed after the fire in Colon.

2. Certain papers attached to the above document.

3. Other evidence in this case showing registrar's fees paid for recording deeds and that taxes were paid on the lands. (See deposition of Eduard Espinosa G., plfs.' exhibit 41, cases 1 and 3, consolidated, now Exhibit "F.")

4. That De la Parra was well known, as the record will show and as hereinafter referred to.

Furthermore, according to Dr. Galindo (Memo, p. 109), the Colombian Government did not order said plan to be drawn up for the purpose of ascertaining who were the owners of the lands situated in the Canal Zone, because they needed only to apply to the office of record to learn this.

The question might be suggested: If the Panamanian authorities or the Commissioners knew of the existence of the deed, as mentioned above, why did they only include on the Harrison-Arosemena map an area

of forty fanegadas, whereas the deed described a much larger area?

The Court has arrived at the conclusion, which it believes the record supports beyond any question, that this adjudication was more or less an ex parte matter, and, furthermore, that the Commissioners were somewhat confused as to the instructions given to them as to how much land a cultivator or claimant was entitled to and could hold.

Counsel for defendant, in his brief, contends that one claiming title by adverse possession must show that his possession is exclusive and that the cases of Villalobos et al. v. Foleston et al., No. 66 in the old Circuit Court, and Nos. 1 and 3, consolidated, show that there were other people claiming the lands, and therefore plaintiffs' possession was not exclusive, and in this connection, attention is called to the record wherein it is shown that there were conflicting claims also to what was known as the "De la Parra lands."

The record shows that, in the case of Villalobos et al. v. Foleston et al., old case No. 66, the plaintiffs' predecessors in title did, in February, 1908, file an action to quiet title and ejectment in which they alleged that certain named defendants were wrongfully trespassing on their lands without a claim of right or interest therein, and that, in the old Circuit Court case of Cerezo v. Diaz et al., No. 118, which afterwards became District Court case No. 1, the plaintiffs' predecessors in title did bring an action against certain named defendants in which they alleged that defendants were wrongfully trespassing upon their lands and that due notice had been given to them and that the defendants persisted in their trespass. In both cases the ejectment of the trespassers and recovery of damages were prayed for.

It is true that defendants came in and filed some pleadings, but they never offered any proof. That they were trespassers, without any right, title, or interest in the land, is shown by the proof in the record herein. Furthermore, the record shows that the plaintiffs' predecessors in title did everything they could to eject them from the land.

After all, exclusive possession only means that the claimant is holding possession of the lands for himself as his own and not for another. It is true that in some cases it is held that the possessor must hold possession to the exclusion of all other persons, while in other cases it is held that the possession need not be exclusive of all persons but only of the true owner. See Illinois Steel Co. v. Tamms, 154 Wis. 340, 141 N.W. 1011, Point Mountain Coal & Lbr. Co. v. Holly Lbr. Co. et al., 71 W. Va. 21, 75 S.E. 197.

The mere entry of a trespasser or a casual and occasional trespass on the land by a stranger to the title does not interrupt the continuity of adverse possession. See Bloodsworth v. Murray et al., 138 Md. 631, 114 A. 575, 22 A.L.R. 1450, and many cases cited in the annotations of that case, page 1458; also Word v. Colley, Tex.Civ.App., 173 S.W. 629, Glover et al. v. Pfeuffer et al., Tex.Civ.App., 163 S.W. 984.

The proof in this case shows that the plaintiffs' predecessors' title had ripened and was full and complete many years before the trespassing mentioned above.

The following statement is made in defendant's brief:

" * * * There is no evidence as to when the defendants named in Case No. 66 went on the land. However, at least some of them continued to reside there after 1908 when that case was tried. The Court will find in defendant's exhibit 24 in the case at bar, deeds dated in 1911, from Thomas Anderson, John Beach, Zachaniah Bell, Thomas Grant, Francis McPherson and William Russell to the Panama Railroad Company, granting to the company— all the right, title, interest, claim, and demand, whatsoever, in and to all or any part of the land situated within the Canal Zone, which is shown on the Harrison-Arosemena map of 1862 as Lot 1. * * * " (Brief, p. 50.)

Defendant's exhibit 24 does contain quitclaim deeds for land and improvements executed by those whose names are mentioned above. The Court, however, can not say from this record that they are the defendants in case No. 66, because they

have not been identified as the same, and the quitclaim deeds give absolutely no description of the property which they were attempting to convey, except that it is included in Lot No. 1 as shown on the Harrison-Arosemena map of 1862. There is no proof to show that the land they were attempting to convey in the quitclaim deeds was the same land in controversy in case No. 66 as that now known as Tract 1 in the instant matter. It must also be remembered that there were over 16,000 acres in Lot No. 1, but only 518 acres involved in Tract No. 1.

There are also certain short-term leases to the Panama Railroad Company shown in defendant's exhibit 23, and some of the grantees mentioned in the leases bear the same names as shown in defendant's exhibit 24 above. These leases were executed after the quitclaim deeds. The leases in exhibit 23 give no description of the land except "a lot of land at Nombre de Dios." An explanation of these quitclaim deeds and leases will be found in the Court's memorandum, page 129.

This record discloses that, after the attempted adjudication of the lands on Toro Point in Lot No. 1 to the Railroad Company, the Company did nothing to take possession of the lands or to assert its ownership in the lands until forty-one years later, when it filed an answer and cross-complaint and pleas in reconvention in the old case of Cerezo v. Diaz et al., Civil No. 118, afterwards District Court case No. 1, which was on May 19, 1910, although it must have known that the plaintiffs' predecessors in title were occupying and using the lands as their own and undoubtedly knew of the instruments under which they were claiming. However, one can not go through this record carefully and escape the opinion that, from the time the litigation was instituted by plaintiffs' predecessors in title to get rid of the trespassers, those who represented the Company were attempting to use the trespassers to muddy the waters and to complicate the title of the plaintiffs and to confuse the issues of the litigation then pending.

The statements are made in defendant's brief that:

1. The United States claims possession through prior grants to the Panama Railroad Company; and

2. If such grants were invalid, the United States is in possession through the exercise of the power of eminent domain.

The Court agrees that others have been in possession of the lands since the wrongful eviction of the plaintiffs by the Railroad Company, which was in February 1912, but it certainly can not agree that the United States is in possession through the exercise of the power of eminent domain. No such proceeding was ever instituted.

Defendant's brief, page 58, contains the statement:

"* * * But the only authentic record as to what tract was called 'Nombre de Dios' is the Harrison-Arosemena map, and an examination of that document shows that a vast tract of land many times larger than Tracts, 2, 3, and 4, described in plaintiff's complaint, was designated thereon as 'Nombre de Dios' * * * and it has alleged that tracts 2, 3, and 4 comprise 2,759.3 acres. But, as stated above, the Harrison-Arosemena map shows a vast area under the name of 'Nombre de Dios,' * * *"

We have examined the Harrison-Arosemena map very carefully, and we do not believe that it shows a "vast tract of land many times larger than tracts 2, 3, and 4." On the other hand, we think a fair interpretation of the map and of the designation on same as to the lands known as Nombre de Dios would compare very closely with the area set forth in plaintiffs' complaint, viz, 2,759.3 acres. There is a designation on the map that shows all the lands on what might be called the Toro Point Peninsula as only 2,141 hectares, which would be approximately 5,288 acres, and there is indication on the map of other lands, including Playa de Flor and San José and all of the land immediately adjacent to Toro Point.

In the litigation involving the lands in controversy, the courts and counsel for the defendant and its predecessors in title have stated many times that the lands in controversy are tierras baldias. The record shows, as do the dictionaries, that tierras baldias means "unoccupied, vacant lands."

We have examined the Harrison-Arosemena map many times, and we find that there are rather large areas on it which are designated as tierras baldias. But we have also discovered that on that map neither the lands in controversy nor any of the lands in Toro Point Peninsula are designated as tierras baldias.

The engineer Patterson testified, and he has never been contradicted by any proof in this record, that the timber had been cut off these lands and that the lands showed present and past cultivation.

Counsel for plaintiffs in his brief, states that the value of the land taken was $422,-574.50, or, in the alternative compromise basis agreed upon, $350,000.

■ We can not understand this statement, because there is no evidence in this record upon this point, and certainly the Court could not take into consideration any offers of compromise or negotiations about a compromise as to the value of the lands.

It is also stated in plaintiffs' brief that, in the case of Villalobos v. Foleston et al., Civil No. 66, the United States District Attorney filed an intervention petition styled "Revindication," in effect, ejectment.

The statement is incorrect, because there was no United States District Attorney in the Canal Zone until 1912, and the attempted intervention was filed by a Prosecuting Attorney for the Isthmian Canal Commission; furthermore, the attempted intervention was not styled "Revindication."

The further statement is made that the quitclaim deed made by the Panama Railroad Company to the United States of America apparently intended to relate only to the Villalobos lands and not to the De la Parra tracts. (There is no such deed in this record.)

We find nothing in this record to support that statement.

It is stated in plaintiffs' reply brief that the old civil case No. 66 was merely in ejectment and that the Court therefore avoided any decree as to title.

The statement is incorrect. The purpose of the case was not only to eject the trespassers but to establish and quiet title of the plaintiffs, and the Court, in its judgment, granted the relief not only as to ejectment of trespassers but in establishing the title.

■ As we approach the decision of this case, we believe it will be helpful to state that we are of the opinion that, under the concession by the Granadian and Colombian Governments of 1850 and the subsequent adjudicating proceedings and the delivery of possession in 1869, the Panama Railroad Company obtained a fee simple title to all lands within the lots numbered 1, 3, and 5, as shown on the Harrison-Arosemena map of 1862, which were not at that time subject to the claims of title and ownership arising under the Spanish laws or succeeding governments having sovereignty over the lands and that the title or rights so acquired by the Railroad Company removed the lands from any classification as public lands or government lands; furthermore, that after that time such lands or any part or portion thereof were subject to acquisition and ownership by other parties under the law of prescription in force and effect before, at the time, or thereafter. We might add that we find that this statement of the situation was conceded in plaintiffs' brief filed in the old case of 1 and 3 consolidated.

In deciding and disposing of this case, the Court will first consider Tract No. 1, as described in Plaintiffs' complaint as amended.

Feliciano Villalobos, Sr., a predecessor in title of the plaintiffs, on December 4, 1855, instituted a proceeding before the judge of the district in which the lands were situated. This is shown by plaintiffs' exhibit 33. (Memo, p. 126)

The initial document evidencing this proceeding shows that Villalobos stated under oath that he was "proceeding without malice and in accordance with what was necessary and right and to accredit the action and right in him to have adjudicated to him the public lands denominated Playa de Flor," giving a description of same, viz, up to the Pescaderitos on the seashore and with a depth back up to the land known by the name of "Santa Rita," and asked that certain named witnesses be summoned to appear to declare under oath whether it

was true and positive that he had for many years possessed, by purchase from its former owners who had possessed and cultivated it from time immemorial, the land, and whether it was true that he in the same manner had continued to cultivate the land constantly.

The witnesses, four in number, appeared and qualified under the law of the land. All of them stated that the petitioner had owned and possessed the land for many years by purchase from its owners, who had previously possessed and cultivated it from time immemorial, and that Villalobos, the petitioner, had constantly cultivated it.

There is also included in these documents a statement of a vendor of some lands, although not described, to the petitioner Villalobos, which contains the statement that the vendor had sold the land to Villalobos. on September 28, 1854. These documents were obtained from the National Archives of Colombia.

The evidence further shows that this denouncement was published in the official organ of Panama, the Gaceta de Panama, on March 15, 1856; further that, presumably because of the fire in Colon in 1885, the denouncement was republished in the official organ, the Gaceta de Panama, on September 14, 1898.

It is also shown (Defendant's exhibit 2) that, on March 14, 1856, the Office of the Secretary of the Department of Government for the State of Panama, Republic of New Granada, reported to the Railroad Company, pursuant to the Company's proposed adjudication of lands, some thirty-one claimants who had claimed lands in the area included in the Company's denouncement. The seventeenth claim was that of Feliciano Villalobos, and it is stated that he had claimed the lands called "Playa de Flor," which were "by the seafront of Playa de Flor in all its extensions up to Los Pescadoritos; and in depth, a straight line from one to the other extreme to the place known by the name of Santa Rita," and that he had presented the testimony of four witnesses taken before the judge of the District of Colon in December, 1855. This report of the claimants of the lands was published in the Gaceta de Panama, No. 34, March 15, 1856.

Counsel for the defendant contends that the description given in the denouncement of Villalobos in 1855 is different from the denouncement given to the Panamanian authorities in claiming the land in the Company's proposed denouncement.

There was no real difference in the description, because the descriptions named, identified and described the lands; however, when Feliciano Villalobos appeared before the Panamanian authorities considering the adjudication to the Railroad Company, he described the land with more particularity. Certainly the Railroad Company or its successor in title could not complain.

The next question that presents itself is: Were these documents color of title? The proceeding Villalobos instituted recorded his title. (Memo, p. 126.) He followed the claiming of the land and the recording of title by having it published in an official publication. The claimant had to pay the costs and fees incidental to the proceeding, and there can be no question in the Court's mind, from its knowledge of this record, but that this was a somewhat expensive proceeding. There can be no question but that Feliciano Villalobos believed in good faith that he had a title to the property.

A great deal has been said, not only in this but also in related cases, about the above being but the initial proceeding to have the land adjudicated. That may be true, but no law of Spain or of any succeeding government has ever been cited in any of these cases to show that there was any limitation upon the time within which a proceeding for adjudication had to be taken or concluded. There can be no question but that this was color of title. See 2 C.J. 168; 2 C.J.S., Adverse Possession, § 60 p. 580, and many other cases cited thereunder. No authorities have been cited to this Court to the contrary, and none could be.

The next question: Did Feliciano Villalobos and his successors in title claim the lands against the whole world? There can be no doubt but that they did. The record shows it without contradiction.

Did they live on and occupy the lands? All the evidence shows that they did, and there is no evidence to the contrary.

Did they cultivate the lands? The evidence shows that they did, year in and year out, not part of it but all of it, and there is nothing to the contrary.

Was the possession of the property hostile? This record shows that it was, and there is no proof to the contrary.

Was the possession exclusive? The record shows it was, with the exception of itinerants and trespassers and squatters, and the owners were attempting in every lawful way to be rid of them.

Was their ownership and possession notorious? The record shows it was, both by oral and documentary proof, and there is nothing to the contrary.

Was their ownership and possession adverse? The history of this litigation shows that it was, to the whole world.

Did they economically exploit the lands? "Economically exploit," it might be explained, under Spanish law does not have the odium and suspicion attached to it that it does in the United States, as it means "to develop and improve lands, to work or develop mines." There is evidence beyond question that they grew large quantities of vegetables and fruits and sold them in the nearby markets year in and year out, and there is no proof to the contrary.

Was there any violence, concealment, or interruption? There certainly was not until 1912, when the plaintiffs were forcibly evicted, and the record so shows.

 The Court is of the opinion, and so holds, that all of the collective facts necessary to prove adverse possession are shown in this record, viz, there was actual possession; it was open, notorious, and visible; it was selfish and exclusive; it was hostile, not only as against the Panama Railroad Company but against the world; and it was a definite possession, marked by the descriptions in the documents mentioned above, which were color of title; in addition to that, the natural boundaries were defined.

The Court is not unmindful of the insistent contention of counsel for defendant that Feliciano Villalobos, Jr., a grandson of Feliciano Villalobos, Sr., indicated to the surveyor where to make the survey; but this contention is not in accordance with the evidence. On the other hand, the witness stated plainly and unequivocally that the surveyor who made the survey got the starting points from the Gaceta de Panama. On cross-examination, several attempts were made to get him to say that he indicated where the survey had been made, and he again stated plainly that he read the description in the Gaceta de Panama to the surveyor and that the surveyor made the boundary lines. See transcript of evidence, old Civil case 66.

Beginning on page 34 of defendant's brief, counsel for defendant undertakes to summarize the testimony offered in old case 66, but this Court is of the opinion that the summary does not fairly summarize the testimony, because it leaves out some very important facts which were proved beyond any question.

Counsel for defendant was certainly mistaken when he stated in his brief that the witnesses Antigua, Lino, and Eufracia Villalobos could not identify the lands claimed; on the other hand, they did identify them and told of the natural objects and boundaries and identified the lands on the map. Further, the statement that it was utterly impossible to know what area of land Antigua Villalobos meant is certainly not accurate, because she gave a very comprehensive description. In fact, all the witnesses showed they knew all the lands and could describe them, and the witness Melendez identified the lands on both the Harrison-Arosemena and the Patterson map.

Antigua, Lino, and Fulgencio Villalobos (age sixty-one, forty-four, and forty-two respectively), all testified that they were children of Feliciano Villalobos, Sr.; that they were born on the land and had lived there since birth; and that, during their residence on the lands, the lands had been continuously under cultivation. All of them could describe the lands and did identify them on the map. All of them swore that the family had always claimed the lands, cultivated, occupied, and used them within their memory.

Antigua Villalobos, sixty-one years old when she testified in 1908, stated that she had been born on the lands and that her parents and her brothers lived on the lands always; that they planted and harvested coconuts and other products, and took them to Colon to sell; that her father died in 1871 and left five children, but only three of them survived at the time she testified, and that all of them had been born on the lands; and that no one had questioned their title to or ownership of the lands. Her testimony clearly shows that she knew the natural objects that bounded the lands, and she indicated on the map the location of the lands. She stated she did not know how long her father had been on the lands prior to her birth. She further stated that her father had made a will, which was sent to Bogota, came back before his death but was burned in the Colon fire in 1885, that she saw it, and it was read in the office in Colon and that they had to pay one hundred dollars in connection with the will. She stated her father cultivated all of the land.

All of these witnesses testified that trespassers had come on their lands and told what efforts they had made to get them off of same.

Eufracia Villalobos was a daughter-in-law of Villalobos, Sr., and at the time she testified she had lived on the lands for thirty-years and was forty-eight years old. She stated that all of her children had been born on the lands and her husband worked on the plantation. She had known Villalobos, Sr., and knew his children.

Feliciano Villalobos was twenty-nine years old and a grandson of Villalobos, Sr., and he testified that the whole family had lived on the lands for years and years and worked the lands; that he had assisted the engineer surveying the lands and that the point upon which the engineer started the survey had been taken from the Gaceta de Panama. He stated that he knew the limits and boundaries of the lands, the locations of same, and identified same on the map. He described their trouble with trespassers and what steps had been taken to get rid of them and that the trespassers had been given written notice. He told of the crops grown on the lands and where same were marketed.

The witness Pedro Cerezo was sixty-eight years old when he testified. He stated that he had been born in the village of Chagres; had lived at Playa de Flor for forty years; had known Villalobos, Sr., and knew that Villalobos had lived at Playa de Flor and that they had settled the country; that he knew all of the Villalobos children, because all had been born on the lands in question.

The witness Jean Gris testified that he had lived in the city of Colon for twenty-nine years; that he knew the Villalobos family and had known them since 1879 and knew that they lived at Playa de Flor because he often went there to hunt and always went to the house; that he knew other people occupied lands adjoining the Villalobos lands; that he did not know the boundaries of the land, but he did know that the Villalobos family brought hundreds of coconuts and other produce to Colon to sell.

Governor Porfirio Melendez testified that he had been born in Panama, lived in Cristobal, was fifty-four years of age; had known Villalobos Sr. and knew that he resided with his family at a town called Playa de Flor and had lived there all the time; had known Villalobos, Sr. since 1868, and before, and knew that he had a shanty on the beach but the farm was on the other side; that he had been on the property a hundred times, more or less, and indicated on the map that the house was between Playa de Flor and Los Pescadoritos. He referred to Santa Rita, was thoroughly familiar with the property which was described and had been there and that the Villalobos family was then living there. He stated that he did not know how much land was under cultivation but that there was a good deal of land being cultivated; that many other people had land in that vicinity, but none of them was cultivating the Villalobos lands. When asked by the Court if the cultivation began right on the seashore, whether it was all together or in patches Melendez testified that the coconut trees were in the same place but that the Villalobos family would plant something here one year, the next year something else, put bananas in a particular location one year

and the next year or so plant grass, and things were in different places.

There were two or three other witnesses who testified at that time, but their only testimony was as to the marketing of the crops and the notoriety of the ownership of the lands, which was proper testimony for this purpose.

There was no evidence contrary to any of the evidence as stated above, and the Court is not only of the opinion that it proved a prima facie case of adverse possession but a very strong case of continuous adverse possession, considering all the elements necessary to prove adverse possession. This would even be true if there were no color of title in this case, which there is.

Now when you consider that the plaintiffs' predecessor in title, Feliciano Villalobos, had a paper title, one which he had given notice of possessing on many occasions and which stated that both he and his vendor had occupied and cultivated the lands since time immemorial, and, according to the proof in this case, that he and his successors in title had lived on the lands and claimed them since 1847, a period of sixty-one years, could there be a stronger case of adverse possession? We think not.

The Panama Railroad Company, when it received its concession and grant of land in 1850, must have known of the occupancy of the Toro Point lands. Certainly in 1855 the Company had public notice of the claims of Villalobos, and in 1856 it received further notice. In any event, it certainly had notice from the time that it says the lands were finally adjudicated in 1869. But it never made a move, never undertook to possess itself of the land, never made any claim to the lands until 1910, and that is forty-one years from the time that it is said the lands were finally adjudicated to the Railroad Company.

There is another thing that is very significant in this case and which shows that the Railroad Company had notice: Long before 1910 the Railroad Company had leased to Hyatt and the Caribbean Coconut Company lands adjoining and north of the lands in controversy, and it also claims to have had a lease on the south of same, but it never undertook to lease the lands in suit before 1910. It is to be remembered that the Railroad Company had a line of railroad across the Isthmus and a terminal not over a mile and a half from these lands.

As heretofore stated in this opinion, the defendant United States interposed by amended answer a plea of res judicata as to the Feliciano Villalobos lands known in this action as Tract No. 1, a history of which will be found in the Court's memorandum, page 49, et seq.

Perhaps it would have been better to have disposed of this plea of res judicata in the Court's memorandum rather than to have prolonged the opinion. We believe, however, that, since the Attorney General has permitted this plea to be injected in this long-delayed case and assuming that the premises on which it is based are not known, this plea should be considered clearly in this opinion in order that any reviewing court and counsel might understand this Court's action on same and the reasons for its action.

Before considering this plea, we will state the way and manner in which the pleas have been asserted:

The first pleading filed on behalf of plaintiffs in which an interest in Tract No. 1 is claimed was on February 16, 1922, in civil case Nos. 1 and 3, consolidated. The parties to the action at that time and until 1934 were the Playa de Flor Land and Improvement Company and the Panama Railroad Company. The United States was not a party and was vigorously opposing an attempt to make it a party; on the other hand, the Panama Railroad Company was just as vigorously urging that the United States was a necessary party.

The first mention we find of this plea is in the answer filed by the Railroad Company on February 16, 1928. This was the answer that they finally interposed after being in default for six years.

The Panama Railroad Company was not a party to the Villalobos case of 1908 (No. 66).

The plea was again urged on April 9, 1936, in civil case No. 772, and it was interposed for the third time in the present action filed in an amendment to the answer on November 9, 1943, just before the trial.

All of the pleas have set out that the case was dismissed, but none of them pleads that the dismissal was on the merits.

The plea is based and bottomed on the following: February 13, 1908, an action was instituted in the Circuit Court of the Third Judicial Circuit of the Canal Zone wherein Lino Villalobos and other heirs of Feliciano Villalobos were plaintiffs and Henry Foleston and others were defendants. The action was to eject the defendants, who were alleged to be trespassing on the lands, and to recover damages, also to quiet title to a tract of land consisting of 518.6 acres on the west shore of the Bay of Limon. The case remained on the docket for quite awhile and was finally set for trial. The day came, and the prosecuting attorney for the Canal Zone, an appointee of the Isthmian Canal Commission, who was also counsel for the Panama Railroad Company, filed the following motion:

"Comes now the United States of America, and moves the Court for leave to file a petition in intervention * * *"

The motion was evidently sustained, because three days later the prosecuting attorney filed a petition in intervention which stated in part:

"Comes now the United States of America, by its attorney G. M. Shontz, and prays to be allowed to file this its bill of intervention and become a party to said action for the purpose of protecting the title and rights of ownership of the United States of America to the land mentioned and set forth in plaintiffs' complaint. * * *"

The intervenor's petition alleged that the lands were public lands and that title was in the Government of Colombia, then in the Government of the Republic of Panama, and then in that of the United States of America by virtue of the Treaty of 1904.

The prayer of the petition was as follows:

"Wherefore, your intervener prays the Court that it be restored to the full possession of all the aforesaid premises, and that all proceedings by both the plaintiffs and the defendants be stayed."

The petition was signed by G. M. Shontz, attorney for the United States of America, intervenor.

Plaintiffs answered the intervenor's petition and denied each and every allegation of same.

The trial of the case was evidently continued until the 26th of August 1908, when the evidence of the plaintiffs was heard. At the close of plaintiffs' case the defendants and the intervenor moved for a nonsuit, which was denied. The defendants declined to, and did not, offer any evidence. Counsel for intervenor stated to the Court, however, that he had a witness who was not present and asked that the trial be adjourned until he could offer the witness.

September 10, 1908, the witness was presented to the Court and proved to be Dr. I. Galindo, who was another attorney for the Panama Railroad Company and also an advisor for the Isthmian Canal Commission. Briefs were filed by the plaintiffs and the intervenor; the defendants filed none.

May 6, 1909, the Court delivered a written opinion and findings of fact and conclusions of law which decided and disposed of every question involved in the litigation in favor of the plaintiffs. The intervenor only objected to the findings of fact and conclusions of law.

May 20, 1909, both intervenor and defendants filed motions for a new trial.

May 24, 1909, the decree was filed ejecting the trespassers and awarding damages against them and fixing and quieting the title of plaintiffs. There was no objection to this decree by either party and leave was given to the intervenor and defendants to withdraw their motions for a new trial, which was done.

On the same day oral motion for appeal was made in open court by both the defendants and the intervenor. Subsequently, the plaintiffs and appellees filed a motion to dismiss the appeal and affirm the judgment, and briefs were filed by the plaintiffs and the intervenor upon the motion. The motion was overruled.

The evidence offered on behalf of the plaintiffs showed plainly, unequivocally, and without any contradiction that the plaintiffs and their ancestor in title had claimed and had been in open, notorious, and peaceful possession, without conceal-

ment, violence, or interruption, of the lands involved in the action and now involved in the instant action as Tract No. 1, for a period of more than sixty years; and that they had been cultivating all the land through the years and marketing the products grown on same consisting of fruits and vegetables, in the market town of Colon.

July 15, 1909, counsel for the alleged intervenor moved that the record of the Court be changed with reference to his withdrawal of motion for a new trial, and for a ruling on the motion for a new trial. If any action was ever taken by the Court on this motion there is no record of it, but the brief of counsel for the alleged intervenor in the Supreme Court indicates that it was overruled.

November 10, 1910, the Supreme Court delivered an opinion and reversed the case and stated that the trial court's decision was error for the reason that the evidence was "far from that clear, convincing, and conclusive character which the law contemplates."

The concluding paragraph of the opinion is as follows:

"* * * It is, therefore, ordered, adjudged, and decreed that the decision of the trial court in overruling the motion made to dismiss the action at the close of the evidence offered by the complainants be and is reversed, and that the cause is hereby dismissed with judgment against the complainants for all the accumulated costs. * * *"

This is the opinion which the defendant contends is res judicata of the question of title as to Tract No. 1 in the instant action. That this contention can not be sustained seems obvious, as will be shown by the following.

 The United States was not a party to the action, and it was not an adversary action as to the intervenor, and the United States would not have been bound by any judgment rendered, for the following reasons:

The Attorney General is charged with the conduct of legal proceedings on behalf of the United States, therefore no one except the Attorney General, or someone acting by his authority, can appear for the Government in any civil or criminal case or enter the appearance of the United States under any circumstances.

The alleged attorney for the United States in the intervention proceeding was a prosecuting attorney for the Canal Zone, an office created by the Isthmian Canal Commission, as follows:

"Sec. 39. The Commission shall appoint a prosecuting attorney for the Canal Zone, who shall be stationed at the seat of Government on the Canal Zone, and shall act as legal adviser for the Governor of the Canal Zone; he shall have charge of the interests of the Commission and the Government of the Canal Zone in all litigation in the courts of the Canal Zone or the Republic of Panama; he shall act as prosecuting attorney in all criminal cases in the courts of the Canal Zone; and shall perform such other services consistent with his employment as may be required of him by the Governor of the Canal Zone or by the Commission. He shall hold said office during the pleasure of the Governor of the Canal Zone. His salary shall be three thousand, six hundred ($3,600) per annum, payable monthly. During his term of office he shall be furnished a dwelling house or apartment, or in lieu thereof a sum of money equal to eight per cent (8 per cent) of his annual salary, at the option of the Commission.

"Sec. 40. The prosecuting attorney of the Canal Zone shall have authority, subject to the approval of the Governor of the Canal Zone, to appoint deputy prosecutors, not to exceed one for each judicial circuit of the Canal Zone. The salary of a deputy prosecutor shall not exceed twelve hundred dollars ($1200) per annum, payable monthly, and they shall hold their office during the pleasure of the Governor of the Canal Zone." Laws of the Canal Zone, Act No. 1, p. 12.

The prosecuting attorney was not appointed by nor was he an employee of the Attorney General or the Department of Justice. That he was the attorney for the United States and had the right and authority to intervene for the United States was denied by the plaintiffs.

The Court certainly should have taken knowledge of the laws of the United States and the decisions thereunder, and the enactment of the Isthmian Canal Commission, and therefore should have known that the prosecuting attorney had no authority to represent the United States, to enter its appearance, or to bind the United States in any way.

It is well established by the opinions of the courts that authority to appear in litigation and to subject the United States to the jurisdiction of a court must be clearly shown. See Carr v. United States, 98 U.S. 433, 25 L.Ed. 209; United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Stanley v. Schwalby, 162 U.S. 255, 16 S.Ct. 754, 40 L.Ed. 960; Stanley v. Schwalby, 147 U.S. 508, 13 S.Ct. 418, 37 L.Ed. 259; Hussy v. United States, 222 U.S. 88, 32 S.Ct. 33, 56 L.Ed. 106; Sutherland v. International Insurance Company of New York, 2 Cir., 43 F.2d 969; Booth et al. v. Fletcher, 69 App. D.C. 351, 101 F.2d 676; Calhoun County, Fla., v. Roberts, 5 Cir., 137 F.2d ·130; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171.

The above cited cases show beyond any question that the United States could not have been a party by that attempted interventon nor could it be bound by it.

The record shows that, after this attorney had walked into court and stopped the trial of the case and attempted to intervene and to enter the appearance of the United States and alleged in his pleading that the Panama Railroad Company never did own the lands and then produced another attorney for the railroad as his expert witness on Spanish, Colombian, and Panamanian law to prove the Railroad Company had never owned the lands because they had never been adjudicated to it, the seriousness of the situation he had created must have been called to his attention, because such an action would seriously jeopardize the interests of the Railroad Company and the Government of the United States (the owner of the railroad) in the lands, not only in the Canal Zone but also in the Republic of Panama, received under the grant and adjudicated to it. Therefore, when the case was pending

in the Supreme Court, we find the attorney disclaiming in his brief any idea of entering the appearance of the United States, as follows:

"* * * The intervener was not coming into court asking that plaintiffs and defendants, or any of them be ejected, but it did ask that all proceedings concerning its property be dismissed, which is all it should have done; in other words, it was an intervention by way of suggestion of interest in the Government of the United States, a Government which cannot be sued without its express consent, which consent can only be given by the Congress of the United States. No action can be brought against that Government or its property without such consent * * *.

"* * * The suggestion of this interest in the government was not made by the attorney for the intervener because of any idea of his that any act of his would, in any manner, be binding upon the United States, but purely for the purpose of informing the court as to the true state of affairs and to offer to the court all the information he could in regard to the same.

"* * * It must be plain, from the decisions above cited, that *no one acting for the government could bind it without the proper authorization by Congress, which as to property rights and interests of the United States Government in the Canal Zone* has never, as yet, been granted. This is, of course, as true in this court as it was in the lower court and the remarks and citations here made are, likewise, made entirely for the purpose of submitting to this court a few of the many decisions and authorities bearing on this question.

"Should Congress adopt a method of disposing of the public lands in the Canal Zone, or grant permission for the government to sue or be sued respecting the same, we are aware of nothing which has been done that could be pleaded as an estoppel, to any action directed to be instituted, or permitted to be instituted against the government. * * *" (Italics supplied.)

There is no identity of parties. The United States was not a party in the Circuit Court nor in the Supreme Court of the Canal Zone in the case of Villalobos

et al. v. Foleston et al., Civil No. 66, and, of course, in order to sustain the plea of res judicata, the judgment must have been rendered in an action between the same parties, or between those in privity with them, and the defendants in that action were certainly not in privity with the United States.

The Supreme Court of the Canal Zone had no jurisdiction of the subject matter and therefore no right to enter a judgment or to order a judgment in the premises.

We will not set forth the law as to the jurisdiction and the procedure of the Supreme Court.

The Supreme Court was created and its jurisdiction defined in Act No. 1 of the Isthmian Canal Commission, and there appears in Laws of the Canal Zone, page 4, the following:

"Sec. 8. (Jurisdiction of the Supreme Court.)—The jurisdiction of the Supreme Court shall be of two kinds:

"1. Original; and,

"2. Appellate.

"Sec. 9. (Its Original Jurisdiction.)— The Supreme Court shall have original jurisdiction to issue writs of Mandamus, Certiorari, Prohibition, Habeas Corpus, Quo Warranto, in cases warranted by the principles and usages of law, and to hear and determine controversies thus brought before it, and in other cases provided by law. Said writs may be granted by any justice of the Supreme Court in all cases where they might be granted by the Supreme Court.

"Sec. 10. (Its Appellate Jurisdiction.)— The Supreme Court shall have appellate jurisdiction of all actions and special proceedings properly brought to it from the Circuit Courts and from all other tribunals from whose judgment the law shall specially provide an appeal to the Supreme Court."

The Code of Civil Procedure of 1907 provided for procedure in the Supreme Court, as follows:

"Sec. 533. General procedure in the Supreme Court.—The Supreme Court may, in the exercise of its appellate jurisdiction, affirm, reverse, or modify any final judgment, order, or decree of a Circuit Court, regularly entered in the Supreme Court by bill of exceptions, appeals, or writ of error, and may direct the proper judgment, order, or decree to be entered, or direct a new trial, or further proceedings to be had, and if a new trial shall be granted, the court shall pass upon and determine all the questions of law involved in the case presented by such bill of exceptions and necessary for the final determination of the action.

"Sec. 534. Hearings confined to matters of law, with certain exceptions.—In hearings upon appeals, in civil actions and special proceedings, the Supreme Court shall not review the evidence taken in the court below, nor re-try the questions of fact, except as in this section hereinafter provided; * * *.

"1. * * *

"2. If the excepting party file a motion in the Circuit Court for a new trial, upon the ground that the findings of facts are plainly and manifestly against the weight of evidence, and the judge overrule said motion, and due exception be taken to his order overruling the same, the Supreme Court may review the evidence and make such finding upon the facts, and render final judgment, as justice and equity require. But, if the Supreme Court shall be of the opinion that this exception is frivolous and not made in good faith, it may impose double or treble additional costs upon the excepting party and may order them to be paid by the counsel prosecuting the bill of exceptions, if in its opinion justice so requires."

Now, it will be remembered that the record shows that the intervenor and the defendants filed a motion for a new trial, and in the motion it was stated that the findings of the Court were contrary to the evidence in many particulars and various questions were raised as to the evidence and the effect of the evidence and the admissibility of the evidence, *but they withdrew their motions*.

The exceptions to the findings of the court, which were the basis of the appeal, followed the motion and reasons for a new trial in almost every particular.

The defendants did not file a bill of exceptions but adopted the intervenor's bill.

It will be observed from the statutes quoted above that the Supreme Court had original jurisdiction and appellate jurisdiction, but the action did not come within the purview of its original jurisdiction. It was, however, a case in which the Supreme Court had appellate jurisdiction, but it could not exercise that jurisdiction and had no right to review the evidence taken in the court below nor to re-try the questions of fact unless the excepting party had filed a motion in the Circuit Court for a new trial upon the ground that the findings of fact were plainly and manifestly against the weight of the evidence and the judge of the Circuit Court had overruled the motion. As there was no motion and reasons for a new trial, which, of course, prevented the judge of the Circuit Court from having an opportunity to pass or rule on same, the Supreme Court therefore had no jurisdiction to review the evidence in the case.

It has long been settled in jurisdictions having statutes similar to those of the Canal Zone that errors occurring during the trial of a case can not be considered by an appellate court unless a motion for a new trial, founded upon and including such errors, has been made by the party complaining, presented to the trial court, and by it denied. In other words, the trial court has a right to pass on the question before appeal. See 4 C.J.S., Appeal and Error, §§ 352, 353, pp. 770, 775, and cases noted thereunder from many jurisdictions.

After this attempted appeal and while the case was pending in this Supreme Court of the Canal Zone, the plaintiff appellees filed a motion to dismiss the appeal upon the grounds stated above, and filed a brief supporting said motion. In the brief the Court's attention was called to the statute involved and that same was taken verbatim from the code in force in the Philippine Islands. Opinion after opinion of the Supreme Court of the Philippine Islands construes this statute and holds that the motion for a new trial is necessary to give the appellate court jurisdiction. There are many of these cases, and they cover every situation and every possible contention that could be made.

The brief also contained a construction of the courts of last resort in many jurisdictions, also of the United States Supreme Court cases reviewing state court opinions.

The attorney for the alleged intervenor filed a response and reply to plaintiff appellees' motion and a brief in support of same. We have examined it with a good deal of interest and curiosity.

Not a single authority nor a sensible contention was made as to why plaintiffs' motion should not be sustained; on the other hand, the response shows that counsel for the intervenor propounded the following questions and made the following statements:

"* * * What did the intervenor want with a new trial? It had taken no part in the plaintiffs' trial in the first place, why then should it have asked for another trial * * * A motion for a new trial may be made upon newly discovered evidence or when one party to the suit believes the findings are against the weight of the evidence. This the intervenor did believe, and still does, but a new trial could in no manner have changed it when the intervenor never had any interest in what the plaintiffs attempted to establish as facts. * * * Another trial might only have added to the confusion, conflictions and erroneous findings and conclusions which had already crept into the case.

"* * * The intervenor had no desire for another trial in this case, and the code under which we are now practicing does not require one to be asked for, if the appealing party does not rely on the facts to set aside the judgment appealed from. * * *"

The Court considers the above quoted response only the flamboyant assertions of counsel trying to bluff his way through, which he did.

Regretable as it may be, however, after counsel for the plaintiffs had called the Supreme Court's attention to the law so specifically and comprehensively, the court absolutely ignored it and gave no reason or excuse for so doing; on the other hand, it was as dumb as the proverbial oyster.

A short time after this the personnel of the Supreme Court was changed, and, in the case of Camors and Company v. Gris,

decided February 26, 1913, 2 Canal Zone 176, we discover that the court decided plainly and emphatically that that court would not review evidence taken upon trial in any case nor re-try questions of fact if the appellant had not filed in the court below a motion for a new trial on the ground that the findings of fact were plainly and manifestly against the weight of the evidence.

The Court could very well rest its rejection of this plea upon what has been stated above, but we will go further.

 There was never any judgment entered pursuant to the Supreme Court's directions.

The Code of Civil Procedure of 1907, in force and effect during the time of the pendency of this case, provided as follows:

"Sec. 543. Certificate of judgment to be remitted to the Circuit Court.—In all cases heard by the Supreme Court on bills of exception, its judgments shall be remitted to the Circuit Courts from which the actions respectively came into the Supreme Court; and for this purpose it shall be the duty of the clerk of the Supreme Court, within ten days after the close of any term, to remit to the clerks of the Circuit Courts, notices of all judgments of the Supreme Court in actions brought from the Circuit Court respectively. Upon receiving the notice so remitted, the clerk of the Circuit Court shall enter the same upon his docket and file the notice with the other papers in the action.

"The judgment so remitted shall be executed by the Circuit Court in the same manner as though the action had not been carried to the Supreme Court. But the Supreme Court may, by special order, direct any particular judgment to be remitted to the proper Circuit Court at any time, without waiting for the end of the term."

The Court has carefully examined the minutes and the docket entries and can find nothing to indicate that any judgment was ever entered by the Circuit Court pursuant to the opinion. Nothing was ever done in the Circuit Court, except that a copy of the opinion was filed. Presumably the case lingered on the docket without any order whatever until April 11, 1912, when

only the cryptic word "settled" appears. This was a short time after the Panama Railroad Company had filed a suit in the Circuit Court, No. 423, afterwards designated as District Court case No. 3.

Therefore, there was no judgment but only an opinion, and the opinion of a court will not support a plea of res judicata; the case must go to a judgment or decree. See Ashton v. Heydenfeldt, 124 Cal. 14, 56 P. 624; Raun v. Reynolds, 18 Cal. 275, 290; Cowdery v. London & San Francisco Bank, 139 Cal. 298, 73 P. 196, 96 Am.St.Rep. 115; Department of Water & Power of Los Angeles v. Inyo Chemical Co., Cal.App., 100 P.2d 822.

 A judgment of reversal is never res judicata unless the appeal court expresses the intention finally to decide the case on its merits, and certainly there was no decision on the merits of this case by the appellate court. See 33 C.J. 774, 889; 48 C.J.S., Intoxicating Liquors, § 371, p. 547; Joint Stock Companies, § 21, p. 890, and many cases cited thereunder.

 A judgment to be res judicata must be on the merits of the case. Judgments of dismissal or non-suit are not sufficient to sustain the plea, because they do not constitute any final conclusion of the merits of the litigation. This is necessarily true, for were the rules otherwise a party might be precluded by some technical, trivial defect. See Dickson v. Taylor, 129 Okl. 191, 263 P. 1102; Armstrong v. County of Manatee, 49 Fla. 273, 37 So. 938; Robb v. New York & Cleveland Gas Coal Co., 216 Pa. 418, 65 A. 938; Phillips v. Phillips, 119 N.J.Eq. 497, 183 A. 222; Schnerb v. Caterpillar Tractor Co., 2 Cir., 24 F.2d 377; Lehigh Valley Railroad Co. v. Quereau, 2 Cir., 289 F. 767; Ploxin v. Brooklyn Heights R. Co., 2 Cir., 261 F. 854; Homer v. Brown, 57 U.S. 354, 16 How. 354, 14 L. Ed. 970; Gardner v. Michigan Central Railroad, 150 U.S. 349, 14 S.Ct. 140, 37 L.Ed. 1107.

 As a further reason why the decision is not res judicata, an examination of it shows that the issue of title was not decided by the Supreme Court. See Villalobos v. Foleston, 2 Canal Zone 34. On page 37 is found, "The evidence offered by plain-

tiffs in support of title was far from that clear, convincing, and conclusive character which the law contemplates." On page 40 is found:

"* * * Many and diverse questions were raised and presented at length in the elaborate and well-prepared briefs of counsel. Argument was offered by litigants, including the intervener, the United States Government, as to claim and interest of each in the premises; likewise the question of acquiring title by prescription as against the government; also the action of complainants in seeking double relief as prayed for in their complaint; as well as many other legal propositions; but as it is apparent, the conclusions heretofore reached (and quoted above) from the evidence offered, must decide the case, *it is unnecessary to consider other matters.*" (Italics supplied.)

The court then concluded:

"* * * It is, therefore, ordered, adjudged, and decreed that the decision of the trial court in overruling the motion made to dismiss the action at the close of the evidence offered by the complainants be and is reversed, and the cause is hereby dismissed with judgment against the complainants for all the accumulated costs. * * *"

Thus it is seen from the decision itself that it is not res judicata. From the language used it could not be a final decision, on the merits, of the issue of title.

As stated above, it is shown in counsel for the intervenor's pleadings, also in his proof and his brief, that his boldly-asserted contention was that the Panama Railroad Company never did have any right, title, or interest in and to the lands in controversy, nor to any other lands granted to it by the Colombian and Granadian Governments, because the Railroad Company had never accepted the lands and had never had the lands adjudicated to it.

The Court does not think it necessary to prolong this opinion by quoting at length from the brief filed by counsel for the alleged intervenor, because there can be no question about his contentions. However, the following excerpt from the brief is indicative of his contention:

"* * * Subsequent to the time the Colombian Government offered to deliver possession of these lands to the Panama Railroad Company, this same Government gave the French Canal Company a similar concession to the one it had on a former occasion given to the said Railroad Company. Thus, that Government recognized that although it had offered to fulfill its contract with the Panama Railroad Company made in 1850, the Panama Railroad Company had in no manner accepted the offer and gained any title or rights to the land, and that it, the Colombian Government, was as free to grant to the Canal Company the concession it did grant as though it had never made any offer of delivery to the Railroad Company, for the Railroad Company had gained no rights by such offer. * * *"

A careful examination of the record of these related cases, and all other cases in the Canal Zone, shows beyond question that never again in any court was the above contention made. On the other hand, the Railroad Company has filed pleading after pleading in many cases in which it affirmatively stated and set forth the claim that it was the owner of the lands by virtue of the concession and subsequent adjudication to it. After this there never was any attempt upon the part of counsel for the Isthmian Canal Commission and the Panama Railroad Company to intervene for the United States. Afterwards they appeared for the Isthmian Canal Commission and the Panama Railroad.

We have carefully considered this case and the record therein, and all other cases in which the Railroad Company has asserted right, title, and ownership to the lands in the Canal Zone since then, and we are compelled to say that, in our judgment and opinion, the conduct and contentions of the attorney for the alleged intervenor and of the witness he offered were motivated by their belief that the plea of prescription asserted by the plaintiffs under color of title would be good as against any claim of ownership or title by the Railroad Company and their erroneous assumption that the lands could not be acquired by prescription against the Government. It is our delib-

erate opinion that this is obvious and is the whole sum and substance of the matter.

The Court might explain that, while this record does not show that the attorney for the intervenor and the witness, Dr. Galindo, were both counsel for the Railroad Company, the published reports of the Supreme Court of the Canal Zone show that they were. See Andrade v. Panama R. Co. et al., 1 Canal Zone 76, and the dockets of the Circuit Court show the same.

The Court has previously stated in its memorandum the difficulty encountered in investigating the records in the related cases, and has used the word "weird" as describing the proceedings in some instances. The description is also very applicable in the proceeding upon which the plea of res judicata is based.

The original defendants in the case, after demurring to the petition, filed their answer more than two months after the case was filed, and in all the answers, although they claimed ownership in parcels of land, they denied specifically that the land they claimed was embraced in the description of the plaintiffs' property. Upon the day of the trial, this allegation was withdrawn by interlineation—by striking out two words and adding one. There is a docket entry and minute showing that this was done; however, the trial court, whose opinion, findings of fact and conclusions of law show that the court had very carefully considered the case evidently did not know this, because, in the opinion, the Court made the following statement:

"* * * The evidence shows, and the findings of the court are, that the occupation and possession of the plaintiffs have been uninterrupted since 1846 except as the defendants, Foleston et al, may have trespassed on the said land.

"They, by their answers, however, eliminate themselves from the controversy in that they deny being in possession of any of the land described in the complaint. * * *"

Furthermore, this discrepancy in the pleading as amended by the interlineation and the striking and the statement in the Court's opinion was never called to the Court's attention by the motion for a new trial, which was withdrawn, the bill of exceptions, nor in any other manner.

In any event, we believe the opinion of the Supreme Court was erroneous for many reasons, and the opinion was not supported by the evidence or the law nor by right or justice.

The whole proceeding upon which the plea of res judicata is based shows that it was not in accordance with any acceptable practice and procedure. It had no law to support it, and it was, we believe, but a trick, device, and subterfuge; and we do not propose to put our seal of approval upon this doubtful and questionable practice.

In this connection, it is well to quote what Joseph White said to Henry Clay, Secretary of State, in his letter of February 4, 1829, as to the preparation of the compilation of the laws of Spain and the Indies:

"* * * While the public domain was to be protected on the one hand, the public faith was to be preserved on the other. * * *"

See Statement of Court, p. 4.

In considering this plea of res judicata, we frankly say that we have not examined the authorities cited by counsel for defendant, because we do not think they could apply to the situation involved. Furthermore, we do not believe that, if counsel for defendant had been thoroughly familiar with the proceeding, the record, and all of its implications, upon which his plea was based, he would have raised this question.

We will now consider plaintiffs' claim as to Tracts 2, 3, and 4, which are referred to in this record and in this brief as the "De la Parra lands known as 'Nombre de Dios'."

The record shows that Pedro Cerezo filed an action in the Third Circuit Court on June 24, 1909 (Memo, p. 53), Civil case 118, afterwards District Court case No. 1. His action was to quiet title to certain described real estate and to eject certain named alleged trespassers. The lands described were what are known in this record as Tract No. 2.

In that action the Isthmian Canal Commission and the Panama Railroad Company undertook to enter their special appearance,

although they were not originally parties to the proceeding. Subsequently, however, the Railroad Company was summoned.

Evidently some proof was taken in December, 1909, but the case, being set, came on regularly for trial January 29, 1910. There was default against the Panama Railroad Company, the evidence was heard for the plaintiff, but the defendants offered no testimony.

The proof showed conclusively that the plaintiff had been in possession of the land for more than forty years, claiming it as his own, living on it, occupying it, and cultivating it. He described the lands, the natural objects that marked their boundaries, and the boundaries, and identified the lands on the Patterson map. He stated that he had bought the lands from De la Parra and received a deed for them—a public document—and that the deed was registered in Colon about the year 1860 and that the record of the deed was destroyed in the Colon fire of 1885. The evidence further showed that the plaintiff had planted cocoanut and fruit trees, had cleared the lands, and, further, that the plaintiff had owned other lands around Toro Point and had planted and cultivated them but had sold them. The evidence further showed that, from 1867 until 1909, no one had disputed the plaintiff's possession and ownership of the lands, but that in 1909 an official of the Railroad Company had come to him and endeavored to collect rent and had wanted the plaintiff to sign a document and that the plaintiff had refused either to pay the rent or to sign the document. The evidence also showed that the Panama Railroad Company had never made any claim to the lands until that time. The evidence also showed that there were trespassers on the land, and the efforts to the plaintiff to dispossess them were described.

To summarize the testimony, it showed beyond any controversy that the plaintiff had been in possession of and had used, occupied, cultivated, and claimed the lands for more than forty years under a deed, the record of which had been destroyed in the fire in Colon, and that his possession had been open, notorious, peaceful, and exclusive, without violence, concealment, or interruption, except for trespassers who were sued in the action and who never offered any testimony to support the answers they had filed.

On page 77 of defendant's brief, counsel undertakes to summarize the testimony offered by the plaintiff Cerezo in the cases 1 and 3, consolidated, and the statement is made that Cerezo was unable to describe his lands. Counsel is certainly mistaken, because Cerezo did describe his lands and his boundaries specifically and accurately.

The evidence showed that Cerezo had a deed to the property, which deed was destroyed in the fire in Colon of 1885, and his evidence in this respect was supported by other witnesses.

Defendant, in its brief, says that the plaintiffs' proof was utterly insufficient to show what the boundaries were claimed under color of title and that he failed to prove cultivation.

The Court is of the opinion that the evidence showed without any contradiction the boundaries of the land and also intensive and active cultivation of 231 acres of land. While we believe that Cerezo had color of title, his proof shows that he had been in possession of the land, claiming it as his own, living on it, and cultivating it to well-marked boundaries for a period of forty-two years.

There was no decision, but the proceeding was continued.

February 17, 1910, the Railroad Company, by counsel, moved to have the default set aside, which was done.

The demurrer of the Railroad Company to the petition was overruled, and, on May 19, 1910, the Railroad Company filed an "answer and cross-complaint or plea in reconvention." In this pleading it claimed to be the one entitled to possession of the lands by reason of the grants and concessions made to it by the Granadian and Colombian Governments and subsequent proceedings thereunder. The pleading prayed for affirmative relief, viz., quieting of the title and the recovery of possession and damages against those withholding the lands.

Subsequent pleadings were filed, not necessary to mention, and on September 13, 1910, the Compania Agraria de Panama filed its motion to be made a party.

September 29, 1910, the original defendants in the case filed an amended verified answer in which they stated they had signed leases with the Panama Railroad Company but that said leases had been secured by fraud, force, intimidation, and duress.

October 4, 1910, the Compañía Agraria de Panama filed its answer, in which it set forth that its predecessor in title, De la Parra, became the owner of the lands in 1856, and that it had acquired title from him and his successors in 1908.

After pleading for other parties, on May 4, 1911, the Compania de Panama filed an amended answer in more detail and containing exhibits upon which it relied. (Memo, p. 55 et seq.)

The record herein does not disclose that any steps, except orders of continuance, were taken in the case for a considerable length of time, but, on March 21, 1912, the Panama Railroad Company, filed an action against Eufracia Villalobos and Porfirio Melendez, Civil No. 423, Third Circuit Court. The pleading was styled "A petition for revindication," and alleged that the Railroad Company was the owner of a tract of land 1700 meters wide on the west shore of Limon Bay, extending from the Pilibio River to the Nombre de Dios River. (It might be mentioned in this connection that this description is rather meager.) The Company claimed the lands by virtue of the grants made by the Granadian and the Colombian Governments and subsequent adjudication.

The Villalobos defendants demurred to the petition and then answered.

The defendant Melendez filed a pleading disclaiming any interest in the land, which ended his connection with the case.

The evidence in the instant case shows that, about this time, the plaintiffs, who had acquired some interest in Tracts 1 and 2, and the representatives of the Railroad Company had negotiations about a settlement of the whole matter. It is to be noted that the titles asserted by Cerezo (Tract 2), and the widow of Jose Villalobos and their children (Tract 3), were all contained and included in documents and deeds of record of Ricardo de la Parra to the lands known as "Nombre de Dios," and described in this complaint as Tracts 2, 3, and 4. Pursuant to these negotiations, and at the suggestion of the Railroad Company, the plaintiffs entered into an arrangement and obligated themselves and did acquire the title to the De la Parra lands from the Compañía Agraria de Panama, and they also acquired the title to the Jose Villalobos lands (Tracts 2 and 3). The actual deeds of conveyance of the lands were not executed until later.

There can be no question but that the negotiations between the Panama Railroad Company and the plaintiffs proceeded to a final agreement and settlement as follows: The plaintiffs were to have and to hold all right, title, and interest in seventy-nine acres of land, which was described in part as extending for four thousand feet on the seashore and in depth eight hundred feet, and the Railroad Company was to have all the plaintiffs' right in which are now known as Tracts 1, 2, 3, and 4, and that conveyance, one to the other, would be made accordingly.

That this arrangement proceeded to a final conclusion about November 1912, can not be doubted, because the negotiations were entered into by the chief law officer of the Railroad Company, who seems to have been directing its affairs; was fully approved by the president of the Railroad Company, Colonel Goethals; and a survey of the lands was ordered. See plaintiffs' exhibit 29, defendant's exhibit 24. However, on August 24, 1912, 37 Stat. 561, 48 U.S.C.A. § 1304, Congress had provided by law (Memo, p. 70):

"Sec. 3. That the President is authorized to declare by Executive order that all land and land under water within the limits of the Canal Zone is necessary for the construction, maintenance, operation, sanitation, or protections of the Panama Canal, and to extinguish, by agreement when advisable, all claims and titles of adverse claimants and occupants. * * *"

It seems, therefore, that the chief law officer of the Isthmian Canal Commission and the Panama Railroad Company, and the president of the Railroad Company and chairman of the Isthmian Canal Commission did not anticipate that the President would issue any Executive Order, as pro-

vided for by the Act of Congress; however, on December 5, 1912, the President did issue his Executive Order, by virtue of the authority vested in him by Congress, and ordered that all lands within the Canal Zone were necessary for the purposes quoted above, and further ordered the Isthmian Canal Commission to take possession of all lands in the Canal Zone on behalf of the United States and to extinguish, by agreement when advisable, all claims and titles of adverse claimants. As a result, on December 7, 1912, the head of the Law Department of the Panama Railroad Company wrote to the plaintiffs (See plaintiffs' exhibit 24), and stated that the settlement could not be effected.

This record shows, however, that there was an attempt upon the part of the parties involved to settle the matter by compromise after this, but nothing came of these offers and counter-offers of compromise.

Pending and in view of the matters mentioned above, however, the plaintiffs had acquired all right, title, and interest in all conflicting parties to all the lands, which consisted of the lands known as those of Feliciano Villalobos, Pedro Cerezo, Jose Villalobos, and De la Parra, namely, Tracts 1, 2, 3, and 4.

A Joint Land Commission having been appointed by the respective governments in 1913 (Memo, p. 83), plaintiffs filed their claims before the Commission.

The plaintiffs subsequently withdrew their claims, because the Joint Commission adopted a rule arbitrarily fixing compensation of all lands on their value in 1903, the date of the Treaty, and also because a question of title was involved.

In view of the foregoing situation, as shown by the record, there can certainly be no question but that the plaintiffs and their predecessors in title were in good faith and had color of title. We therefore conclude that, as to Tract No. 2, known as the "Pedro Cerezo lands," the proof shows without contradiction not only a prima facie case but a good title by adverse possession.

The remaining inquiry is as to the Jose Villalobos lands and as to what are known as the "De la Parra lands." It is, of course, to be remembered in this connection that the De la Parra lands, and the documents under which they were claimed, included Tracts 2, 3, and 4. (Memo, p. 34-A.)

The record, of course, shows that all the cases involving all the lands in controversy, viz., Nos. 1 and 3, were consolidated in 1921; that in 1922 the plaintiffs filed appropriate pleadings in the consolidated case, setting forth that they were the owners and claiming all the lands in controversy, in the instant action, namely, Tracts 1, 2, 3, and 4; and that, six years afterwards, the Railroad Company filed an answer and there was a trial, beginning in February, 1928, or, at least, a hearing of the evidence. (Memo, p. 41.) Upon this trial the plaintiffs offered their evidence, including the title papers to what are known as the "De la Parra lands," also evidence as to why the plaintiffs acquired said lands.

At that time the plaintiffs had acquired all right, title, and interest to the Jose Villalobos lands (Tract 3), and had also acquired, long before, all right, title, and interest to the De la Parra lands (Tracts 2, 3, and 4). Only two witnesses were introduced as to the occupation and possession of the Jose Villalobos lands. Eighteen years had passed since the action had been instituted, and presumably the witnesses had either died or the plaintiffs were relying upon their title to the De la Parra lands, which included the Jose Villalobos lands, (Tract 3), and which they had acquired at the instance of the Panama Railroad Company.

We will now consider the ownership of the De la Parra lands. The evidence consists largely of documents, and we will now proceed to examine the proof.

Ricardo de la Parra seems to have been a man of some importance in New Granada, Colombia, and Panama and was evidently a soldier.

In defendant's exhibit 13, "Public Land Laws of Colombia, 1821-1905," a decree of June 18, 1851 concedes to Ricardo de la Parra and Benjamin Blagge an exclusive privilege to open a canal by way of the Atrato and San Juan Rivers and a concession of lands which might be necessary for a canal or railroad, or both. This decree

recites a concession of a minimum of fifty thousand fanegadas of land and provides that the company could dispose of the lands in any way it desired, except it could not sell the lands to a foreign government.

Upon the trial of this case, plaintiffs' exhibit 14, which is a copy of a deed dated November 16, 1852 from Messrs. Antonio Maria Pradillo and Ricardo de la Parra to Dr. Manuel Laverde, could not be found, but, as it had been placed on record in the Registrar's Office of the Canal Zone, the record was introduced.

The original exhibit has since been discovered and will be made a part of this record and designated "Exhibit G." This instrument recites that the vendors sold and conveyed the lands described as follows:

One half of the island called "El Muerto," situated in the province of Chiriqui of the Isthmus of Panama, which island had been acquired by the vendors by adjudication of the Republic made to them.

The fifth part of twelve thousand fanegadas of uncultivated land purchased from Dr. M. M. Saldria and which they had a right to claim in the most favorable places in the province of Panama or of the entire Isthmus.

The fifth part of seven thousand fanegadas of land, at least, on the Atlantic coast of the Isthmus of Panama, situated between the Bay of Limon, Aspinwall of Colon, and Almirante Bay, which lands constituted five farms or landed properties each of which was susceptible of being converted into a hacienda (large estate).

Included in the seven thousand fanegadas last mentioned above was the land called "Nombre de Dios," which was described in the exhibit as follows:

" * * * The first of said tracts called 'Nombre de Dios', in which there have already been made some agricultural works, is found on the very Bay of Limon itself at a distance, more or less, of one mile from the City of Aspinwall or Colon. * * *"

It is further stated in the document:

" * * * These five tracts form pasture lands appropriate for the raising of cattle, and Nombre de Dios is a good place to fatten them and feed them. These five have

been acquired by legitimate titles transferring dominion and ownership. * * *"

The deed is quite a lengthy document and recites the consideration for the lands and various conditions and limitations. It also describes the adaptability of the lands for certain purposes, and refers to other instruments and also to rights acquired into the lands by De la Parra by denouncement during the administration of a General Mosquera.

This was a general warranty conveyance. It was executed in Spanish, but an English translation is attached. It is on stamped paper, and a certificate shows that a notary and other officers were paid fees and that it was inscribed in the 27th Book of Registry on page 246 under No. 2626 at Bogota on November 20, 1852. It is also recited that the document is a second copy and in conformity with the original.

The next document for consideration is Public Document 204, now exhibit "A." The Court has already described this document in its memorandum (Memo, p. 129 et seq.), and it suffices to say that it shows conclusively that there was a public deed of record executed before the notary public of Colon on the 12th of January, 1856, which deed showed that Ricardo de la Parra had purchased in 1852 from Manuel Jose Furnier, Lino Mayalle, and Francisco Miranda, residents of Chagres, the land described as follows:

" * * * the lands known as 'Nombre de Dios', on the north of the Bay of Limon, the boundaries of which are comprised from 'Los Pescadoritos', to the 'Morro de Limon', in front of this city; and in depth from this place up to the 'Quebrada Honda', three miles in a southerly direction, the same that they acquired by virtue of law, having cultivated them for more than ten years, but as in the date above set forth, there was no notary in Chagres, or public registrar or stamped paper for the execution of the proper instrument in favor of the purchaser, today they find in this city the above mentioned Ricardo de la Parra and they proceed to verify it in the manner most solemn and legal. * * *"

The complaint herein shows the successive conveyances by which the plaintiffs be-

came vested of title to the De la Parra lands; however, we will state that the record herein and the various documents introduced as exhibits show the devolution of title as follows: A conveyance recorded on January 12, 1856, in Colon, which recites that the conveyance had taken place in 1852. In the instrument it is shown that De la Parra purchased the right of Manuel Jose Furnier, Lino Mayalle, and Francisco Miranda to the lands known as "Nombre de Dios," on the north of the Bay of Limon, the boundaries of which were comprised from Los Pescadoritos to the Morro de Limon in front of the city and in depth from that place up to the Quebrada Honda, three miles in a southerly direction, the same that they had acquired by virtue of law, having cultivated the land for more than ten years. It is recited in the instrument that there was no notary or public registrar or stamped paper for the execution of the proper instrument in favor of the purchaser at Chagres at that time, but "to-day they find in this city the above mentioned Ricardo de la Parra and they proceed to verify it in the manner most solemn and legal." Plaintiffs' exhibit 12 and exhibit "A", recorded in Canal Zone Property Book 8, 283.

November 15, 1852, which presumably was after the purchase of the lands by De la Parra, as set forth above, De la Parra and Pradillo conveyed to Laverde an interest in certain lands in Panama, as set forth in exhibit "G".

June 16, 1855, in the city of Bogota, Colombia, a document was executed (plaintiffs' exhibit 14) which shows the organization of a sociedad anonima o comandita (joint stock company) of what was designated "Laverde, Latorre & Company," and the conveyance of various tracts and parcels of land in Panama, including conveyances from De la Parra, Pradillo, Laverde, and others, to the company. Among other properties conveyed by this instrument were seven thousand fanegadas of land situated between the Bay of Limon, where Colon and Aspinwall were situated, and Almirante Bay, constituting five landed properties, or farms, the first of which was designated as "Nombre de Dios," in which some agricultural work had already been performed and

which was situated on the Bay of Limon at a distance of two miles, more or less, from Colon or Aspinwall. The original exhibit introduced in related cases heretofore was not to be found on the trial of the instant matter but has since been found and is designated exhibit "H".

June 15, 1903, the successors and assigns of Laverde, Latorre & Company formed a corporation under the laws of the Republic of Colombia, and to which reference is made in Public Document 890 dated November 21, 1908, in the name of the Compania Agraria de Panama. The lands known in this action as Tracts 2, 3, and 4, and as the "Nombre de Dios," or "De la Parra" lands, were conveyed and constituted the capital stock of said organization, together with other lands. All conveyances were duly registered.

The company and shareholders of the Compania Agraria de Panama nominated and appointed Eduardo Espinosa G. as attorney in fact for said company, with full power to sell or otherwise dispose of the lands of the company.

A substitute power of attorney was executed by Eduardo Espinosa G. to Horace R. McRae on December 4, 1912, and was recorded in the office of the Registrar of Property of the Canal Zone in Book 7, page 293. A copy of this instrument was filed in civil case No. 772.

A conveyance executed by the attorney in fact Horace R. McRae for the Compania Agraria de Panama to the plaintiffs, Playa de Flor Land and Improvement Company, dated December 1, 1913, is recorded in the office of the Registrar of Property of the Canal Zone in Book 7, page 294. A copy of same was annexed to the complaint in civil case No. 772. See exhibits "I" and "J".

The deposition of Eduardo Espinosa G. was taken September 29, 1919, before the Joint Land Commission, exhibit "F." (Memo, p. 132.) It is hardly accurate to say that the deposition was taken by the Commission, because a reading of it discloses that the Commissioners had very little to do with the matter and that the proceeding was largely conducted by counsel for the Commission and, due to his objections, assertions as to the law and the·

Commission's duties, and his quibbling, the Court can hardly see how any comprehensive statement could have been made by the witness. The deposition, however, does show that the witness was a Colombian, born in Bogota, a man of some prominence and engaged in commercial and diplomatic missions for his government; that he was acquainted with the property known as "Nombre de Dios" and that his family had been interested in the property since 1852 and that the family had been actively represented as to its interest in the property by a brother of the witness, Rafel Espinosa G., who had been in Panama a few years before but had recently died; that the witness was not acquainted with Ricardo de la Parra during his lifetime but knew of him, had seen him two or three times when the witness was but a boy; that he understood that De la Parra had died in David, Panama; that, after the death of Rafel Espinosa G., the witness had examined some papers which the witness had brought with him and which he believed to be of value to the interest of the family. (These papers proved to be either the exhibits or copies of the exhibits introduced in the instant case. Among others was the deed of 1852 referred to above, which the witness stated was recorded at the proper office in Bogota.) The witness further stated that Don Rafael Reyes and Dr. Juan A. Henriquez had also looked after the property for the owners.

Deponent's counsel also introduced certain exhibits showing the payment of fees for registering deeds and conveyances in Panama, including deeds to the Ricardo de la Parra lands.

The witness stated that he arrived on the Isthmus for the first time in 1876, that he was acquainted with the lands in question in the action and known by the name of "Nombre de Dios," and that he considered them to be valuable lands; that the lands began to have considerable value about the time the French took up the building of the canal, dropped in value for a time when the French effort failed, and then, when it was known that the United States had taken up the matter and that there would be a canal eventually, the lands had a value "such as they have now," which was at the time of the taking of the deposition in 1919.

He stated that the company had tried to dispose of the lands, and at one time tried to get someone to go to the United States or to Europe to endeavor to get someone interested in the lands, then decided to wait and see if a canal would be built, and then decided to do nothing but just wait.

Some of the exhibits are still attached to the deposition and show the payment of recording fees and also show that the shareholders of the company had been assessed to pay the expenses of same, amounting to $2,240; that there had been paid for registration fees on a deed of sale and conveyance of certain lands, executed by Ricardo de la Parra and others in behalf of Manuel Laverde, the sum of eighty dollars, and that there had been paid taxes as per Decree 181 of October, 1886, the sum of $5.60. Also attached is a letter from the then governor of Panama, Alejandro Posada, to Rafael Espinosa G., showing that the Governor had advanced and paid the sum of $85.60, as mentioned above, and requesting that the bearer of the letter, his son, be reimbursed for the $85.60 the Governor had spent.

We have already stated that, when the Panamanian authorities reported to the Railroad Company the claims made and the proof in support of same, thirty-one in number, De la Parra's claim was not mentioned. The whole proceeding by which the lands were denounced and subsequently adjudicated is set forth in the Court's memorandum, page 24 et seq.

In an attempt to clarify the situation, we will again state that the initial proceeding to denounce the lands was in 1854 (defendant's exhibit 2), and, pursuant to this action of the Railroad Company, that the office of the Superior Chief of Panama, on August 29, 1855, advised the Company as follows:

"1st. The Company, or its agents, will transmit to this Office six copies of the plan or map in which is shown the area of land from which the public lands are solicited."

The communication also stated that the copies of the plan, or map, obtained should be posted at certain places for four months

and that during such time those claiming the dominion of any portion of the land situated within the area denounced by the Company would appear before the office of the Superior Chief and claim such dominion and present titles to the property in due form, or, in default of this, they would present the testimony of witnesses to the effect that the claimants had been in possession in good faith for at least ten years; that the Secretary's Office would note in a special pamphlet all the proofs that might be presented in conformity with the requirements set forth, and all other important circumstances bearing on the object of the resolution; that, after four months, the agent of the Company would be informed of the individuals who claimed dominion to the lands situated in the area and as to what documents they might have presented.

Furthermore—and very important—it was provided that, if the Company should recognize the rights claimed, the lands so recognized would be excepted from the adjudication asked for by the Company, but if the claims were not recognized, the question should be submitted for adjustment to the tribunals; that such part of the land was not in question, for the reason that no dominion claimant to same appeared, should be measured at the cost of the Company and should be adjudicated to it up to the number of hectares to which it was entitled; and that the resolution was purely administrative and would not prejudice at any time the true owners of the land, if any be found, within the area denounced by the Company, which owners would always have their rights excepted in accordance with the law.

On March 14, 1856, the Secretary of State of Panama, Republic of New Granada, reported to the representative of the Railroad Company the claims, thirty-one in number, and the proof offered by each claimant. This was published in the Gaceta de Panama, No. 34, March 15, 1856. (See defendant's exhibit 2.)

Now, on the Harrison-Arosemena map, presumably prepared by the commissioners six years after the proceedings noted above, there was designated "De la Parra 40 fanegadas." The question naturally presents itself: Why was this done? There can be

but one answer: That his titles were recorded in Panama and Colombia, and, after the fire in Colon in 1885, a judgment of the court had re-established, registered, and recorded the titles; the name of the lands, "Nombre de Dios," was well known and appeared upon the map; his ownership of the lands was notorious in the capitols of Panama and Colombia; and his ownership of the lands was well known to the commissioners.

If the above be true, the question might be asked: Why was the area confined to forty fanegadas? The answer is as follows: The Law of the Legislative Assembly of the State of Panama of the 26th of October, 1861 (defendant's exhibit 4), was long after the office of the Superior Chief had reported to the official of the Railroad Company the private landholders' claims, thirty-one in number, and had furnished the proof offered in support of the claims (defendant's exhibit 2). There were no commissioners until after the Law of October 26, 1861, because that was the act creating the office of commissioner; therefore, the commissioners had nothing to do with the presentation and proving of the claims, which had occurred at least six years before they were ever appointed.

The Law of 1861 referred to did not say anything about setting apart lands of cultivators, but the decree to carry out that law, dated February 19, 1862 (defendant's exhibit 5), did provide as follows:

"Article 2nd. Said lands to the extent of six hectares and forty acres (ten fanegadas) for each cultivator are reserved for the occupants who have improved them, in order that they may make use of the right given to them by said law: but such lands shall be considered as public lands and grantable to the Company, or to whomsoever may apply for them, if the Company should not take them, insofar as the excess of said quantity (ten fanegadas) is concerned. * * *"

There can be no question but that the commissioners, when they prepared the map or plat, were trying to conform to the decree but were confused. In other words, they were trying to apply to the private owners of the land in the area a decree that

had no application to them and had no effect as to the law of prescription; furthermore, there was no intimation in the decree or in any proceeding about the adjudication that those who appeared and claimed land within the area denounced were limited in the area of their claim or possession.

Counsel for defendant, in his brief, makes the statement that the commissioners took the description of the land claimed by Villalobos from his notice of claim dated "August 29, 1855." (This date is in error, because the description was given to the proper official subsequent to August 29, 1855, on which date the office of the Superior Chief informed the agent of the Railroad Company as to the steps to be taken in connection with the adjudication of lands, and the description of the Villalobos lands was furnished to the agent of the Railroad Company in the report of the Secretary of State of Panama dated March 14, 1856.) If they did, they certainly knew that the description which he set forth in his claim included more than ten fanegadas, or the small area which they marked on the map. As a matter of fact, there is nothing in this record to show that the commissioners ever saw Villalobos. He made no claim to them; he made his claim to the Panamanian authorities, who reported the claim to the official of the Railroad Company.

Counsel for the defendant then makes the following statement:

" * * * This, however, was not evidence of title because the commissioners 'had to mark on the map the land that was claimed by these parties no matter if they had good title or not.' * * *" (p. 28)

He cites the above as having been the testimony of Dr. Galindo, and the above statement shows the confusion of counsel and of the witness.

Upon the trial of old case 66, the Court asked Dr. Galindo a very simple question: "What did the shading on the Harrison-Arosemena map mean?" The answer is long and involved and the Court will not quote it in full because of its length, but, in the meanderings of his answer, the witness stated in part:

" * * * Any land or portions of land that were claimed by private persons these persons *had to show their title to these commissioners* but they were not to pass on that title the commissioners had to mark on this map the land that was claimed by those parties no matter if they had a good title or not * * *" (Italics supplied.)

As a matter of fact, there is nothing in this record to show that any claim was made to any commissioner; on the other hand, the claims to the lands were made long before the office of commissioner was created or the commissioners themselves were appointed.

We believe that a great deal of the confusion in this, related, and analogous cases has been the result of those who represented the Panama Railroad Company, the Isthmian Canal Commission, and the United States refusing to face the plain premises and provisions of the grant of the lands by the Colombian and Granadian Governments to the Railroad Company.

The record reveals that there is an insistent contention and argument running through the whole record based upon the erroneous assumption that the *only way* that one could have acquired title to lands in Toro Point Peninsula was by government grants made *prior* to the grant to the Railroad Company in 1850. This contention would appear to be true as to those who claimed lands by *direct* grant from the government; however, there was a grant of lands made in 1891 by the Colombian Government of seven acres of land on Toro Point to the Compania del Faro de Colon. This grant was the subject of litigation in the case of Compania del Faro de Colon v. Morrow et al., decided in 1923 (Memo, 84 et seq.), in which the subsequent granting of land seems to have been upheld by the court of the Canal Zone, and the defendants, who happened to be officers of the United States and the Panama Railroad, by an agreed judgment paid fifteen thousand dollars and took a conveyance of the land from the grantee. In addition to direct government grants, there were other means by which absolute title to lands could have been, and was, acquired in Toro Point Peninsula, which was included in the Railroad grant, Lot No. 1.

We believe that those acting for the Railroad Company, and its successor have overlooked the very important fact that the grant to the Railroad Company was not made of *government or public lands* but that the grants and concession, and every modification of same, expressly and specifically provided that the grant and concession was to *vacant and unoccupied lands.* Not only was this true, but the government was very careful to provide that it was not bound in any case to the vacating or guaranteeing the title of the vacant lands which might be adjudicated to the Company, and that it was incumbent on the Company to *prove their character as vacant lands, to survey them, to measure them, etc.* . (Memo, p. 23.)

As stated by Judge Brown in the old case of Morales v. Arcia, supra, by some sort of legerdemain the Railroad Company, the Isthmian Canal Commission, and their successor have undertaken to shift the burden from the Railroad Company, and place it squarely on the shoulders of the private landowners. (Memo, p. 110.)

We seriously doubt that there were any vacant and unoccupied lands in the year 1850 in the area described as the Toro Point Peninsula. In support of this opinion, we believe that the Harrison-Arosemena map so shows, and we again call attention that this map does not show any area of the Toro Point Peninsula as "tierras baldias" (vacant and unoccupied lands), while other parts of the map do show land so designated.

In support of this opinion, the record and standard historical and geographical writings of which there can be no question as to their verity and integrity in a general way (Memo, p. 2 et seq.), show that the colonization of this part of the Isthmus occurred only about ten years after Columbus discovered the Western Hemisphere in 1492. It was not very long until it was discovered that the nearest route between the Atlantic and the Pacific Oceans was that across the Isthmus of Panama and that the Chagres River could be used as a means of crossing the Isthmus for more than half of that distance. Long before the construction of the Panama Railroad and until about 1855, the village of Chagres, located at the mouth of the Chagres River, was the seat of government on the Atlantic side of the Isthmus. In that village were located the courts, notaries public, and other officials and, no doubt, transfers of land and property were effected through such offices. However, there can be no question but that the records were carelessly kept and, in many instances, were destroyed through the constant changes taking place in the governments, the governing officials, and the character of the inhabitants.

It is reasonable to assume that, along the Chagres River where it was navigable, settlements, towns, and villages were established and that all available land along the river—especially that adjacent to Chagres, principal port on the Atlantic coast—must have been occupied and cultivated during this long period of time, as in no other manner could food and supplies have been available for the inhabitants, of whom there must have been a considerable number.

The evidence in this record shows that the lands in controversy showed evidence of past cultivation and occupancy, the cutting of timber, etc.; therefore, the lands must have been occupied and cultivated and titles thereto acquired by means of grants, concessions, warrants, orders of surveys, prescription, or some other act which might have been perfected into a complete title under the laws, usages, and customs of Spain and succeeding governments.

The failure of the former occupants to perfect and preserve their titles undoubtedly arose from the conditions prevailing, the inability of the government to protect the inhabitants in their possession of property, the despotic form of government, and the excessive fees charged by notaries and other officials.

Surveyors were few and far between, we imagine, and the cost of a survey was beyond the means of the ordinary settler, landholder, or landowner. In consequence, landed properties were, in general, designated by some name, without the boundaries being definitely determined; however, the limits of the properties must have been recognized by adjoining occupants. This led to land transfers and conveyances

wherein distances and directions were stated in general terms, and the extension of the same was ascertained by reference to rivers, streams, and other natural monuments, also by reference to the occupants of the adjoining properties. This custom and usage of conveying property by the name of the land is fully shown in this record, by the report of the Panamanian authorities to the Railroad Company in the proposed denouncement, and an examination of the claims in thirty-one instances shows this to be true. The reports of the Joint Land Commission show the same.

For many reasons, as set forth above, and due and owing to the changes in the natural monuments mentioned in old deeds and conveyances, it has proven difficult, even in modern times, to make an accurate survey of lands by reference to documents describing the same.

Counsel for defendant, in his brief, states that the evidence is undisputed that at least twenty persons were occupying the land described as "Nombre de Dios" prior to December 1, 1913, under leases from the Panama Railroad Company and argues that this shows plaintiffs' possession was not exclusive.

Defendant's exhibit 23 consists of twenty documents, or leases, executed by various named parties to the Panama Railroad Company in November and December, 1911, the consideration of the leases being anywhere from fifteen cents to one dollar a month. The leases simply state, as a description, "a lot of land at Nombre de Dios." These were short-term leases and provided that the lessee should give possession on one month's notice and if the lessee failed to comply with the notice, the Railroad Company was authorized, without recourse to the courts, to go upon said premises and take possession thereof and to remove or destroy said buildings or improvements and to charge the lessee with the reasonable expense thereof.

At the time the Railroad Company had these leases executed, the lands known as Nombre de Dios were in litigation in the above mentioned case. The Railroad Company was a party to the action and had asked that its title be quieted and that it be placed in possession of the lands.

It is elementary that an entry of others, even the legal titleholder, upon lands pendente lite will not affect the continuity of adverse possession by one claiming title by adverse possession at the beginning of the lawsuit. See Middlesborough Waterworks Co. v. Neal, 105 Ky. 586, 49 S.W. 428. Furthermore, the possession of a purchaser pendente lite is not adverse to the parties during the litigation. If the rule were otherwise, alienations made by parties during the pendency of the suit might defeat its whole purpose, and there would be no end to the litigation.

In this connection, we might just as well dissect and analyze the so-called "quitclaim deed" executed by the Panama Railroad Company to the United States of America in 1919 and introduced in evidence in 1928.

Courts and counsel have frequently referred to this instrument as a "quitclaim deed." (We are not so certain that we did not fall into that parrot-like error in our memorandum.) It is, however, nothing of the kind; it is nothing more nor less than a release which the Railroad Company executed to the United States.

The instrument states that the attorney for the Railroad Company was authorized to present same to the Joint Commission and that it might be considered by said tribunal and given full effect in any claims pending before the Commission affecting the said Toro Point lands. If it was ever submitted to the Commission at any time, however, this Court has been unable to find any evidence of same from the Commission's records.

This release provided for an alleged and imaginary taking by the United States of America of the Railroad Company's lands on the Toro Point Peninsula in the Canal Zone and seems to have been devised for the specific purpose of affecting the jurisdiction of the plaintiffs to litigate their claims against the Railroad Company in the courts of the Canal Zone. Evidently someone advised the officials of the Railroad Company that, as they had forcibly and unlawfully evicted and dispossessed the plaintiffs, they could escape the responsibil-

ity for their unlawful act and absolve themselves from any liability by this device, subterfuge, and chicanery: That, as the United States could not be sued, by this process of vicarious sacrifice they would be granted complete immunity.

The lessees in eight of the leases referred to above had the same names as did eight of the original defendants in the old Circuit Court case 118, afterwards District Court case 1. Five of the eight bore the same names as did five of the defendants in the old Circuit Court case 66. While there is nothing in this record to identify them as the same persons, presumably they were.

It is to be remembered that four of the defendants in District Court case 1 filed a pleading in which they said that they executed leases to the Panama Railroad Company but under duress, force, and fraud, which has never been denied.

The Court has no way of identifying the other twelve lessees nor can it learn where they had resided before they executed the leases, but it does appear from defendant's exhibit 24, that, about this time, the Railroad Company was engaged in shifting the squatters and itinerants around on the lands in the Toro Point Peninsula. The exhibit contains correspondence between the British consul, acting for subjects of his country—Jamaicans—and Judge Feuille. In this correspondence it appears that the land upon which these Jamaicans had been living was to be taken for a proposed military reservation, and Judge Feuille, as counsel for the Railroad Company, was suggesting that the inhabitants of same could occupy other lands on the Toro Point Peninsula.

We do not know where the lands covered by the leases were situated, because, as previously mentioned, it was only described and designated as "a lot of land at Nombre de Dios," but we have long since arrived at the opinion that those acting for the Railroad Company would not have hesitated to encourage and abet the squatters and itinerants in occupying the lands in litigation if they would thereupon acknowledge the Railroad Company's ownership and dominion.

We will now consider the contentions of counsel for defendant as to the conflicting claims of Pedro Cerezo and Jose Villalobos.

It is true that the lands claimed by Cerezo (Tract 2) and by Jose Villalobos (Tract 3) were included within the boundaries of the De la Parra title.

By a process of elimination we will dispose of the matter as to Jose Villalobos' lands. No doubt he and his family occupied the lands for a long time, lived on them, and cultivated them, but, due to negotiations which have been referred to, there is no proof in the record that they occupied the lands for such a length of time and under such circumstances as to establish title by adverse possession as against the De la Parra title. Therefore, the plaintiffs can not claim title to this 370 acres (Tract 3) by reason of any right, title, or interest they acquired from the widow and heirs of Jose Villalobos, although the evidence shows that the plaintiffs paid to the widow and heirs of Jose Villalobos $24,674 for a one-half interest in these lands. (Plaintiffs' exhibit 22–A.)

The Court has already indicated, and it now decides, that Cerezo was the owner in fee simple title to the 231.7 acres (Tract 2), because he had claimed it against the world and had possessed the lands openly, notoriously, peacefully, and exclusively, without violence, concealment, or interruption for more than forty years to a well-marked and well-defined boundary. While it is not necessary to decide that he had color of title, the Court is of the opinion that he did possess color of title; furthermore, that the plaintiffs derived title from Cerezo, as mentioned above, and, in addition, acquired title from the titleholder of record, De la Parra, and his successors.

Counsel for the defendant contends that this conflict of title as between the Cerezo and the De la Parra titles shows discrepancies and irregularities and that same are a fatal defect to the title acquired by the plaintiffs.

The defendant was not a party to any of these transactions, and, if the title to Tracts 1, 2, 3, and 4 had been acquired by

purchase or prescription, or both, subsequent conveyances could not affect the basic title except as between the parties. The Court does not know of any law, and none has been cited, to the effect that the plaintiffs, under the circumstances, did not have the right to acquire conflicting titles necessary to perfect their title or to avoid further litigation.

The proof shows that the plaintiffs were in litigation with the Panama Railroad Company over Tracts 2 and 3, that the Railroad Company was claiming these lands in the litigation and asking that its title be quieted and that it be placed in possession of the lands. It further shows that a duly-authorized officer of the Railroad Company, acting with full approval of the president of the Railroad Company, suggested to the plaintiffs and their attorney that, if they would acquire the De la Parra title (which included Tracts 2, 3, and 4), the Company would then settle the lawsuit by conveyance, one to the other, of certain parts of the lands and that, pursuant to this suggestion, the plaintiffs obligated themselves and did acquire what was known as the De la Parra title. There can be no question but that this happened.

It may be said, however, that the Government of the United States, under ordinary circumstances, would not be estopped and bound by this proven arrangement, representation, and agreement; however, their alleged predecessor in title would be bound by it, and therefore the United States should be charged with it, in the Court's opinion.

The plaintiffs having acquired this outstanding title by reason of this representation and agreement, can the defendant United States now say, "There was a conflict of title and therefore you have no title"? We certainly do not believe that it could.

We will now consider the remaining question.

There can be no doubt but that the plaintiffs succeeded to all the right, title, and interest that De la Parra ever had in Tracts 2, 3, and 4. Since, however, the plaintiffs' title to Tracts 3 and 4 must stand

or fall by that title, the obvious question then presents itself: What right, title, or interest did De la Parra have?

The Court is of the opinion, and so holds, that Ricardo de la Parra was the owner and in possession of the lands described in this action as Tracts 2, 3, and 4 under a fee simple title of record in the capitol of Colombia, Bogota, and in Colon, Panama. The fact that the ownership and possession of and title to Tract 2 was subsequently acquired by Cerezo by prescription or adverse possession, as mentioned above, has nothing to do with De la Parra's right, title, and interest to Tracts 3 and 4, which now belong to the plaintiffs. The Court's reasons for this opinion are as follows:

It is not necessary to decide whether or not De la Parra ever received or had a government grant or concession to any lands in Panama or Toro Point Peninsula. He had a deed of record, a deed which was registered and recorded in Colombia and Panama, executed in 1856. In this deed it was stated specifically that De la Parra had purchased and paid for the lands in question in 1852. The deed recited the reasons why it had not been executed in accordance with the formalities of law at that time, viz, that there was no notary, registrar, or stamped paper available in Chagres, where the sale was evidently consummated. The lands were well described, especially in view of the custom regarding the transfer of lands under the law of Spain and succeeding governments.

It further appears that there was a court proceeding had in the Civil and Commercial Court, Department of Colombia, Republic of Colombia, May 21, 1884, and the subsequent protocolization of such proceeding before the Political Court of Gorgona, March 15, 1895, which recited the destruction of all records in the city of Colon in the fire of 1885, and by that action the deed was re-established, registered, and recorded. This proceeding was in conformity with Law 53 of the Republic of Colombia of 1882. (Memo, p. 130) The deed referred to above is a general warranty deed.

The lands are described as follows in the deed (Exhibit "A"):

"* * * the lands known as 'Nombre de Dios,' on the north of the bay of Limon, the boundaries of which are comprised from 'Los Pescadoritos,' to the 'Morro de Limon,' in front of this city; and in depth from this place up to the 'Quebrada Honda,' three miles in a southerly direction, * * *"

The deed states that the vendors had acquired the lands by virtue of law, having cultivated them for more than ten years, and further states that they dispossessed themselves of the lands and transferred all right to the vendee and vested in him a legitimate and just title.

Evidently this deed was prepared in accordance with the law then prevailing, because certain laws of the country, by book, title, and chapter, are referred to therein.

The statement of the vendors' title is contained in the deed. The statements that the vendors had cultivated the lands for more than ten years and were dispossessing themselves of same, in our opinion, were prima facie proof, at least of the facts which were stated.

The Law of Civil Procedure (1905-1907), which was the law of the Canal Zone, provided as follows:

"Article 677. A public instrument is that executed before a notary and filed in the respective protocol.

 * * * * * *

"Article 681. Public instruments always, and authentic documents when obtained in the manner already stated, are full proof as to the contents thereof. * * *"

The Code of Civil Procedure 1907, which was in effect in the Canal Zone from 1907 until 1934, provided as follows:

"Sec. 332. Entries in official book.— Entries in public or other official books or records, made in the performance of his duty by a public officer of the Canal Zone; or by another person in the Zone in the performance of a duty specially enjoined by law, are prima facie evidence of the facts therein stated."

Section 332, as quoted above, is contained in the present Canal Zone Code, title 4, section 1946.

The Civil Code of the Republic of Panama, in force and effect in the Canal Zone from 1904 until 1934, provided as follows:

"Art. 756. The tradition of the ownership of real property shall be effected by the recording of the title in the Office of Registration of public instruments.

"The tradition of rights of usufruct and use constituted in real property, and those of habitation or mortgage, shall be effected in the same manner.

 * * * * * *

"Art. 1758. A public or authentic instrument is that authorized with the legal formalities by the competent official.

"When executed before a notary or the person discharging his duties, and incorporated in the respective protocol, it is called a public document (escritura publica).

"Art. 1759. A public instrument is full proof with regard to the fact of the execution and the date thereof; but not with regard to the truth of the declarations which the persons interested may have made therein. In this part they are full proof only against the persons making them.

"The obligations and discharges contained therein are full proof with regard to the parties thereto and the persons to whom said obligations and discharges may be transferred under a universal or singular title.

 * * * * * *

"Art. 2637. The registration or inscription of public instruments has in view mainly the following purposes:

"1. To serve as a means of transferring the ownership of real property and of other real rights therein, which have been mentioned * * *.

"2. To give publicity to the acts or contracts transferring or changing the ownership of such real property, or imposing charges or limitations upon the ownership of the same, making it possible for all to ascertain the state or situation of the inmovable property; and

"3. To give a greater guarantee of authenticity and security to the titles, acts or documents, the registration of which is required, providing for the intervention of a

large number of officials in their preparation and custody, and thus avoiding the dangers to which they would be subject if such acts, titles and documents were recorded in one office only."

All of the above-quoted provisions of the codes were derived from the civil law as found in the laws of Spain and the succeeding governments.

■ We believe that the rule in the United States is that the recorded warranty deed from the party who has had possession is presumed to pass title, seizin and title corresponding. See 26 C.J.S., Deeds, § 190, p. 606; Saecker v. Cohn, 180 Cal. 151, 179 P. 890; Ames v. Empire Star Mines Co., Cal.Sup., 110 P.2d 13; Laster et al. v. Cunningham Land & Improvement Co. et al., Mo.Sup., 213 S.W. 89.

The principle is well stated by the Supreme Judicial Court of Maine in the case of Landry v. Giguere, 128 Me. 382, 147 A. 816, 817:

" * * * When the demandant in a real action relies on a record or paper title, which does not reach back to the state, a title prima facie is shown by a deed from some one who had possession. A recorded warranty deed is presumed to pass title, seizin and title corresponding. Blethen v. Dwinel, 34 Me. 133. Such a deed in evidence, it is for the opposing party, if he has a better or stronger title, to prove it, and, until he does, the prima facie title prevails. * * * "

On November 16, 1852, Ricardo de la Parra and Antonio Maria Pradillo conveyed several parcels of land in Panama to Dr. Manuel Laverde. See p. 49, this opinion 70 F.Supp. 328].

Counsel for the defendant contends that the validity of this conveyance is involved, because Pradillo's interest in the property is not shown; but, in our opinion, this would not make any difference, because the real owner of the property was conveying it. We believe, however, that, if this deed or conveyance (which is a very lengthy document) is carefully scrutinized and fairly interpreted, it will be discovered that Pradillo was interested in only part of the properties conveyed; for example, one half of the island called "El Muerto" was con-

veyed, and the instrument states that this island had been acquired by an adjudication by the government to the grantors. The Court does not doubt that the conveyance was made pursuant to some agreement between the grantors which was satisfactory to themselves and that they adjusted their interests in the various properties according to their own agreement and that this joint conveyance was for the purpose of convenience as well as to save notarial and registral fees, which were very high.

Subsequent conveyances are fully complete, and there can be no question but that the plaintiffs have acquired all interest in Tracts 2, 3, and 4 that De la Parra originally had.

It is true that the De la Parra title does not trace back without interruption to a grant from Spain or the succeeding governments, but the Court does not believe that necessary to sustain his title in this situation. Such a contention was made to the Joint Land Commission in 1908 by counsel for the Isthmian Canal Commission, and it was answered as follows:

" * * * The principal questions which occupied the attention of the Commission were those of title and of valuation. In cases when the title to land was in dispute among private parties the Commission made no attempt to ascertain the lawful owners, but left the adjudication of such matters to the courts of the Canal Zone. But where the United States contested the right of the claimants to any property, contending that the lands in question were public lands, it became necessary for the Commission to reach a decision in order that it might determine whether the claim should be dismissed or whether an award should be made.

"In determining such questions the Commission took the view that it should not disturb titles to land where such titles had been acquiesced in for a number of years by the public authorities. At the time the Commission of 1908 was in session, counsel for the United States advanced the theory that no title to land in the Canal Zone was valid unless it could be traced without interruption to a grant from the Crown of Spain or from the Government of Colombia and that all the steps necessary to secure

title under the laws of Spain or of Colombia should be duly verified. Very few, if any, of the present holders of lands in the Canal Zone would have been able to comply with such requirements. The records of the Commission of 1908 indicate that the Commission did not concur in this view of the requirements for land titles. It may also be remarked that while establishing this theory in principle, the former counsel for the United States departed from it, in practice, by taking deeds from a large number of persons with whom he made private contracts for the acquisition of land below the 87-foot contour line. * * *" (Interim Report of Joint Commission, March 1, 1913, to September 23, 1913.)

For more than one hundred years these lands show private ownership by conveyance of record, and we think the long-continued claim of ownership and the doing of such things as are shown to have been done by De la Parra and his successors in title is sufficient to show that they had a grant from the government, or, at least, a good, just, and perfect title to the lands. See Ross v. Sutter, Tex.Civ.App., 223 S.W. 273, 276, in which the Court stated as follows:

"* * * It is, however, immaterial in this case that the grant was not proven by the testimonio, for the reason that under the facts of this case a grant will be presumed. Long-continued possession of land under a claim of ownership, varying in length of time according to the circumstances, is sufficient as a basis for presuming that a grant has been issued. Herndon v. Casiano, supra [7 Tex. 322, 332]; Lewis v. San Antonio, 7 Tex. [288], 302–309; Paschal v. Perez, supra [7 Tex. 348, 359]; Sheppard v. Harrison, 54 Tex. [91], 96; Von Rosenberg v. Haynes, 85 Tex. 357, 20 S.W. 143; [Texas Mexican] Railway v. Uribe, 85 Tex. 386, 20 S.W. 153; State v. Bruni, 37 Tex.Civ.App. 2, 83 S.W. 209. * * *"

It is true that there is a total absence of proof in this record to show that De la Parra or his successors in interest were ever in actual possession, except possibly when the plaintiffs were evicted from the lands. However, there can be no question but that they were the owners of the land, and possession being incident to ownership, in the absence of evidence that anyone else was in possession, possession is presumed to be in the owner, and De la Parra and his successors in interest have a complete, legal, fee simple title, and no actual possession appearing in someone else sufficiently establishes peaceable, constructive possession.

Constructive possession, or a possession in law, as it is sometimes called, is that possession which the law annexed to the legal title or ownership of property when there is a right to the immediate, actual possession of such property but no actual possession, and one having the legal usage in fee in the land has constructive possession, unless there is an actual possession in someone else. See 51 C.J. 192; Southern Railway Co. v. Hall, 145 Ala. 224, 41 So. 135; Wood Lumber Co. v. Williams, 157 Ala. 73, 47 So. 202; Montgomery v. Spears et al., 218 Ala. 160, 117 So. 753; Gibson v. McGurrin, 37 Utah 158, 106 P. 669; Tilton v. Bader et al., 181 Iowa 473, 164 N.W. 871.

Furthermore, the deed and conveyance to De la Parra of 1852 recites plainly that his vendors had acquired the lands by virtue of law, having cultivated them for more than ten years and that they had dispossessed themselves of the lands and transferred all rights to the vendee and vested in him a legitimate and just title. Therefore, he acquired the lands from vendors in possession, and De la Parra, being the possessor of the record or paper title, can successfully claim possession, because his vendors were in possession. See 19 C.J. 1055, Note 1; 28 C.J.S., Ejectment, § 19, p. 869, and many cases cited from almost every jurisdiction.

As stated on page 63 of this opinion [70 F.Supp. 339], when one relies on a record or paper title which does not reach back to the state, a title prima facie is shown by a deed from someone who had possession. See Landry v. Giguere, supra.

The next question that presents itself is: How is it shown in this record that De la Parra's vendors were in possession?

The answer to that query is that the deed itself cites as a fact that they were in pos-

session and had been for more than ten years and that they were dispossessing themselves in favor of the vendee.

Was this recital in the deed evidence of the fact?

As we understand the general law, a recital in a deed, conveyance, or public document may or may not be evidence of same. 19 C.J. 1157; 28 C.J.S., Ejectment, § 84, p. 958. In the Canal Zone, however, we have a provision of the Code which states that it is prima facie proof of the facts stated. Title 4, Sec. 1946 of the present Canal Zone Code provides that:

"Entries in public or other official books or records made in the performance of his duty by a public officer of the Canal Zone, or by another person in the performance of a duty specifically enjoined by law, are prima facie evidence of the facts stated therein."

This is an adaption from the old Code of the Canal Zone of 1907. There is no question but that it is a rule of evidence that was adopted in this jurisdiction, and the history of it shows that the law of the Canal Zone was largely taken from that of California, and California has identically the same statute (Code of Civil Procedure, Sec. 1920), which was an adaptation of the common law on the subject. 1 Greelee Evidence, 493; 1 Starke Evidence, 158, 183; Gregory v. McPherson, 13 Cal. 562; 32 C.J.S., Evidence, § 730, p. 637, and cases cited thereunder. We believe that Puerto Rico and the Philippines have the same provision. We are also inclined to believe that it was part of the civil and Spanish law, but we have made no research in this respect.

Both the notary and the registrar of deeds—which were public documents—were required to keep records under the law of Spain and succeeding governments, including Panama. As a matter of fact, there was more formality about the writing, preparing, drafting, executing, acknowledging, and registering of deeds under the Colombian and Panamanian laws than there is in the continental United States.

We know of no reason why this plain, affirmative statement of fact contained in the deed of conveyance to De la Parra is not prima facie evidence of the possession of his vendors. Especially is this true when we consider that other evidence appears in the record, such as the notoriety of his ownership; the reestablishment of his title of record by a court proceeding that was pending in the courts from May of 1884 until March 12, 1895, when it was disposed of by judgment of the court; and many documents, including powers of attorney, recorded both in Panama and in the Canal Zone; and negotiations between the plaintiffs and the Panama Railroad Company in which the Railroad Company virtually acknowledged the paramount title of De la Parra.

The proof in this case, oral and documentary, shows beyond any question that De la Parra and his successors in title had in no manner surrendered their rights to the property, always claimed the property, and for many years actively engaged in negotiating the sale or development of same. In other words, they were "economically exploiting the property."

It is also shown that they paid the taxes and fees for registering and recording instruments. Further, when the Harrison-Arosemena map was prepared, at the instance of the Panama Railroad Company, the fact that there was noted on same that De la Parra had certain lands indicates to this Court that the De la Parra title to the lands was not questioned and that the record of same was well known in Panama, and certainly the Railroad Company had every reason to know of it.

So far as this record shows, no one other than De la Parra and his vendors and his successors were ever in possession of or claimed these lands, except Pedro Cerezo in Tract 2, which consisted of 231.7 acres, and José Villalobos in Tract 3, which consisted of 370 acres. Therefore, there is a total of over 2,500 acres situated in the oldest settled part of the Isthmus of Panama, a part which was the most highly cultivated and industrialized of the Isthmus, and located not more than one mile from Chagres, which was the capitol of the province until 1850, and then not more than two miles from Aspinwall (afterwards Colon and Cristobal), the only port on the At-

lantic side, and within a mile and a half of the ancient Fort of San Lorenzo, that no one ever occupies, claimed, or asserted any right, title, or interest in except De la Parra and his vendors and successors in interest. During all this time De la Parra and his successors in title had a title of record to a well-named and notoriously-known boundary of land, viz. Nombre de Dios, which condition existed from 1842 until 1912, a period of seventy years.

The evidence in this case shows without contradiction that, long prior to the concession, adjudication, and delivery to the Panama Railroad Company of Lot No. 1, as shown on the Harrison-Arosemena map, the predecessors in interest and title to the plaintiffs were in the peaceful possession of all the lands described in the pleading, viz., Tracts 1, 2, 3, and 4, and that such possession, under claim of color of title and title, continued without violence, concealment, or interruption until the year 1912, fifty-six years after the adjudication and fifty-three years after the delivery of the concession to the Panama Railroad Company.

Whatever defects, if any, there might have been in the title of the possessors in the years 1850, 1856, or 1869 were absolutely cured by the claimants' and occupants' continued possession thereafter.

If the Panama Railroad Company had a paramount title to these lands, or any part thereof, it could have, and should have, asserted same long prior to the expiration of the prescription period set forth in the statute. The Railroad Company certainly knew of the claims to and possession of the lands at the time of the preparation of the Harrison-Arosemena map in 1862 and during the adjudication proceeding which it instituted. For us to say that the officers of the Railroad Company did not know that the lands were claimed and occupied and did not know who the occupants were would convict this Court of knowing less than anyone else on the Isthmus. We do not propose to be placed in that category.

During all the time mentioned, the evidence discloses that in only two instances did the Panama Railroad Company assert or obtain any right of possession or domin-ion of the lands within the area of Lot No. 1, situated on the west side of the Bay of Limon, and, in both instances, the land in question was without the boundaries of that involved in this action. The fact that the Railroad Company failed to assert any rights in the land during all of this time not only raises a strong presumption to the effect that the title of the occupants was known and recognized but, in our opinion, it is conclusive of the Railroad Company's knowledge of such. They must have known what they could and should have known.

Plaintiffs introduced certain tax receipts (Plaintiffs' exhibit 23) showing the payment of taxes on the lands involved in this action.

Counsel for defendant stated in his brief that the payment of taxes is not evidence of title. If counsel means by this statement that it is not conclusive evidence, he is correct, but it certainly is evidence, so far as it goes, to show title, ownership or possession of, or claim to lands.

Counsel for defendant also stated that plaintiffs only introduced evidence of payment of taxes for two years and that the plaintiffs' predecessors did not pay taxes prior to 1909 and that plaintiffs' failure to prove the payment of taxes by the occupants prior to 1909 is failure to prove an act of ownership on their part during that time. It is further stated that, if plaintiffs expected any weight to be given to the tax receipts of 1909-1910, greater weight should be given to the failure to prove payment of taxes prior to 1909.

Two of the tax receipts offered in evidence show that taxes were paid on the lands in 1907, the other show that taxes were paid on the lands for the fiscal years 1908 to 1909 and 1909 to 1910. We might add that the receipts show a substantial sum paid for taxes.

There seems to be a great deal of confusion in the law as to the assessment and collection of taxes in the Canal Zone.

Prior to the Treaty between the United States of America and the Republic of Panama, there was, so far as this record and available evidence shows, no land tax in the State of Panama.

Act No. 7 of the Isthmian Canal Commission of September 1, 1904, provides for the organization of municipal government in the Canal Zone and also provided for the municipal government to levy an ad valorem tax of from one fourth of one per cent to one per cent on real property. March 13, 1907, the President of the United States, by executive order, provided for a tax-collector and prescribed his duties, and it was not until after the promulgation of this order that any taxes were ever assessed or collected upon real property within the Canal Zone. They were only collected for three or four years, or until 1912.

We have been unable to say from this record exactly how many years taxes were collected in the Canal Zone, nor can we say how and upon what basis property was assessed. There has been some confusion, also, as to whether it was assessed upon the lands or upon the improvements. We will state, however, that, in our opinion, the fact that the taxes were paid, as set forth above, was at least notice to the Isthmian Canal Commission and the Panama Railroad Company that the plaintiffs' predecessors in interest were occupying and claiming the land.

Having considered the proof, as above, we will now consider the law which we believe is applicable to the facts and situation of this case.

Counsel for the defendant cited and quoted from many cases, both state and federal, in support of his contention as to the law of adverse possession and adequate descriptions as set forth in title papers. All of the cases were based and bottomed upon the conditions prevailing in the United States and laws, practice and procedure applicable thereto.

We have carefully considered all of the cases cited, and a statement and history of each is contained in the Court's memorandum, beginning on page 133.

We must take into consideration the location of the lands in suit, the conditions prevailing in the possessions of Spain and under the succeeding governments, as have been stated many times in the Court's memorandum and herein, also the policies proclaimed by the United States through its president, viz, that the Isthmian Canal Commission was to "acquire by purchase or through proper and uniform expropriation proceedings, to be prescribed by the commission, any private lands or other real property whose ownership by the United States is essential to the excavation and completion of the Canal."

Also, we must remember the proclamation of the President of the United States to the effect that:

"The inhabitants of the Isthmian Canal Zone are entitled to security in their persons, property, and religion, and in all their private rights and relations. They should be so informed by public announcement. The people should be disturbed as little as possible in their customs and avocations that are in harmony with principles of well ordered and decent living:

\* \* \* \* \* \*

"The laws of the land, with which the inhabitants are familiar, and which were in force on February 26, 1904, will continue in force in the canal zone and in other places on the isthmus over which the United States has jurisdiction until altered or annulled by the said commission, but there are certain great principles of government which have been made the basis of an existence as a nation which we deem essential to the rule of law and the maintenance of order, and which shall have force in said zone. The principles referred to may be generally stated as follows:

"That no person shall be deprived of life, liberty, or property without due process of law; that private property shall not be taken for public use without just compensation; \* \* \*"

 Considering the above, we believe that the opinions of the Supreme Court in similar and analogous cases regarding the validity of land titles acquired under former sovereignty, and specifically the cases wherein the treaties with Spain and France affected land titles in Texas, Missouri, Alabama, Louisiana, Georgia, and other states are applicable to the situation and proof and facts of this case. We believe that the same principles of law as set forth in those opinions should be the law of this case, and

we will therefore, as briefly as possible, cite and quote from such cases.

The first of these cases brought to the attention of the Court is United States v. Arredondo, 6 Pet. 691, 31 U.S. 691, 8 L.Ed. 547. In this case the plaintiffs were landowners in Florida, holding under Spanish grants. The territory was ceded to the United States by Spain, thus raising an issue of whether the United States must recognize the plaintiff's right to the land. This Court first proceeded to inquire into its jurisdiction and the validity of the proceedings bringing the case before it, and then took up the case on the merits, making the following observation:

"* * * As the law giving jurisdiction to hear and determine this cause not only authorizes but requires us to decide it according to the law of nations and the stipulations of the treaty, we shall consider, 'that it has been very truly urged by the counsels of the defendant in error, that it is the usage of all the civilized nations of the world, when territory is ceded, to stipulate for the property of its inhabitants. An article to secure this object, so deservedly held sacred, in the view of policy, as well as of justice and humanity, is always required and is never refused.' Henderson v. Poindexter, 12 Wheat. 530, 535, 25 U.S. 530, 535, 6 L.Ed. 718. When such an article is contained in a treaty of cession, and its meaning submitted to our consideration, we shall follow up and effectuate the intention of Congress, by deeming the subject matter to be, whether the land in controversy was the property of the claimants, before the treaty, and if so, that its protection is as much guaranteed by the laws of the republic, as the ordinances of a monarchy. * * *"

After recognizing such a duty in treaty-making powers to recognize private rights when land is the subject of the treaty, the Court held that the plaintiff's title to the land was good, stating as follows:

"* * * The United States seems never to have claimed any part of what could be shown by legal evidence and local law to have been severed from the royal domain before their right attached, whether the severance was by patent, concession, war-

rant, order of survey, or any other act which might have been perfected into a complete title, by the laws, usages, and customs of Spain. * * *"

The next case is Delassus v. United States, 9 Pet. 117, 34 U.S. 117, 9 L.Ed. 71. In this case the plaintiff had made a contract with the Spanish authorities by which he was to acquire title to land. At the time of the occupation by the United States, this title had not yet been perfected, and the question arose as to whether the United States must recognize an inchoate title to land. It was held by the Court that such an inchoate title is a kind of property and must be recognized and protected by the United States. The Court went on to say that the right would be held sacred, even though there were no treaty stipulation. While the sovereign may acquire full dominion over an inhabitant territory, this dominion does not divest the vested rights of individuals to property. The people change their sovereign, but their right to property remains unaffected. The Court then cited the Arredondo case with approval and went on to confirm the claim of the plaintiff.

At about the same time and under similar circumstances, there arose the case of Mitchel v. United States, 9 Pet. 711, 34 U.S. 711, 9 L.Ed. 283. Here the plaintiff's title was founded on deeds from the Creek and Seminole Indians, which had been ratified by the Spanish authorities. The question arose as to the validity of these deeds. It was held by the Court that they were sufficient to establish title in the plaintiff. The Court recognized the proposition that the inhabitants of a conquered or ceded country retain all the rights as to property which are not taken from them by the orders of the conquerors or the laws of the sovereign who acquires it by cession. Purchases from Indians or natives, therefore, are valid if made with license from the sovereign authority or its agent.

In Strother v. Lucas, 6 Pet. 763, 31 U.S. 763, 8 L.Ed. 573; and again before the Supreme Court, 12 Pet. 410, 37 U.S. 410, 9 L.Ed. 1137, the Court reaffirmed the above rule, and went on to say that there is a presumption of validity attached to a grant made in a customary mode and under

lawful authority, and that, in order to controvert it, it is necessary to show by a preponderance of the evidence either that the officer making the grant has transcended his powers or that the transaction is tainted with fraud. The court said:

"* * * This court has also uniformly held that the term 'grant' comprehends not only those which are made in form, but also any concession, warrant, order, or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession. * * *"

A situation rather similar to that in the instant case arose in United States v. Chavez, 175 U.S. 509, 20 S.Ct. 159, 44 L.Ed. 255. There a continuous possession of the land in question by the plaintiff and his predecessors was shown to have existed for over one hundred years, and inferentially for a longer time. Mexico and Spain had respected the plaintiff's ownership and possession, and the question arose when the territory was ceded to the United States whether the United States must also respect them.

The plaintiff was unable to present any direct evidence connecting him with the original title to the lands but offered copies of deeds connecting him with a former possessor. The descriptions in these deeds are interesting. The first was a deed for an undivided fifth of the Bosque de los Pinos, "bounded on the north by the league of the pueblo of Isleta, on the south by the residents of Valencia, on the east the plain, on the west the Rio del Norte." The second described the land as "bounded on the north by the lands the pueblo Isleta, on the south by the lands known as those of Los Lentes, on the east by the hills, and on the west by the Rio del Norte."

It was held that:

"* * * Long and uninterrupted possession of real property, in the absence of rebutting circumstances, creates a presumption that formal instruments or records of title have once existed, even if they cannot be found.

"A presumption of title arising from long possession extends to all that may be necessary to the repose of the title, and is not limited to a presumption of only one step in the title. * * *" Syllabus, United States

v. Chavez, 175 U.S. 509, 20 S.Ct. 159, 44 L.Ed. 255.

In Carino v. Insular Government of the Philippine Islands, 212 U.S. 449, 29 S.Ct. 334, 336, 53 L.Ed. 594, the plaintiff, a tribesman, had held the lands in question for more than fifty years. No title had ever issued from the Spanish crown, although application had been made. The question arose, when the United States took over, whether the plaintiff had any rights that the United States must respect, since plaintiff had not complied with the Spanish administrative regulations providing for a registration of title. The court held for the plaintiff, on the theory that the regulations did not confer title but only went to establish those already existing. More important, the court laid down the following principle:

"* * * Whatever the law upon these points may be, and we mean to go no further than the necessities of decision demand, every presumption is and ought to be against the Government in a case like the present. It might, perhaps, be proper and sufficient to say that when, as far back as testimony or memory goes, the land has been held by individuals under a claim of private ownership, it will be presumed to have been held in the same way from before the Spanish conquest, and never to have been public land. Certainly in a case like this, if there is doubt or ambiguity in the Spanish law, we ought to give the applicant the benefit of the doubt. * * *"

The court further stated:

"* * * As prescription, even against crown lands, was recognized by the laws of Spain, we see no sufficient reason for hesitating to admit that it was recognized in the Philippines in regard to lands over which Spain had only a paper sovereignty. * * *"

This latter quotation from the Carino case was approved in Pueblo of Santa Rose v. Fall, 56 App.D.C. 259, 12 F.2d 332.

The Supreme Court of the United States, in the case of United States v. Auguisola, 1 Wall. 352, 17 L.Ed. 613, in passing on certain property rights involved in the territory ceded by Mexico to the United States in 1848 stated:

" * * * They have directed their tribunals, in passing upon the rights of the inhabitants, to be governed by the stipulation of the treaty, the law of nations, the laws, usages, and customs of the former government, the principles of equity, and the decisions of the Supreme Court, so far as they are applicable. They have not desired the tribunals to conduct their investigations as if the rights of the inhabitants to the property which they claim, depended upon the nicest observance of every legal formality. They have desired to act as a great nation, not seeking, in extending their authority over the ceded country, to enforce forfeitures, but to afford protection and security to all just rights which could have been claimed from the government they superseded. * * *"

We believe that the above opinions of the Supreme Court (and there are many others to the same effect) fully set forth the law as to the situation herein involved. These opinions and decisions of the Supreme Court show the settled principles of law as applied to the territories which are now great States of the Union, all of which had formerly been under the jurisdiction and sovereignty of other governments. The principles announced are plain, simple, and easily understood. They are grounded on common honesty, right, and justice, and they have received the approval of the executive and the legislative branches of the government for more than a hundred years.

For thirty-five years counsel for plaintiffs have been citing and quoting from the above mentioned cases and attempting to get the courts to apply the principles enunciated in the decisions to the lands in controversy in this action.

We have been unable to find where the courts of the Canal Zone or counsel for the Panama Railroad Company, the Isthmian Canal Commission, or the United States of America ever mentioned these cases, except in the old case 66 there was a feeble attempt on the part of the prosecuting attorney (who attempted to enter the appearance of the United States) to distinguish the law of these opinions according to his own unsupported theory.

These cases are cited and quoted from in the memorandum of associate counsel for plaintiffs filed in this case.

Counsel for the Government has filed three briefs in this case, but none of the above opinions have been mentioned, commented on, or discussed; they have been absolutely ignored, except for a cryptic concluding statement to the effect that counsel for plaintiffs had cited the cases but that it appeared in those cases that the boundaries of the land were well established. There has been absolutely no attempt to explain to or show the Court why the clean, clear principles stated in these opinions should not apply to the facts and situation herein involved.

These lands were, of course, until 1904 in the jurisdiction and under the dominion and sovereignty of Spain and succeeding Latin American governments. We will therefore consider the laws of these governments. In doing so, we realize that any investigation of the laws of the ever-changing government that we now know as Colombia is not without its difficulties. We doubt that anyone could say at any specific or particular time between 1821 and 1904 what the current law was in a country that had had seventy revolutions in a little more than seventy years. After reviewing this record, carefully considering the exhibits which contain excerpts of the laws of Colombia and succeeding governments and Panama, and carefully considering the testimony of the Government's witnesses upon the law, and after making our own independent research, we express the opinion that the governments which succeeded Spain largely followed the civil and the Spanish law, so far as the premises of this case are concerned. We are also of the opinion that there was no law of Spain or of the succeeding governments that would impair the title of the plaintiffs herein to the lands in question.

In addition to the frequent changing of the government, government officials, and dynasties in Colombia and Panama, as mentioned above, we have in this case some unusual complications.

In the thirty-seven years during which this and related cases involving the lands

in controversy have been the subject of litigation, the Panama Railroad Company, the Isthmian Canal Commission, and the Government of the United States have appeared and been represented by many different lawyers, each of whom seems to have had his peculiar theory as to the law and the facts. The pleadings herein and the fragmentary briefs that can be found in the record show that there is a total absence of any unanimity in opinions of counsel, and there is no way in which their theories and contentions can be harmonized, for they have never been the same in any two cases. It will be found that succeeding counsel would often retract and withdraw all that had been done by his predecessor.

Another most unusual situation has developed upon the trial of this and related cases.

The Canal Zone Code, title 4, section 1928, provides as follows:

"The oral testimony of witnesses skilled therein is admissible as evidence of the unwritten law of a State or foreign country, as are also printed and published books of reports of decisions of the courts of such State or country, or proved to be commonly admitted in such courts."

In the old civil case 66 (1908), referred to in this opinion and in the Court's memorandum, there was an abortive attempt upon the part of the prosecuting attorney of the Isthmian Canal Commission, as has previously been mentioned, to enter the appearance of the United States in that action, and, by browbeating, bullying, and blustering, he was successful.

Counsel for the Government has put his seal of approval upon the validity of that intervention and has based his plea of res judicata herein on that proceeding.

The only other related case in which the Government of the United States has ever appeared as a party in the Canal Zone, so far as we have been able to discover, is the present action, instituted pursuant to the Act of Congress. (Memo, p. 1)

Only two experts on Spanish, Colombian, and Panamanian law have appeared in this and all related cases, viz., Dr. Galindo in case 66, and Dr. Chiari in the present case,

and both of them were offered by the Government.

Dr. Galindo testified with a great deal of gusto that the Panama Railroad Company never had any right, title, or interest in and to the lands involved in this controversy, because—although it had a grant or concession—the lands were never adjudicated to the Railroad Company.

In the present action Dr. Chiari testified plainly, emphatically, and positively that the lands were legally and properly adjudicated to the Railroad Company and that, after the grant and subsequent adjudication and delivery, the Railroad Company was the owner of all of the lands included in said grant.

Counsel for the defendant, in a subhead found on page 102 of his brief, states that "the defendant has proved that it has title to the land in controversy in this case." This contention and conclusion of counsel is based entirely upon the title that it derived from the Panama Railroad Company, which title was derived by the grant and concession to the Railroad Company in 1850.

In his brief, counsel for defendant refers frequently to the testimony of Dr. Galindo, and also relies on, cites and quotes at length the testimony of Dr. Chiari.

In a rather active experience of more than forty years upon the bench and at the bar, we, of course, know that experts can be found in any situation and in any exigency to support any theory, some pro and some con, and we also know that adversary parties frequently retain these experts and that it is not unusual to have these opposing experts express and expound opposite views and theories with all the finality of a demigod. In all of our experience, however, this is the first time that any litigant has offered two experts—and two only—whose testimony is absolutely contradictory, and then has expected a court to rely upon such testimony.

We do not believe it necessary to examine the testimony of Dr. Galindo at length. The sum and substance of it was that all of the lands in what is known as Lot No. 1 on the Harrison-Arosemena and all the lands in controversy in this action were part of the lands allotted to the old munici-

pality of Nombre de Dios. (Memo, p. 3) However, he did testify emphatically that the Panama Railroad Company had absolutely no title to the lands, because it failed to perfect its title by adjudication. At no place did he ever state what it was necessary for the Railroad Company to have done to have perfected its title.

We do not believe that a careful reading of his testimony—and we have read it many times—is of any great value to one sincerely trying to discover the law of Spain and the succeeding governments. Most of his testimony is simply his conclusions, and his answers are long and involved and without any evidential value.

We will next consider the testimony of Dr. Chiari, which was given in Spanish and interpreted by a member of this bar who is an accomplished linguist, speaking both English and Spanish. His evidence will be found in transcript (969), page 75 et seq.

Evidently Dr. Chiari had made some research before he testified, because the transcript shows that he had conferred with counsel for defendant and that certain questions had been submitted to him and that he had made notes on same, and his answer had been formulated in Spanish and translated into English.

He testified at length as to the ever-changing laws of Colombia, defined "public lands," and stated that prescription could not operate as to public lands after 1882. He defined "prescription," and then confused it with cultivation. He also stated that, if possession of government lands were commenced prior to 1882, it could not be completed thereafter and title acquired unless the public interest had terminated. He stated that a deed of sale did not carry any presumption of possession and that vendors could not sell what they did not have. He described the procedure for de-nouncement and stated that the beaches were owned by the sovereign, further, that a cultivator who denounced lands subsequent to 1850 could not retain the right to get a grant, and that denouncement was not title. He stated that all adjudication and grants were suspended until the Railroad Company received the lands under its grant and concession.

Counsel for the Government propounded a rather lengthy hypothetical question, or series of hypothetical questions, to this witness, and the questions and answers will be found in transcript, page 81 et seq. After this question was propounded, the Court had some doubt as to whether all the assumed facts had appeared as proof in the case, and so indicated. Counsel for plaintiffs made no objection to the question, however, and the Court, desiring the record to contain everything necessary for the proper consideration and decision of the case, preferred to admit the testimony, even though it might prove to be incompetent, and therefore made no further suggestion.

The hypothetical question begins by referring to what is known as the "Matthew Klein concession of 1847," and refers to the Law of June 12, 1849 as relating to that concession. There was no such law introduced as evidence in this case, and the Court has been unable to find any Law of June 12, 1849 of the Congress of New Granada, as mentioned in the hypothetical question.

The record in this and the related cases shows that this was the first time that any suggestion or intimation had ever been made that there was any law or decree of Colombia connecting in any way the Panama Railroad Company's concession with the Klein concession. There is absolutely no connection in this respect shown by any evidence in this case, and the Court does not believe that the so-called "Klein concession" has any connection with nor has it anything to do with the Panama Railroad Company's grant or concession. (Memo, p. 33.)

The question then refers to Article 18 of the original grant to the Panama Railroad Company and states that the grant provided that the Colombian Government would make no grants of *public lands* in the provinces of Panama and Vereaguas until after those mentioned in the article had been delivered into the possession of the Company, saving, however, "The right which any other person might have acquired by virtue of grants of the Granadian Government anterior to the date of the present contract."

It will be observed that the question propounded to the witness assumed and stated

that, under Article 18 of the contract ratified between the Republic of New Granada and the Panama Railroad Company, the "government of the Republic will make no grants of *public lands*. * * *" No such language appears in Article 18, or anywhere else in the contract. The Article provided that the government of the Republic would make no grants of *vacant lands*. So far as this Court has been able to discover, from reading the contract and its various modifications from 1850 until after the lands were finally delivered to the Railroad Company, the words "public lands" were never once mentioned in the contract, grant, concession, or any modification of same. (See Court's Memorandum, page 22, et seq.; Bristow's Report, p. 296, et seq.)

The question then goes on to state certain assumed facts about the adjudication and final delivery of the lands.

Dr. Chiari began his answer by stating that the facts and the legal acts described in the preceding question must have had a great effect on everything relating to the acquisition of public lands in the provinces of Panama and Veraguas and that, as a result of the contract entered into with the Panama Railroad Company, the adjudication or granting of land was suspended until delivery to the Company was made of those that had been granted to it. He said that, with regard to prescription as a means of acquiring ownership, it was to be noted that the possession given to the Company put an end to any previous possession.

The witness then stated that, in his opinion, a person who, subsequent to 1850, filed a denouncement to lands which later were granted to the Railroad Company could not maintain the right to perfect his title by additional proceedings subsequent to the grant to the Company, because it was clear that the title given to the Company was perfect, because it combined not only nude ownership but also physical possession of the ground, and that such title could not be invalidated by a mere petition of adjudication.

He further stated that a cultivator who had filed such denouncement subsequent to 1850 but had not obtained adjudication from the government held *no rights* whatsoever with respect thereto. While such

cultivator was on the road to obtain title and before that was accomplished, the owners of the land—the State—alienated same, and such cultivator had no vested right but a mere expectancy.

He stated that a mere denouncement did not constitute title at all so far as concerned ownership of public lands.

It will be observed that nowhere in the hypothetical questions was the witness given the literal language of the contract and grants. The original contract and grant and concession and all subsequent modifications thereof, state and show that the only lands granted to the company were vacant lands and that it was understood that it referred to lands belonging to the Republic, while with regard to those belonging to individuals, the Company was to obtain them from their owners after proper evaluation and indemnification in the manner specified in Article 21 of the grant. (This conferred on the Company the right of eminent domain and condemnation.) All of this was made plain, as the language of the grant will show.

Only vacant lands belonging to the Government and all *lands in the two provinces mentioned that the Government could pronounce vacant were granted, it being understood that such were vacant lands belonging to the State and no others,* and that the grants should be effected provisionally as soon as designated by the Company, after proof of their character as *vacant lands,* a survey, and an appropriation to it by the governors of the respective provinces.

As late as July 5, 1867, the granting Government was still reiterating that the lands granted were *vacant, unoccupied lands* and that it was "encumbent upon the Company to prove their character as *vacant lands,* to measure them, and to make the respective plans," and that the Government was not bound to the vacating or guaranteeing of the titles of the *vacant* lands which might be adjudicated to the Company, and that it was obligatory upon the Company to make a survey of the lands, with notice to the owners of the adjoining lands.

Always there is expressly and specifically set forth that the grant was made to *vacant lands belonging to the Government* and that

it was the duty of the Company to show that they were vacant, unoccupied lands.

It will be observed that, at the time this hypothetical question was propounded, there was nothing in the record to base same on, because there was no evidence of any grant by the Government to the Panama Railroad Company of *public lands*.

As we understand the well-known provision of the codes cited above, viz, "that the oral testimony of witnesses skilled therein is admissible as evidence of the unwritten law of the state or foreign country," the only proper and admissible testimony that this witness could possibly give would be as to the unwritten law of Spain, Colombia, and Panama. He did, in the course of his testimony, speak of two decisions of the Colombian courts: One of November 25, 1896, in which the witness stated that the court decided that the most important title, and the one which constituted lawful ownership of public lands, was the title arising from the adjudication of such lands, such title being the method of proving that public lands had ceased to belong to the State and had passed over to private ownership, and that such title was the basis of subsequent transfers and that without same of title between private persons must be considered defective.

The Court will agree that a government grant of land is a very convenient title—especially is this true where there is no conflicting grant by the government—but whether it is the most important title is open to question. Burke, the great British statesman, spoke of the "solid rock of prescription" and stated that it was the soundest, the most general, and the most recognized title between man and man that is known in municipal as in public jurisprudence. 9 Wheat International Law, p. 449.

The other opinion mentioned by the witness was one of March 14, 1912, concerning which the witness stated that the court decided that the validity of a sale of another's property did not mean that the sale of something not belonging to the person vested per se title to the purchaser, and that it could not be juridically possible that one who was not the owner could transfer rights which were not his. We assume that such would be the law in all jurisdictions.

The styles of these cases were not stated, nor whether or not the opinions had ever been published and, if so, where. Therefore the Court has not read them but does not think they are necessary in the decision of this case.

If we understand this witness's testimony, there is a total absence of any testimony as to the unwritten law, customs, and usages of Spain or the succeeding governments.

Our own diligent research as to the laws of Spain and the succeeding governments, and a careful, painstaking reading of the provisions of the codes, statutes, and decrees of those governments, leads us to the opinion and the conclusion that the witness was mistaken when he stated that possession commenced prior to 1882 as to public lands could not be completed thereafter and title acquired unless the public interest had terminated, also when he stated that the deed or conveyance of sale did not carry the presumption of possession.

We assume that the procedure for denouncement and adjudication as explained by the witness was correct. It is to be noted, however, that nowhere in his testimony did he ever state that the time, within which the owner claiming and denouncing the lands could have them adjudicated, was limited.

We do not think that he was correct when he stated that a cultivator who denounced lands subsequent to 1850 could not retain right to get a grant. A denouncement may not be a perfect title, but it is color of title, at least in some situations.

We believe that the grants and adjudications to the Railroad Company suspended the right of the government to make further governmental grants of the same lands, but we do not agree that the government ever granted the Railroad Company anything except vacant, unoccupied lands. In our opinion, lands occupied and cultivated and possessed and claimed by private landowners in 1850 were never granted nor adjudicated to the Panama Railroad Company.

The witness was asked by counsel for the defendant if the State owned the strip of land between high and low tide. He answered that it did, without any question. He further stated that the strip of land between high and low tide could not be acquired by prescription and that it was generally called "beach," and it was for public use. He then attempted to state and quote the provisions of the Civil Code as to property of the Union, especially Articles 674, 679, and 2518. His statement and quotation of these sections, however, was not exactly accurate or correct.

Article 2518 merely provides that the ownership of corporeal things, real or movable, which are the object of trade, and which have been possessed with the legal conditions, may be acquired by prescription.

There is a whole chapter in the Civil Code, beginning with Article 674 referring to property of the Union, and it is substantially stated that property of the Union is that whose ownership is vested in the Republic, but if in addition the use thereof belongs to all the inhabitants of a Territory, such as that of streets, squares, bridges and roads, it is called "property of the Union for public use" or "public property of the Territory," and that all lands situated in the territorial limits which have no other owner are property of the Union. Rivers and all waters running along natural channels are, it is stated, the property of the Union; and then it is provided that the use and enjoyment which for transit, irrigation, navigation and any other licit purposes, private individuals have in the streets, squares, bridges and public roads, in rivers and lakes, and generally in all the property of the Union of public use, shall be subject to the provisions of that Code and such others on the subject as may be contained in the law.

Article 679 provides that no one can build, without special permission from a competent authority, any work upon the streets, squares, bridges, *shores,* fiscal lands and other places which are the property of the Union.

The above is the whole law upon the subject that the Court has been able to find after the most diligent research, and it is all contained in the *Civil Code* of the Republic of Panama, which was adopted from that of Colombia, and which was translated into English and was in effect in the Canal Zone until 1934.

The witness cited a certain decree of 1866 wherein docks and wharves could only be built with the authorization of the government. That is plainly provided in the Code referred to above, and we assume that it is the law in all countries. But no decision and no statute has been cited to support the testimony of this witness, especially as to that part in which he stated that the government owned the strip of land between high and low tide, and that *same could not be acquired by prescription.*

On cross-examination the witness stated that Dr. Galindo was right when he testified that landholders would succeed to the predecessors' right to perfect title and that no one could divest landholders of rights acquired before lands were set aside for public use.

He stated that individuals could institute necessary proceedings to perfect title after 1850, providing that the land had not been reserved or taken up by others. If a person occupied land by virtue of purchase and obtained a legitimate title thereby, he could perfect title by prescription.

He also stated that one who had completed prescription prior to the delivery to the Railroad Company in 1869 would have obtained title, and the government would respect his rights.

He also stated that, if possession had been specific, open, and uninterrupted for the time prescribed by law, there was no question but that possessory rights would be converted into ownership by extraordinary prescription.

Specifically he stated that, if one began possession anew in 1869 and held it for thirty years, they could acquire ownership of the lands as against the Railroad Company.

He further stated that there was no limitation to the area of land that could be obtained by prescription, as he was positive there was no limitation in that respect.

He further stated that, prior to 1882, the conditions now prevailing existed, viz,

for ordinary prescription, regular and continuous possession for ten years, and that "regular possession" meant that which arose from just title and which had been acquired in good faith. For extraordinary prescription, he said, possession for thirty years was required, without the requisite of title or good faith.

He stated that every individual who occupied uncultivated land belonging to the government which had not been especially appropriated by law, and established there a home and cultivation, acquired title to the land cultivated regardless of the area.

He further stated that the claimant in denouncement proceedings was required to furnish the government with the general limitations of the lands claimed and the *name by which the lands were known.*

He was specifically asked about certain provisions of the civil code of the Republic of Panama and stated that it was the civil code of Colombia, which was in force in Panama at the time of independence and then continued in force, that he was familiar with it, and that same was in full force and effect in Panama until about 1917. He also testified that Articles 2517 and 2531 of that code were in full force and effect at the time of the treaty between the United States and Panama, and that Article 3, Law 48 of 1882, did not repeal the two sections of the civil code mentioned but had excluded public lands from prescription by classifying public lands as property dedicated to public use and that this law of 1882 provided that public lands were to be classified as lands dedicated to public use to prevent any public prescription thereof.

He stated that the term "tierras baldias" was used to refer to unoccupied lands.

The provisions of the Civil Code of the Republic of Panama, which Dr. Chiari stated was also the Civil Code of Colombia, were from the civil code which was in effect in Panama at the time of her independence in 1903 and which code continued in effect in Panama until about 1917. This same Colombian and Panamanian Code was translated into English and was in effect in the Canal Zone from 1904, until 1934 and contained provisions which we think are applicable to a proper decision of this case, as follows:

"Art. 756. The tradition of the ownership of real property shall be effected by the recording of the title in the Office of Registration of public instruments.

"The tradition of rights of usufruct and use constituted in real property, and those of habitation or mortgage, shall be effected in the same manner.
* * * * * *
"Art. 759. Titles transferring ownership which require registration shall not give or transfer the actual possession of the respective right until the registration shall have been made as prescribed in the Title.
* * * * * *
"Art. 762. Possession is the seizin of a determined thing with intention of ownership, whether the owner of the person claiming to be such, as the thing himself, or by another person in his place and name.

"The possessor is considered the owner, as long as another person does not establish his ownership.
* * * * * *
"Art. 764. * * * The possession of a thing, with the knowledge and consent of the person who bound himself to deliver it, shall cause a presumption of tradition; unless it were necessary to effect the latter by the registration of the title.

"Art. 765. A just title is one which constitutes or transfers ownership.

"Occupancy, accession and prescription are constitutive of ownership.

"Titles transferring ownership are those which by their nature serve to transfer it, such as bills of sale, exchanges, donations inter vivos.

"Decrees of adjudication in proceedings for division, and legal acts of partition, belong to this class.

"Judicial decisions on rights in litigation do not serve as a new title to legalize the possession.

"Transactions (or compromises) in so far as they are limited to the recognition or declaration of pre-existing rights, do not form a new title; but when they transfer

the ownership of an object not the subject of dispute, they constitute a new title.

\* \* \* \* \* \*

"Art. 778. Whether one succeeds under a universal or singular title, the possession of the successor begins at the time thereof; unless he shall desire to add that of his predecessor to his own; but in such case he appropriates it together with its qualities and vices.

"One's own possession may be added in the same terms to that of an uninterrupted series of predecessors.

\* \* \* \* \* \*

"Art. 789. In order that registered possession may cease it is necessary that the record be cancelled, either by the will of the parties or by a new record in which the registered possessor transfers his right to another, or by judicial decree.

"As long as the record subsists, he who obtains the thing which is the subject-matter of the record, does not acquire the possession thereof nor does he put an end to the existing possession.

"Art. 790. If a person, claiming to be the owner, violently or clandestinely takes possession of an immovable, the title of which is not of record, he who had the possession loses it.

\* \* \* \* \* \*

"Art 946. *Revendication* or an *action of ownership* is the right of action which the owner of a singular thing, of which he is not in possession, has to have the possessor thereof adjudged to return it.

\* \* \* \* \* \*

"Art. 2512. Prescription is a manner of acquiring the things of another, or of extinguishing another's actions or rights, by reason of having possessed the things and said actions and rights not having been exercised during a certain lapse of time, and with the attendance of the other legal requisites.

"An action or right *prescribes* when it is extinguished by prescription.

\* \* \* \* \* \*

"Art. 2517. The rules regarding prescription are applied equally in favor of and against the Nation, the Territory, municipalities, establishments and corporations and private individuals who have the free administration of their property.

\* \* \* \* \* \*

"Art. 2519. In no case is property of public use subject to prescription.

\* \* \* \* \* \*

"Art. 2521. If a thing shall have been possessed successively and without interruption, by two or more persons, the time of the previous possessor may or may not be added to the time of the successor, according to the provisions of article 778.

"The possession begun by a deceased person continues in the vacant inheritance, which shall be understood to possess in the name of the heir.

"Art. 2522. Uninterrupted possession is that which has not suffered any natural or civil interruption.

"Art. 2523. The interruption is natural:

"1. When without the possession having passed into other hands, the exercise of possessory acts shall have been made impossible, as when a tenement has been permanently flooded.

"2. When the possession shall have been lost by reason of another having entered thereon.

"The natural interruption of the first kind produces no other effect than that of deducting its duration; but the natural interruption of the second kind causes all the time of the previous possession to be lost; unless possession shall have been legally recovered, in accordance with the provisions contained in the title on possessory actions, as in such case there shall not be considered that there was an interruption for the person dispossessed.

"Art. 2524. Civil interruption is any judicial remedy instituted by him who claims to be the real owner of the thing, against the possessor.

"Only the person who shall have instituted this remedy may plead the interruption, and not even he in the following cases:

"1. If notice of the suit shall not have been served in legal form.

"2. If the complainant shall have expressly abandoned the suit, or ceased its prosecution for more than three years.

"In these three cases the prescription shall not be considered as having been interrupted by the suit."

"(No. 3 'If defendant shall have received a decision in his favor' was omitted when the Colombian Code was adopted from Chile.)

"Art. 2525. If the property belongs in common to various persons, he who shall interrupt the prescription with regard to one of them, does so also with regard to the others.

"Art. 2526. The acquisitive prescription of real property or of real rights constituted therein does not obtain against a recorded title, except by virtue of another recorded title, nor shall it begin to run but from the date of record of the second.

"Art. 2527. Acquisitive prescription is ordinary and extraordinary.

"Art. 2528. To acquire the ordinary prescription, a regular uninterrupted possession, during such time as the laws require, shall be necessary.

"Art. 2529. The time necessary for ordinary prescription is three years for movables, and ten years for real property.

"Every two days shall be counted as one for absentees, in the computation of the years.

"As present for the purposes of prescription are understood those who live in the territory, and as absent, those who reside in a foreign country.

\* \* \* \* \* \*

"Art. 2531. The ownership of things in commerce, which shall not have been acquired by ordinary prescription, may be acquired by extraordinary prescription, under the following rules:

"1. For the extraordinary prescription no title whatsoever is necessary.

"2. Good faith is presumed therein of right notwithstanding the absence of a title acquisitive of ownership.

"3. But the existence of a title of mere possession, shall cause bad faith to be presumed and shall not produce the prescription, unless the following two circumstances be present:

"1. That he who claims to be the owner cannot prove that during the past thirty years his ownership shall have been acknowledged expressly or impliedly by the person pleading the prescription.

"2. That he who pleads the prescription shall, prove that he has had possession without violence, concealment, nor interruption for the same period of time.

"Art. 2532. The lapse of time necessary to acquire by this kind of prescription, is thirty years against any person, and is not suspended in favor of those enumerated in article 2530." (Note: Minors, insane, deaf mutes, wards, etc.)

"Art. 2533. Real rights are acquired by prescription in the same manner as ownership, and are subject to the same rules with the following exceptions:

"1. The right of inheritance is acquired by extraordinary prescription of thirty years.

"2. The right of servitude is acquired according to article 939."

The above provisions of the Code are taken from the immemorial law of Spain and the succeeding governments, substantially all of which can be found in White's New Recopilacion of the Laws of Spain and the Indies, Vol. 1, p. 345, et seq.

As incorporated in the Civil Code of the Republic of Panama, adopted in the Canal Zone and translated into English, they represent the law of Spain and the succeeding governments as construed, interpreted, and simplified. There is no ambiguity about them; they are plainly and easily understandable and, in our opinion, they represent all the "law and the prophets" necessary for the proper decision of this case. No decisions of Spain or the succeeding governments and no textbooks have been cited to this Court to the contrary.

Counsel for the plaintiffs, in his memorandum, did cite a case of the Supreme Court of Panama, Nation v. Muller, 5 Registro Judicial 82, 83. The Court has examined the case and finds that it is decided therein that the landholder could successfully claim prescription against the government for ordinary prescription of ten years. There was a question about the possession of the landholder and his vendor which was decided against the Nation.

The Court does not believe, however, that the opinion in this case is very helpful in a decision of the instant case.

Counsel for the defendant, in his brief, expounds at length as to the limitation of area which one could acquire by prescription under the law of Spain and succeeding governments. In view of his own witness's testimony that there was no limit to the area, we think that there is nothing necessary to be said; however, since counsel for the defendant so often contends that the plaintiffs and their predecessors in title could not acquire land in excess of ten fanegadas, it may be explained that there was a law of 1848 of New Granada—and we assume, without deciding, that it is still the law of the succeeding governments—that allowed the executive power to concede up to ten fanegadas of tierras baldias to the citizen of New Granada who cultivated same. This was based upon the policy that the government was trying to colonize the lands, and it was a simple, short, and inexpensive procedure for a small cultivator to obtain title to land and has nothing whatever to do with the law of prescription.

The Act of Congress under which this suit was instituted conferred upon this court jurisdiction to hear and determine, as in other cases, the claim of the Playa de Flor Land and Improvement Company against the United States of America on account of property taken by the United States in the Canal Zone, and we have assumed that, in order for the Playa de Flor Land and Improvement Company to have any claim, it would necessarily have to establish its title to the lands in controversy.

The answer in this case denies its title, and upon this issue the Court has heard the evidence, which consisted of the evidence and record in cases 1 and 3, consolidated, in which cases the record and evidence in old case 66 was also incorporated, all of which, as the Court as heretofore stated in its memorandum, was competent. (Memo, p. 119 et seq.)

It is to be observed in this connection that the evidence in cases 1 and 3, consolidated, consisted of two trials without decision, one on January 29, 1910, the other in February and March of 1928, and there were several depositions admitted as evidence in those cases. In addition, the Court heard the evidence in the instant matter, which consisted of the former testimony, as referred to above, the evidence of a few witnesses, and the exhibits, as set forth in the Court's memorandum. (Memo, p. 120.)

The Government has introduced proof in support of its denial of plaintiffs' title which the Court thinks was proper and all of which has been duly considered. Counsel for the Government has urged many reasons in support of its contention that the plaintiffs did not have title.

We have given this evidence and the arguments and contentions of counsel the attention and the consideration which the magnitude of the interest involved and the importance of the question would suggest, but, after doing so and after applying all the judicial acumen which we possess, we have arrived at the definite conclusion that the plaintiffs have not only proved their case but that the proof goes far beyond a prima facie case. It is therefore our opinion and conclusion, as set forth in this opinion, that:

1. The plaintiffs and their predecessors in title in interest acquired title to Tracts 1 and 2 by proscription or adverse possession against all others and against the Panama Railroad Company since the adjudication to the Railroad Company of lands granted to it by the Granadian and succeeding governments.

2. The plaintiffs and their predecessors in title have full and complete title to, and are the owners of, and were in possession of Tracts 3 and 4.

The Court, of course, understands the well-known principle of law that in this case the plaintiffs must prevail on the strength of their own title and not upon the weakness of another. We are of the opinion, however, that the plaintiffs have proved that they have, in good faith, acquired a good, just, sufficient, and superior title to the lands in controversy and are the owners thereof and that they and their predecessors in title were in possession of the lands upon the 1st day of February, 1912, when they were wrongfully and forcibly evicted and dispossessed.

Plaintiffs having established and proved a prima facie case to the lands, the burden of proof is shifted to the defendant to show superior right. This is the accepted law. See 19 C.J. 1154; 28 C.J.S., Ejectment, § 81, p. 955; 2 C.J.S., Adverse Possession, § 214, p. 814.

We have heretofore stated that the answer of the Government of the United States of America herein was a denial of all the material allegations of the complaint and the amended complaint. The answer discloses that there is no affirmative plea, although in an amended answer there is a plea of res judicata. At no time, however, did the defendant plead the title of its predecessor in title, the Panama Railroad Company, acquired by reason of the concession, adjudication, and delivery of the lands from New Granada.

Defendant offered and introduced certain exhibits, which have been often referred to in this opinion, to show these concessions, grants, adjudication, and delivery. This evidence was objected to at the time by a general objection of relevancy and competency. The Court could properly have refused to admit this testimony under the state of the pleadings and could have stricken that evidence from the record, because, if the defendant expected to rely upon the superior title of its predecessors, it was its duty to plead it. See 51 C.J. 233; 19 C.J. 1116; 28 C.J.S., Ejectment, § 66, p. 919; Swift, Jr., v. Mulkey et al., 14 Or. 59, 12 P. 76; Steinwand v. Brown et al., 38 N.D. 602, 166 N.W. 129. The Court is very doubtful that the defendant could rely upon a general denial and then raise the issue on the proof. The Court, however, will consider the case as though that issue were raised and will assume that the issue was raised by proper pleading, which would justify the proof accordingly.

For the reasons set forth in this opinion, we do not believe these lands were ever granted or conceded to the Panama Railroad Company. In any event they could not have been granted to it under the prevailing law of the land, because the government did not own or possess the lands at that time, and the attempted adjudication and formal delivery by walking

around the lands did not have any effect on the ownership of these lands. Furthermore, at that time plaintiffs' predecessors in title were the owners and in possession of the lands under title, color of title, adverse possession, and prescription.

The Court is of the opinion that the defendants have failed to sustain the burden and that the plaintiffs have not only proved a prima facie case but they have proved a much stronger case, and they have proved their claim and title to this property by a preponderance of the evidence. As to Tracts 1 and 2, the plaintiffs and their predecessors acquired title by adverse possession. Having already decided that Ricardo de la Parra had a good, sufficient, and just title to Tracts 2, 3, and 4, and the plaintiffs having acquired all the rights he possessed, we therefore decide and hold that the plaintiffs were the owners and in possession of the lands and that they have a fee simple title to all the lands involved in this action.

We again emphasize that, during the time the Railroad Company constructed and completed its railroad and specifically during the time of the adjudication and the final delivery of the lands, which was in 1869, it knew that these lands were possessed, claimed, and owned by the plaintiffs and their predecessors in title, and the evidence so shows, including the Harrison-Arosemena map, but not until 1910, 1911, or 1912 did it ever assert or make any claim to the ownership, title, or possession of the lands involved in this controversy.

Having arrived at the definite conclusion that neither the United States nor its predecessor in title, the Panama Railroad Company, has ever acquired title to or possession of the lands herein involved, for the reason that neither lands nor possession of same can be acquired by trespass, as was done in this case, and especially is this true should the trespass occur while actions were pending to establish the possession and title, we would ordinarily proceed no further, leaving the United States to institute the proper proceeding under the law to expropriate or condemn the lands and fix the value of same, as it has the unquestionable right and provided procedure to do. How-

ever, the Act of Congress confers jurisdiction upon the District Court of the Canal Zone to determine herein the claim of the Playa de Flor Land and Improvement Company against the United States on account of property taken by the United States in the Canal Zone. The United States by this Act of Congress has legalized the wrongful taking, and the pleadings herein have converted the claim into a compensatory action, and it therefore becomes the duty of the Court to fix just compensation for the land.

It is only natural that, after thirty-seven years of hotly-contested litigation as to the ownership of the lands, every conceivable question that could be raised by ingenious counsel has been injected into the litigation assailing the title of the plaintiffs and their predecessors in interest. As a result, the plaintiffs, being so intensely interested in establishing their title to the lands, have evidently become confused as to the important issue of value and it has been somewhat overlooked, but the value, after all, was a very simple matter, susceptible to proof easily available.

Realizing this situation, the Court has considered calling a jury to pass upon and fix the value of these lands. There is, however, an imperative necessity that this case be disposed of as promptly as possible, and the Court has therefore decided that it will fix the value of the lands in this judgment. Perhaps, after having reviewed the record herein and that of all the related cases, the historical and geographical documents of which the Court takes judicial knowledge, and after having been a resident of the Canal Zone for the past seven years as Judge of the District Court, and knowing the situation of the lands, the Court should be able to fix the value of these lands as accurately as the average witnesses and jury.

In approaching this question of value, the Court has received the distinct impression from the pleadings, proof, and the contention of counsel for the Government and its predecessor in this and related cases, that the fixing of the value of the lands is somewhat of a mystery and almost impossible, because they are in the Canal Zone and the Government, in 1912, decided to acquire all the lands in the Canal Zone and that, as private enterprise would not be permitted after that time, the lands would not have any value, or, at least, it would be difficult to fix it. Such a contention is just "foxfire and fiddle-dust."

Counsel for the defendant contends that the value of the lands was enhanced by the building of the canal and that the Court can not consider any enhancement of the value of the lands by reason of the construction of the Canal. We will refer to this contention later, but, assuming, without deciding, that it is true, we are on the other hand, firmly of the opinion that the value of the lands should not be decreased by the action of the United States in acquiring all lands in the Canal Zone in 1912, because we believe that the value of the lands was to be fixed in accordance with their availability for any purpose to which they were adaptable to any purchaser anywhere in the world who wanted to buy them.

We have always understood that the value of the lands taken under eminent domain for public purposes was to be fixed on the value of the lands to the owner, that is to say, what he could get for them for any available purpose in a free, fair, and open market in their present condition and without taking into consideration what they were to be used for when taken. We know of no law that establishes the principle that the value is to be fixed by what the taker intends to do with the lands and certainly none that would suggest that, if a taker were not going to put the lands to any use, except to keep them, the value would be lessened on that account.

We will therefore undertake to apply our common knowledge and our understanding of the situation, in addition to the evidence in the record, to fix and assess what we believe to be the value of the lands and give our reasons for our conclusions.

It will be remembered that the President of the United States in 1904, in accordance with existing law, only authorized the Isthmian Canal Commission to take such lands as were *essential for the excavation and completion of the canal.* From that time until December, 1912, private enterprise

operated in the Zone, and the laws of Congress and of the Isthmian Canal Commission show this to be true. There were taxes levied and regulations promulgated for the operation of such places of business, and there was absolutely no thought during those years upon the part of the inhabitants of the Zone, those in business therein, or of the officials of the Isthmian Canal Commission, as is fully shown herein, that the United States would subsequently acquire all the lands in the Canal Zone. In fact, the Canal Zone, like the United States, was an altogether new thing in history. The construction of the canal was subsequent to that of the Suez Canal which was the only other great international canal, but the company or government operating the Suez Canal never did have sovereignty over the lands through which it was constructed.

There is absolutely no foundation for any thought or suggestion, as revealed by the record, that the plaintiffs or their predecessors in title acquired the lands for the purpose of disposing of them to the United States Government or to the Panama Railroad Company. To the contrary, the evidence shows affirmatively that the plaintiffs did not want to dispose of them to the Government or the Railroad Company, but they wanted to utilize the lands for other purposes.

We have referred in our memorandum and this opinion to a controversy that arose after the President's Executive Order of December, 5, 1912, empowering and authorizing the Isthmian Canal Commission to acquire all the lands in the Zone. This controversy was as to whether the lands should be valued as of 1903, the date of the Treaty between the United States and Panama, or the value as of 1912, the date of the eviction. In this connection, we referred to opinions of Attorney Generals McReynolds and Gregory. (See Memo, p. 46 and 131.) In our view, this controversy is not important; however, since the parties have attached so much importance to it, the Court will explain it.

October 13, 1913, the Honorable J. C. McReynolds, Attorney General, rendered an opinion to the Secretary of War. This opinion answered several questions that had arisen as to the jurisdiction and the duties of the Joint Land Commission, all of which were answered understandably and comprehensively. The language of the Treaty was set forth, and the important question was about the improvements made by the occupants subsequent to the Treaty, it appearing that some official had raised the question that the Joint Land Commission, then in session, should appraise the private lands and private property and assess damages based upon their value before the date of the Treaty. The Attorney General stated that no such point had been made by Government counsel, either in the proceedings before the Commission or since, nor had it been referred to the Secretary of State or discussed by him, and then added:

"* * * I regard it as not well founded. The clause was enacted in 1903 and plainly had reference to property intended to be occupied by the United States immediately; and in fact the property necessary for the immediate structure of the Canal was forthwith occupied and damages were awarded its value by the earlier commissions.

"Now ten years later the Government has extended its occupation to other lands and it is for these recently occupied additional lands that this last commission has been making awards. It would certainly be a very harsh and unfair construction to apply the clause in question so as to withhold compensation for those improvements made during the decade when the Government was not occupying the premises for its public purposes. * * *"

November 25, 1916, the Honorable T. W. Gregory rendered an opinion to the Secretary of War commenting on, attempting to distinguish, and minimizing the effect of the opinion of his predecessor, as set forth above. This opinion shows beyond any question, by contemporaneous construction of the parties involved, that there was a conflict between the opinion of 1913 and that of 1916, and this undoubtedly was true as to the Isthmian Canal Commission and its legal advisors, and they were trying to avoid it. An examination of the two opinions will show beyond any question this sharp conflict.

The Court will not comment further in regard to these conflicting opinions of the attorney generals, except to quote an astounding statement contained in Attorney General Gregory's opinion, as follows:

"* * * The Republic of Panama could without doubt have granted to this Government the Canal Zone free from all private rights whatsoever, and since it could do this it could likewise make its grant to the United States subject to only a qualified right in the private property owners. * * *"

We have very serious doubts that the Attorney General ever read the opinion before he signed it. We certainly do not believe that he would have sanctioned the inclusion of a statement which absolutely nullified and destroyed what had been the proclaimed policy of the Government of the United States for more than a hundred years, as is clearly shown by the decisions of the Supreme Court of the United States, and many of these decisions in his own native state. See this opinion, pp. 68, 69 et seq. 70 F.Supp. 342–344 et seq.]

In addition to the opinion of Attorney General Gregory of November 25, 1916, referred to above, counsel refers to a communication of Secretary of State Hughes of October 15, 1923, replying to a letter of January 3, 1923, which had been received from the Panamanian Minister, and excerpts from the letters are quoted. The communication from Secretary of State Hughes was not introduced as an exhibit herein and is not a part of the record, and the Court has been unable to locate it and has no way of doing so. However, we do have a distinct recollection that, during the statement of the case or sometime during the trial, we saw a photostatic copy of this correspondence, and our recollection is that it was very lengthy and that the Panamanian Minister was making various complaints and calling a great many grievances to the attention of the Secretary of State, none of which had anything to do with the question herein involved, but that, in the course of the letter, something was said about the date of the valuation of the lands.

The excerpt from the letter of Secretary Hughes appearing in the brief of counsel merely calls attention to this statement of the Panamanian Minister in this respect and quotes that part of Article VI of the Treaty which is pertinent. It is then stated that the Article seems to be clear and specific on the point and that, should Panama desire to negotiate for a change in this stipulation of the Treaty, the United States Government would give careful consideration to any proposals it might care to make. The Secretary of State did not express any opinion as to the legality or limitations of the Article mentioned.

Counsel for the Government, in its brief, strongly relies on the opinion of the Attorney General mentioned above, and on the letter of Secretary Hughes wherein it is stated, so counsel contends, that the lands should be valued as of 1903.

Since we have not hesitated to express our opinion on any question herein, whether same were necessary for a proper decision of this case or not, we will do so again. With all due deference to the Attorney General who rendered the opinion and to the Secretary of State, who, counsel for the Government asserts, meant more than he said, and assuming that they did say and mean what counsel contends they said, we can not agree with them. Our reasons for this statement are as follows:

We have no doubt but that the two contracting governments had the perfect right to provide the Joint Land Commission to fix and assess the value of the lands at the time of the Treaty, just the same as though they provided for a court or jury to do so, but we do not believe that Panama, or any sovereign, had the right to provide that, in the event the United States decided to take the lands in the future, it could do so on the valuation fixed in 1903. We submit that, if they could do this, they could have granted the lands in fee. Our authority for this conclusion is the President's Executive Order of 1904 and the decisions of the Supreme Court of the United States heretofore referred to in this opinion, which have stood the test of time for more than one hundred years.

We have no doubt but that, if the United States Government had proceeded in the

proper way and in accordance with the law and procedure set forth in the Canal Zone Code to condemn these lands, the Joint Land Commission's valuation and assessment of the value of the lands would have been final and conclusive upon the Court as to the value of same.

We do not understand how the Government can seriously contend that the provisions of Article VI or the Treaty of 1903 between Panama and the United States providing for a Joint Land Commission to fix the value of lands, has any application to this case. There is not a scintilla of evidence in this case that these lands were necessary for the construction or maintenance of the canal nor that they have ever been used in that connection. At the time the plaintiffs were wrongfully evicted from the lands (February 1, 1912), there was absolutely no law or executive order, expressed or implied, giving anyone any right to take the lands for the United States. True, the plaintiffs were evicted and the lands attempted to be taken by a corporation, the Panama Railroad Company. Moreover, so far as this Court is aware, the lands have never been conveyed by the Railroad Company to the Government of the United States, except orally and pursuant to some understanding and agreement between the Government and the corporation. The Government, however, by the Act of Congress and the pleading in this and the former case 772, has admitted that it took the lands and that it has never paid any compensation for same. If it took the lands, it took them from the Railroad Company, which Company had wrongfully dispossessed the plaintiffs and taken same from them and their predecessors in title.

Can the Government of the United States now say, "We took and now hold the lands by reason of the unlawful act of the Panama Railroad Company in evicting and dispossessing the plaintiffs, but, if we have to pay for the lands, we want to apply all the law and procedure and the provisions of the Treaty to the transaction and only pay for the lands what they would have been worth in 1903"? In other words, "Since we have been sued, we want to take advantage of all the law

and procedure which was provided in a proper case but which we absolutely ignored." No principle of law or equity or right or justice can be found to support this contention.

As a practical matter in the decision of this case, the value of the lands in 1903 was substantially the same as the value in 1912 and later, with the possible exception of improvements placed thereon. Hereinafter we will give our reasons for this conclusion.

In support of counsel's contention that the value of the lands should be fixed as of 1903, he cites and quotes the following:

"Under the established rule Congress must be taken to have approved the administrative construction and thereby to have given it the force of law." Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 426, 83 L.Ed. 536.

"The Supreme Court has admonished us that interpretations of a statute by officers, who, under the statute, act in administering it as specialists advised by experts must be accorded considerable weight by the courts." Queensboro Farm Products v. Wickard, 2 Cir., 137 F.2d 969, 980.

We do not believe that, when Congress passed the present Act, it had forgotten or abandoned the settled policy of this nation as promulgated by the President of the United States in the Executive Order of 1904 and as found in the many decisions of the Supreme Court, which have never been questioned, nor that Congress only considered the opinion of an Attorney General which was opposed to this long-proclaimed governmental policy, and the conclusions and implications of counsel based on the letter of the Secretary of State referred to above.

It is also stated in the brief that the Court will take judicial notice of the fact that millions of dollars have been paid out to great numbers of landowners at a 1903 valuation and that, in all justice and equity, plaintiffs can show no reason why they, alone of all the persons whose lands have been expropriated, should be compensated on a more favorable basis than the great number of persons who had been compensated on a 1903 value, and that to

hold otherwise would be to open the door to legitimate complaints from all former landowners that they had been treated unfairly, and would establish the inequitable rule that one who is successful in getting Congress to enact a private jurisdictional act should be treated on a different basis than those who were not in such a favorable position, and that it is submitted that this raises a grave question of public policy to be considered by the Court.

We esteem it to be our duty to consider this case fairly upon the record herein and the applicable law and to decide it in accordance with same and without taking into consideration what was done with reference to some other claim for the taking of lands.

We also assume that Congress know what it was doing when it passed the Act. Furthermore, the record reveals that same was submitted to it by the Secretary of War, and it would be fair to conclude that this official and Congress knew at the time that this court had complete jurisdiction without any Act of Congress to adjudicate the matter but that they thought the legislation was the most practical way, in view of the judicial timidity herein evidenced, to get the matter finally determined.

The Court is unable to state, after a very careful investigation of the record and reports of the Joint Land Commission, how much was paid to landowners by reason of judgments and awards of the Commission, for the very simple reason that in many, many cases (and especially was this true of lands adjacent and contiguous to the terminals of the canal on the Atlantic and Pacific sides), private settlement was arranged, as indicated in the reports of the Commissions, and the Court has no access to the files from which it could determine the amounts paid. We will state, however, that the Joint Land Commissions' reports reveal that there was not a great deal of land in the vicinity of the Atlantic and the Pacific terminal of the canal that was acquired after 1903 by the Government; as stated in our memorandum (Memo, p. 131), the greater portion of the lands acquired after that date were

in the interior of the Zone, especially the Gatun Lake area.

We might add, however, that, as we understand the law, in the fixing of the valuation of lands, evidence as to what was paid for other lands by the condemner would not be proper. However, since counsel for the Government has made this contention, we are bound to state that, so far as we have observed in scanning the reports and the acts and doings of the Isthmian Canal Commission and the Joint Land Commission awards to landowners, we do not believe that the great difference in valuation will appear when the situation of the lands is considered.

As a result of our 7-year acquaintance with the Canal Zone and the Isthmus of Panama and the location and availability of the lands, and after considering the records referred to above, we believe that the plaintiffs, after thirty-seven years of litigation to vindicate their rights, could not be favored by this Court's judgment. Especially is this true when you consider that their lands were taken from them thirty-three years ago without any warrant of law, that they have never received one cent for same and that for these long, weary years they have been undertaking to establish their title in the courts of the Canal Zone against every contention and obstruction that ingenious counsel could devise.

We will now consider the contentions of counsel for defendant as set forth in its brief, beginning on page 93, referring to the valuation and evidence thereon.

 Counsel contends that the Court should give no consideration to the various offers to buy and sell the lands, as set forth in plaintiffs' exhibit 26-A, because prior offers of purchase of land are not competent evidence of value, and authorities are cited in support of counsel's contention. Counsel is correct. On the other hand, upon cross-examination, inquiries are permissible to test and to try the witness's qualifications.

Upon the trial of preliminary motions in this action, the Court learned of the deplorable condition of the record and that the files had been removed from the Clerk's

Office by counsel for the Government in the old case 772 and disarranged and broken down.

During the attempted pre-trial conference a week before the trial, the Court discovered that many of the plaintiffs' original exhibits had never been returned to the Clerk's Office and could not be found. During that week we requested the entire personnel of the Clerk's Office to assist counsel in investigating, recovering, and replacing the record, or in the securing of copies of same. Only the plaintiffs' exhibits were missing, because the record in all related cases shows that the Railroad Company and the Government were allowed to withdraw at will any exhibits which they had filed, which, we assume, included even their briefs, because only fragments of same can be found.

Confronted with the trial of the case in this situation, we requested counsel for the parties to make a complete statement and to give the Court not only their contentions and the evidence and the law upon which they relied but also a full history of the whole related proceedings, and questions were propounded during the course of the statement.

We knew that counsel for the plaintiffs, who was a non-resident and familiar with the history of the case only in a general way and that since his employment, was bewildered by the situation, and, had it not been for the previous long and unnecessary delay in the cases, the Court would not have proceeded with the trial under the circumstances.

The transcript herein will reveal that there were frequent recesses during the trial in order that counsel might make further search for original exhibits or secure copies, and the personnel of the Clerk's Office were assisting in this respect in every way possible.

The transcript of the evidence herein will also disclose that the Court interrogated the only important witness in the case, Fairman, quite a bit. We did not approve of this practice, but, under the circumstances, it could not be avoided.

The witness testified, as the record shows, that since 1906 he had been a resident of the Atlantic side of the Isthmus, that he had been from the beginning very active in local land litigation, appearing before the Joint Land Commissions and the courts of the Canal Zone in cases wherein the Government and the Panama Railroad Company were involved, as well as in other cases.

We took into consideration that the witness possibly knew more about the premises and the history of the case than any living person, and much more about it than non-resident counsel who was examining him.

The Court, in its interrogation of this witness, was interested in having included in the record everything that might be relevant and necessary to properly consider the case, furthermore, that, in the event the Court for any reason were prevented from trying the case and deciding it, any successor would have the whole case in the record, even though some of it might not be proper and might later be excluded. The Court propounded a great many of its questions to the witness for the purpose of eliciting the history of the cases. We understood that a great deal of his evidence consisted of statements of premises rather than evidential facts, but we believe that his statements as to the history, the laws, which included acts of Congress, regulations of the Isthmian Canal Commission, reports of governmental bodies, and the laws of Spain and succeeding governments were pertinent, relevant, and helpful to a proper consideration of the whole matter. We also realized, of course, that he was a lawyer, and we attempted to confine his evidence to relevant statements and facts instead of conclusions and arguments.

After the witness had stated his qualifications, the Court considered that he was competent to testify as to the value of the lands. The Court had already been advised, especially by statement made, that the plaintiffs had acquired the De la Parra tract of land during previous litigation, and interrogated the witness as to how that had happened. The transcript will show in this connection, as did the statement of counsel before the evidence was heard, that, pending negotiations and agreement entered into by the plaintiffs and counsel for the Panama Railroad Company, plain-

tiffs had received offers to sell the land which they would receive in accordance with the agreement and that this was considered by the plaintiffs as a reason for the agreement.

■ The Court did inquire of this witness as to whether the plaintiffs had had any offers for the lands and if the parties were responsible, but nowhere did the Court inquire as to the details or as to the amounts of such offers. We think it was perfectly proper for the Court to make these inquiries for the purpose of testing the witness's knowledge and the good faith of the plaintiffs in acquiring the De la Parra title, also as to the purposes for which the lands could be used.

It is true that the witness afterwards did detail the amounts of the offers, and the exhibit mentioned above (Plaintiffs' exhibit 26–A) contains correspondence with respect to same, but the Court did not consider this to be competent testimony at the time it was given and does not now consider it competent.

■ Counsel for the defendant, in its brief (p. 97), stated that the second type of evidence that should be excluded from all consideration in determining the value is the purchase by the United States of the lands at Toro Point (Plaintiffs' exhibit 23–C), which is the record of the case of Compania del Faro de Colon v. J. J. Morrow et al. Counsel stated that the documents introduced in evidence in this connection show that the lighthouse was included in the sale, and also states that there is absolutely no evidence upon which the Court could allocate the price paid between the lands and the improvements. It is also stated that it has been repeatedly held that evidence of sales of similar tracts of land is not competent evidence, and the cases of United States v. Foster, 8 Cir., 131 F.2d 3, and United States v. Reynolds, 5 Cir., 115 F.2d 294, are cited in support of counsel's statement.

We have no hesitancy in agreeing with counsel that the adjustment, compromise, and settlement in the lighthouse case mentioned above is not proper evidence, by way of comparison or in any way, as to the value of the lands in controversy. We

were more or less responsible for this exhibit, and we did it for the specific purpose of showing the unnecessary delay in this case.

In the lighthouse case the plaintiffs brought suit in ejectment against those in charge of the lighthouse and the Governor of The Panama Canal and President of the Panama Railroad Company, and the plaintiffs set forth that they had a good and just title to the property and had been in possession of same for twenty-five years, and that the defendants named above had evicted the plaintiffs from the property and were holding it and keeping the plaintiffs out of possession. (Memo, p. 84) The complaint does not show whether or not the plaintiffs had a paper title, but it is revealed by a pleading for defendant and memorandum in support of same that the plaintiffs had a junior grant or concession of 1891 from the Colombian Government, therefore the action was based upon adverse possession under color of title. The matter was promptly considered by the Court and, we believe, correctly decided in favor of the plaintiffs. Rather than to face an appeal, there was an adjustment of the matter, and the plaintiffs conveyed the lands to the Government of the United States.

Practically the same question was involved in that case as is involved in the present case. One is handled vigorously and decided promptly and correctly, the other is played with and practiced over for thirty-seven years, no decision, no conclusion.

The cases cited by counsel in this connection merely decide that testimony of prices paid by condemner for other tracts is not admissible in condemnation proceedings as to value. We agree that this is the settled law on the subject.

■ Counsel also contends that evidence of negotiations between the parties to settle the matter without litigation is not admissible. The Court has no recollection of any evidence in this record in regard to any proposed settlement until many years after the litigation was first instituted; however, we agree with counsel in this contention, but the evidence as to the adjustment of the matter by conveying to the parties each parts of the land has been con-

sidered for one purpose only: to show the good faith of the plaintiffs in acquiring the De la Parra title. The evidence as to an attempted compromise subsequent to the matter mentioned above has never been, and is not now, considered as admissible testimony.

Counsel also contends that the only evidence of value before the Court is the sale in 1909 of seven acres of land by the plaintiffs to Bischoff (plaintiffs' exhibit 25), the cost of land to plaintiffs' organizers in 1909 and 1910, and Fairman's testimony. We are not prepared to agree with counsel in this contention, and we think there is a great deal more evidence which the witness Fairman had a right to consider in formulating and expressing the value of the lands and that the Court has a right to consider in fixing just compensation herein.

It is also contended that Fairman's testimony as to values is entitled to little or no weight. We can not agree with counsel in this contention, for the following reasons:

■ Congress, having conferred jurisdiction upon this Court to determine this matter, evidently intended for the matter to be tried in this Court according to the practice and procedure of the Canal Zone, as set forth in the Canal Zone Code. The Codes of the Canal are largely an adaptation of the California law, and the rules of evidence are practically the same. Therefore, we will consider the qualifications of this witness.

■ In the case of People v. McReynolds et al., 31 Cal.App.2d 219, 87 P.2d 734, it is stated that the value of lands appropriated by eminent domain is essentially a question of opinion, to be established by testimony, and that a witness must be familiar with the market value of similar lands in the same neighborhood and should be acquainted with the property involved in the suit and that he should possess special knowledge regarding the particular land in question which would enable him to form an intelligent and fairly accurate estimate of the actual market value of the lands sought to be condemned.

■ The courts of California have, through many years, firmly fixed the rule as to values in condemnation cases, and it is stated in many opinions that the owner has a right to obtain the market value of the land, based upon its availability for the most valuable purpose for which it can be used, whether so used or not, but *to be available* for a purpose means capable of being used for that purpose and that, as the market value at the date of taking controls, the land must be shown to have been marketable at the date of taking for the purposes stated. The showing must be that the use is one to which the lands may be reasonably applied, such as would affect a purchaser, and proper inquiry is, not what is the value of the property for any particular use, but what is it worth on the market, in view of its adaptation for that or any other use, and speculative uses, or remote and conjectural possibilities, are not to be taken into consideration, as the land must, at the date of the taking, have been available for the more valuable use shown. Actual value is the price that would, in all probability, result from fair negotiations where the seller is willing to sell, but doesn't have to sell, and the buyer desires to buy, but doesn't have to buy.

In the case of City of Stockton v. Ellingwood, 96 Cal.App. 708, 275 P. 228, the whole rule is summarized, as follows:

" * * * While a great deal of language has been used in different decisions having to do with the fixing of values, it is evident that the law contemplates one purpose in eminent domain proceedings, and that is that the landowner shall be compensated for the full market value of his property taken, irrespective of what the elements may be which enter into the making up of that value. * * *" 275 P. at page 230.

We believe that this is practically the same rule in all jurisdictions, including the Federal.

■ The Federal rule, as announced in the Washington Water Power Co. et al. v. United States, 9 Cir., 135 F.2d 541, is as follows:

"In fixing compensation for condemned property, 'market value' thereof is what a

willing buyer would pay in cash to a willing seller, and, where property taken and that in its vicinity has not in fact been sold within recent times or in significant amount, application of such concept involves a guess by informed persons.

\* \* \* \* \* \*

"A witness may base his appraisal of market value of condemned property on highest and most profitable use for which property is adaptable and needed or likely to be needed in reasonably near future."

Also, in United States v. Foster et al., supra, it is stated:

"In determining value of land taken by eminent domain, jury may consider all uses to which land is adapted and might be put, and may award compensation upon basis of its most advantageous and valuable use."

We believe that the witness Fairman, under the rules announced in California and other jurisdictions, was a competent and qualified witness and that his evidence so shows. We are of the opinion that, while his evidence, of course, is to be considered by the fact that he is a party plaintiff herein and an associate attorney, his evidence has considerable weight, considering that he is the only witness who testified as to value and his opportunities to know about what he was testifying.

It is true that this record reveals that there were very few sales of lands adjacent to the lands in controversy. There were some sales, however, which, no doubt, this witness took into consideration in forming his opinion and placing his estimate upon the value of the lands.

In addition to the selling to Bischoff by the plaintiffs of seven acres of land for $5,000 in 1909, there were other sales to the plaintiffs, which were recited in the evidence and the conveyances. The evidence and conveyances herein show that the plaintiffs paid substantial sums of money for some of these lands: They paid $24,674 for a one-half interest in the José Villalobos lands and an interest in the improvements. (Under Spanish law, improvements on lands could be conveyed independently.)

In addition to these transactions, the Panama Railroad Company paid the Pacific Mail Steamship Company the sum of $150,000 for its property and the Royal Mail Steamship Company the sum of $250,000 for its property, all situated not more than a mile and a half from the property in suit. (See Defendant's exhibit 14, deposition of Claybourn.) It also appears from the deposition that these properties were in very poor condition. In Bristow's Report (1905), page 15, it is stated that the Pacific Mail Steamship Company's property was out of repair and had not been used for several years. It is common knowledge that neither of the properties covered any considerable area of land.

The witness knew these properties, the area of land involved, and the condition of the piers. He had a right to take these sales into consideration.

The fact that the witness had been a resident of the Atlantic terminal of the canal since 1906 and that he had been very active in land matters would suggest that he was thoroughly familiar, not only with the valuation of lands as placed on them by the awards of the Joint Land Commission, but that he was also more or less familiar with the many lands acquired and sold to the Government by private individuals by agreements and arrangements. He was in splendid position to know the adaptability and availability of the lands in suit for the purposes stated.

He had a right to take into consideration the restricted and congested condition of the waterfront as affecting the Atlantic terminal of the canal, where, necessarily, the commerce and traffic over the Isthmus must flow. He also had a right to take into consideration Bristow's Report referring to the above (p. 87), wherein it was recommended that the Panama Railroad Company's port facilities be enlarged by the construction of additional wharves and that modern facilities for handling cargo should be provided.

The testimony of the witness shows that he himself made soundings as to the depth of the water in and around these lands.

He also had the right to take into consideration that a great engineer, viz., Colonel Goethals, testifying as a witness before a Congressional Committee (plain-

366

tiffs' exhibit 28) at Ancon, Canal Zone, November 19, 1912, had stated that the land was valuable because it was the only piece of property on Limon Bay which was "available for the use of coaling-stations, warehouses, and things of that sort."

The witness certainly understood the accessibility of these lands to the markets of Colon and Cristobal. He knew what was growing and what could be grown on same. He stated that, after plaintiffs acquired the land, they were continually planting fruit trees, etc., until they were evicted. He knew the area of cultivation, the improvements, and, no doubt, knew the value of same.

Counsel for the defendant had full, free, and fair opportunity to cross-examine the witness and to test his knowledge and qualifications. Perhaps it would be much better to have done so, and especially is this true as to the fruits and vegetables growing on the lands.

The witness testified that there was a large number of coconut trees growing on the lands, some non-bearing and some bearing. He gave his opinion as to the value of same. There is no explanation in this record as to what the terms "bearing" and "non-bearing" mean; however, it is common knowledge here that it takes about ten years for a coconut tree to bear and that it will continue to bear the year around for anywhere from fifty to seventy-five years and that there is practically no cultivation necessary. There is nothing in this record to show whether or not coconuts are a profitable product. This witness's testimony develops that there were other fruits and vegetables growing on these lands, but the Court has no information, except that testimony, as to the value of such crops.

The Court considers that the witness had a right, in fixing the value of these lands, to take all of these things into consideration.

The cross-examination of this witness by counsel for defendant was largely devoted to inquiring as to the organization of the Playa de Flor Land and Improvement Company, its legal status, and who the stockholders or members of that company were, and to an inquiry as to the amounts paid by plaintiffs and others in acquiring the lands in controversy.

Counsel for defendant did ask the witness, however, what he took into consideration in the opinion he had expressed as to the value of the property, and the witness answered that he took into consideration the potential value as well as the actual cash value established by transactions, offers, and inquiries and that he took into consideration all the uses for which the property could be used and had applied his knowledge of the purpose for which the lands were available and their possible use in that respect.

The Court realizes that this witness did take into consideration to some extent the inquiries and offers made by prospective purchasers, whom he believed to be responsible parties, and this was proper evidence as to interest in the property and its availability. Aside from this however, there were many other pertinent and proper matters and transactions from which, no doubt, the witness formed his opinion.

The Court believes this witness fully possessed the knowledge and experience to enable him to know something about these lands. As previously stated, he had been a resident of the Isthmus of Panama, Atlantic side, since 1906 and, while his testimony shows that he was active in the practice in other matters, this record develops that he should, and did, know more about these lands than anyone living. Therefore, he had the experience, he had the knowledge, and he knew the facts and the whole situation. If his evidence were not true and his opinion as to the valuation of the lands not fair and reasonably accurate, it was the duty of the defendant to so show. This it failed to do, and neither did counsel for defendant introduce a scintilla of evidence in contradiction of his testimony. While the Court has considered the argument advanced, it is not convincing.

Counsel for the defendant refers to the deposition of the witness Claybourn in this connection (defendant's exhibit 14). This deposition was taken on September 16, 1936, in civil case No. 772, by agreement, but the caption and the preliminaries are much longer than an ordinary deposition.

The witness was then, and is now, Superintendent of the Dredging Division of The Panama Canal. Admittedly he is a competent engineer. He testified that he arrived on the Canal Zone on August 24, 1910.

The Court has no hesitancy in saying that the witness evidently knew a great deal more about engineering than counsel who took his deposition and interrogated him seemed to know about the law and the premises of the case.

The witness testified as to the location and situation of the properties, and he was well acquainted with same; also as to what was necessary to be done in order that the lands might be used for the erection of piers, warehouses, and coaling-stations, also as to the expense that would be incurred. He detailed at length the conditions an engineer would take into consideration in such development. His evidence is of great weight.

He also gave his opinion, from his professional knowledge and his personal investigation, to the effect that a system of docks, piers, and warehouses for ocean freight could not have been constructed on any part of the Playa de Flor waterfront, as indicated by the attorney examining him, which business undertaking would or could have been a sound business venture and gave his reasons for his opinion.

We think all of this evidence, as recited above, is proper, and the Court has carefully considered same; however, it may be noted that another engineer, whose qualifications can not be doubted, viz., Colonel Goethals, disagrees with the witness as to this question.

The reasons advanced by the witness as to why the installations mentioned above would not be a sound business venture were as follows:

"A. In 1912 the Gatun Lake had not been brought up to its full height and we did not know whether or not the question of underground seepage streams would develop which would prevent the attainment of that condition, although, everything had been done to assure the success of the undertaking in the way of test borings all around the rim of the lake, and so on, but this was one of the conditions the Chief Engineer had to meet at that time and was well known outside. At the same time the slide condition in the dry through Gailliard Cut, then known as Culebra Cut, had already developed. This condition, as a matter of fact, continued on through until after 1917, and a good bit of the Chief Engineer's time was consumed in combating these ideas that the Canal would be a success and was not a failure as was generally expressed in political circles, in shipping circles, and, as a matter of fact, among engineers themselves. I will offer excerpts of the Governor's report. I have it here as of 1916. I have it written out.

"Q. Do you offer that in support of your opinion? A. Yes, I offer this in support of my opinion, that it would have been impracticable for an individual or concern to have put money into a development not knowing at that time whether or not the Canal was going to be a success itself.

"The idea is, there was a vague doubt in the minds of the commercial world, the political world, as well as the engineers, that the Canal itself was not a practical proposition. If the Canal were a practical proposition, certainly a development of this proposition would not have been a ggood business venture because we already had sufficient docks, so far as they were, to take care of the then shipping coming into the port. That is my contention. * * *" (Pages 9, 10 of deposition of Claybourn.)

While this evidence reflects only what everyone knew as to the misgivings as to the ability of the United States and its engineers to build a canal across the Isthmus of Panama, it was not very pertinent to the issues in the present case.

Yes, let it be conceded that, through the years, there was an incessant conflict as to whether or not a canal could be constructed through the backbone or the dividing line between North and South America. There were many eminent engineers, including no less an authority than Jefferson Davis, who gave it as their positive opinions that it could not be done, and perhaps this had a great deal to do with Senators

Morgan and Pettus always favoring the Nicaraguan route. But, as a practical matter applied to this lawsuit, it seems contradictory of the Government's contention that the determination of the Government of the United States to construct the canal greatly enhanced the value of the property herein.

This witness, of course, was an engineer, and a splendid one, with unusual knowledge of all the conditions that affected his profession upon the Isthmus. He was a competent witness as to all of this, but even a careless reading of his deposition will show that counsel had him wander into the realm of political, diplomatic, and governmental policies and to express opinions as to these controversial questions, which was not proper. For instance, he stated that the prime reason for the construction of the Panama Canal was a military measure. He further stated that it was inconceivable that the Government would permit the erection of the installations mentioned above immediately adjacent to the military reservation, plans for which were already underway. He interpreted the Treaty of 1903. He stated that it had been a consistent rule of the Government since the start of construction of the canal to prevent private enterprise from being developed on the Canal Zone.

As a matter of fact, and the laws so show, private enterprise was not prohibited in the Canal Zone until the President's Executive Order of 1912, and private enterprises operated until that time. We might add that, up to and including the present time, under some sort of lease or agreement, oil companies, shipping agents, banks, and other private business activities are permitted to operate in the Canal Zone.

He stated that he had taken into consideration, in his evidence, that the Government was erecting fortifications in that section as of December 5, 1912. He said that, from his observation, there was no likelihood of the Government granting private enterprise permission to construct extensive works in the Canal Zone.

All of this evidence was improper, and it has no application to the issues involved herein. It was objected to upon the taking of the deposition, and none of the evidence as to the opinions and conclusions as to political, diplomatical, historical, and governmental policies will be considered by this Court as evidence herein.

On cross-examination the witness was interrogated as to the statement of Colonel Goethals, referred to above, and the sum and substance of his reply was that he thought every engineer had a right to form his own conclusions.

This witness had previously stated in direct examination that he arrived in the Zone on August 24, 1910, but he said that he didn't exactly know the conditions in 1912 and his evidence as to conditions then was based upon what he had learned afterwards.

The witness was also asked if he didn't know that, in the year 1912, there were more than twenty towns and villages in existence between the towns of Colon and Panama along the railroad tracks of the Panama Railroad Company, and that the populations of same totalled more than sixty thousand persons and that private business was being conducted in them. He answered that he didn't know as to the population, but he knew that some private business was being conducted. He further stated that he knew that the idea was to depopulate the Zone but didn't know whether the idea first prevailed before or after the Panama Canal Act of 1912, that he was engaged in engineering and not in international affairs.

He was asked about specific private enterprises and said he didn't know about them.

He was cross-examined at length in regard to his opinions and conclusions stated in direct examination in regard to questions of policy, and political and diplomatic affairs.

The witness did not state that the Panama Railroad Company paid the Pacific Mail Steamship Company $150,000 for its property in Colon and paid the Royal Mail Steamship Company $250,000 for its property in Colon and that the properties were in bad repair. He also indicated in his evidence that the area of these properties was rather small. Significantly, however,

neither in 1936, in his deposition, nor in 1943, when this case was tried, did this witness express an opinion as to the value of the lands in suit.

Counsel for the defendant refers to and quotes from the case of United States et al. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390, also Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541, and states that the opinions in those cases and the excerpts therefrom are "on all fours," meaning by that, we assume, that the principles of law asserted in those cases are the law of this case. If counsel feels that way and is unable to differentiate and distinguish between the facts and principles stated in those opinions and the case at bar, we realize that there is nothing that we can say that would convince him otherwise. However, we do not believe that the doctrine that a riparian owner has no property right in the bed of a stream or to the use of the water or in the power inherent therein as against the United States, or that the well-settled rule that it is the owner's loss and not the taker's gain which is the measure of compensation for the property taken, have any application to the premises or the law of this case.

Counsel refers to the evidence of Dr. Chiari, and contends that no docks or wharves over beaches and into the water could be built without the authorization of the government under Colombian law, and again states that the plaintiffs had no right, title, or interest in the land between high and low tide.

We have previously discussed Dr. Chiari's testimony on this point, page 79 et seq. of this opinion [70 F.Supp. 351 et seq.].

We assume that the sovereign, whether it was Spain, New Granada, Panama, or the United States, has the right of regulation over those using the lands on the shores of its waters, including the sea, and also upon the streets and any other public property of that kind. We have also assumed that the government's regulations would be reasonable and that one who complied with same would have the right to use the property so long as he didn't interfere with the navigation and other legitimate purposes in which the state has an interest. We will also assume that, by the common law and the civil law, the title in the soil of the sea below high water mark, except so far as private rights in it have been acquired by express grant or by prescription or usage, is in the king or the sovereign, subject to the public rights of navigation, and that one can not make any installations on it without authority from the government.

Yes, we concede that the sovereign owned all the lands, including lands under water, within its domain. We also believe that the law is plain that lands and lands under water could be granted or conceded by the government and they could be acquired by prescription or usage. The only difference would be that those received by grants or acquired by usage or prescription in lands under water could not be used in interference with navigation or irrigation or other legitimate public purposes and would be subject to the control and regulation of the government. (See Book II, Title III, The Civil Code of the Republic of Panama and Amendatory Laws, Continued in Force in the Canal Zone, Isthmus of Panama, by Executive Order of May 9, 1904.)

In support of our conclusions, we refer to the well-considered and leading case of Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331. This case reviews all the law on the subject, including the great opinions of Lord Hale, which has been followed and accepted in the United States as the correct doctrine.

This record, and especially defendant's exhibit 13, which contains excerpts from the land laws of Colombia (1821-1905), translated and prepared by an attorney for the Panama Railroad Company, shows beyond any question that the insecure, violently-erupting, and crumbling governments of New Granada and its successors were continually granting, selling, and otherwise disposing of the lands to pay their debts, providing for the colonization of the lands by cultivators, establishing the right of prescription, and granting and conceding lands to military dignitaries, and nowhere is there any indication that the laws ever exempted any lands under water in the grants; on the other hand, by implication

at least, it is shown that they were not restricting these grants, right of prescription, or usage by any limitations. Our own research of the laws of New Granada and its succeeding governments, including Panama, indicates the same.

The grant and concession to the Panama Railroad Company of 1850, so often mentioned in this case, which gave it the right to erect docks, wharves, and port facilities, subject to the regulations of the government, presupposes that the shores and beaches might be the property of individuals, because Article XXI of the grant provides that when the lands required for building the railroad or for ports are the property of individuals, the Company would have the right to take them by order of the governor of the respective province, after valuation made and just indemnification given to the owners in accordance with the right granted to it of eminent domain.

The boundaries of the lands in controversy, as set forth in the documents heretofore referred to, are, in part, as follows:

Tract 1: "By the seafront of Playa de Flor in all its extensions up to Los Pescadoritos * * *."

Tracts 2, 3, and 4: "The lands known as Nombre de Dios on the north of the Bay of Limon, the boundaries of which are comprised from Los Pescadoritos to the Morro de Limon * * *."

The record shows that these landmarks and boundaries, as set forth above, are on the shore of the Bay of Limon. This record also shows beyond any question that, from the time that the towns of Aspinwall, Colon, and Cristobal were established, large quantities of produce from these lands had been marketed in those places. It is common knowledge that there was no road at that time, and that the only way they could transport their products to the market was across the Bay of Limon to the market towns named.

It has been our own experience that the proving of values in any sort of a case is always a very difficult matter, but in this case the difficulty was more fanciful than real, and we have arrived at the conclusion that, had it not been for the confusion of counsel, there would have been absolutely no difficulty in arriving, as near as is humanly possible, at the value of the lands involved in this controversy.

As stated before, the evidence of value in this record is somewhat meager. We believe that it is fair to assume that the reason the record is in this condition is the result of the often-suggested and often-insinuated, but never clearly stated contention that, as the lands were in the Canal Zone and because the Government decided to acquire all the lands therein in 1912 and private enterprise would not be permitted after that time, the lands would not have any value. This incessant insinuation on the part of those representing the Isthmian Canal Commission, the Panama Railroad Company, and the Government of the United States is shown by both counsel and witness in the taking of the deposition of Claybourn, previously referred to.

Certainly there can be no law that, because the United States wanted these lands for a specific use or merely to keep them or to prevent anyone else from owning and using them, it could take the lands at its own price, or without any price. On the other hand, it is plain that, if the United States wanted the lands and wanted to keep others from using the lands, it would have to pay for them according to the market value, which has been defined many times as the amount in cash for which, in all probability the property could be sold by an owner willing but not obliged to sell to a purchaser desiring but not obliged to buy, and to a purchaser who could use them for any lawful purpose and purposes not necessarily those identical to their present use but also with reference to the use to which they were plainly adapted. As an example, this record shows that these lands were well suited and presently needed for installations of warehouses, oil—and coaling-stations and that these elements should be considered in estimating the values of the lands.

We realize that a great many elements and factors are to be considered in fixing the market value of these lands and assessing just compensation. As briefly as we can, we will enumerate some of them,

at least, giving our reasons and our conclusions.

Counsel for the defendant contends that any enhancement of the value of the lands by reason of the construction of the canal should not be taken into consideration in fixing the value of the lands. He seems to have labored under the misapprehension that the lands would have had but little value in the absence of the canal. We can not agree with him.

Nature had more to do with the value of these lands than anything else. When it was discovered that, from the Arctic Region to Cape Horn, the narrowest land between the two seas was the Isthmus of Panama, transportation, trade, and traffic across it naturally contributed to increase the value of these lands. These lands and those surrounding them were colonized as set forth in the Court's memorandum, in less than ten years after Columbus discovered Central America. From the beginning, traffic across the Isthmus followed roughly the same course it takes today. As early as 1850 men invested their capital, went through untold hardships, and jeopardized their lives and their fortunes to build a railroad across the Isthmus. The lands became valuable for the same reason that, in the early days in the United States, the people established the country store or the village at the crossroads.

The colonization, development, progress, and industrialization of that great country, the United States, and especially, as time passed, the colonization and mineral discoveries of the Pacific coast states increased the travel and traffic over the Isthmus and, therefore, had a great deal to do with the importance and value of the lands at the terminals of the Isthmus. Even after the construction of transcontinental railroads in the United States, the Isthmus and the Panama Railroad Company became important factors in traffic and commerce, and the Panama Railroad, a crude, one-line railway of not more than fifty miles in length, became an important link in transportation from the east coast of North, South, and Central America and the West Indies to the west coast, a very important link in the transportation system of the Western Hemisphere.

One does not need any better evidence to support the above statement than to examine Bristow's Report. (Mem., p. 131.) We discover in that very intelligent and comprehensive Report (1905) a statement as to the condition of the equipment of the Railroad Company and a discussion as to its docking and warehousing facilities. A specific recommendation is made that the railroad be double-tracked, re-equipped with modern rolling-stock, and that its port facilities be enlarged by the construction of additional wharves and that modern facilities for handling cargo be provided. (Bristow's Report, p. 87.)

Assuming that there had never been a canal across the Isthmus, and that all transportation were by rail, it would have required more men to direct and handle the shipping than it does to operate the canal, and more wharves, warehouses and similar facilities than have been necessary since the canal has been constructed. One does not need anything but a map to see that these lands were available for such purposes, including homes, houses, and residences for the personnel.

The Atlantic side of the Isthmus is now and has always been more important to shipping than the Pacific side, for the simple reason that the population and the industrial centers of the United States are located, to a great extent, in the eastern part of the United States. This is also true of Central and South America. Furthermore, the West Indies, the most productive islands in the world, with their industry, commerce, and trade, were more important in years gone by than now. All of them are located within a radius of not more than fifteen hundred miles from the Atlantic side of the Isthmus.

The conception of a canal across the Isthmus of Panama dates back to about the year 1500 and the days of Columbus and his fellow explorers. (Memo, p. 5 et seq.) Agitation for and the idea of a canal having covered a period of more than 350 years, we can understand that it was inevitable that a canal be constructed. Where? At the most logical place, the Isthmus of Panama, the narrowest strip of land between the two oceans.

As has been heretofore stated, there were many eminent engineers who doubted that the canal could be constructed across the Isthmus because of the topography of the land at that particular place. This undoubtedly delayed the construction of the canal for many years, but it is worth mentioning that, aside from a considerable number of surveys made, there was never any serious effort to locate a canal at any other place. It is our opinion that there never will be. To say the least of it, the construction of the canal across the Isthmus was not an entirely unexpected eventuality, nor was it a surprise. There can be no question but that the fact that the United States, a great, just, and stable nation, was going to undertake the project would have something to do with the valuation of these lands and all other lands adjacent to the canal in the Zone and the Republic of Panama.

We might go even further and suggest, because it is a matter of public notoriety and obvious, that, prior to 1903 and during the Colombian regime, with its civil wars and political upheavals, neither property rights nor human rights were of much value on the Isthmus. Naturally, this situation in any country and in any era would have resulted in those who had wealth or property converting same into cash or any negotiable securities or anything that could be hidden, and, under those circumstances, land would not have much value, and the acquisition of same would be more or less of a gamble, because some succeeding government might take it away from the owner at any time.

Since we are so freely expressing our opinion as to all questions herein, we might suggest that, notwithstanding all the argument undertaking to distinguish property rights and human rights, there never was a country and never will be a country where, if property rights are ignored, human rights will be respected.

We believe that when Panama became a republic, sponsored, at least, by the United States of America, this had a great deal to do with the stabilization of conditions in the Republic of Panama and the Canal Zone and the increasing in value of all sorts of property therein.

Another factor might be mentioned, which the Court believes has a great deal to do with the value of these lands: The Panama Railroad was constructed across the Isthmus without any thought that anything could be done to combat the tropical diseases that infested the Isthmus, and the French companies labored under the same handicap. Many causes contributed to the failure of the efforts of the French Companies, but it is a notorious fact that perhaps the greatest was sickness and death from tropical maladies. Before 1903, science stepped into the picture, and the United States largely developed scientific discoveries which showed beyond any question the cause of these tropical diseases, especially yellow fever and malaria, furthermore, how they could be prevented. These discoveries were published and proclaimed all over the world, and their application in tropical countries showed conclusively that they worked. Therefore, the inhabitants of the tropical countries of Central and South America, including the Isthmus of Panama, well understood that such deadly maladies were no longer a necessary evil.

It is fair to say that the construction of the canal greatly hastened the application of these new scientific discoveries to the Isthmus. By 1912 it was an established fact that the Isthmus of Panama, once as unhealthy a place as could be found in the world, had a rate of sickness and death comparable to that of any country in the world. It would be stupid to say that all of this had nothing to do in increasing and enhancing the value of the lands on the Isthmus, including the lands in controversy.

The Court has placed in this record a map of the Canal Zone for the purpose of showing the congested area of the Atlantic terminal of the Isthmus. The aggregate area of Colon and Cristobal is not more than eight hundred acres. Employees of The Panama Canal and the Railroad Company, because of the restricted area of Cristobal, are forced to reside in housing provided by the Panama Railroad and the Panama Canal in The Republic of Panama. The vast shipping interests on the Atlantic side are housed in the Canal Zone, but their personnel, which is consid-

erable, reside in Colon to a large extent. The same is true of many others whose residence in the Zone is largely attributable to shipping activities.

It is a notorious fact that a great many employees of The Panama Canal and the Panama Railroad Company are not satisfied with the housing furnished them, which is stereotyped and standardized, and would like very much to own their own homes. It is also true that a great number of the employees of The Panama Canal and Railroad from the early years have been retiring, and, as there are no living accommodations for them in the Canal Zone, if they desire to remain on the Isthmus, as many seem to do, they must acquire homes in the Republic of Panama, and naturally, they prefer places accessible to Cristobal on the Atlantic side, and Balboa or Ancon on the Pacific side, where the commissaries, post offices, dispensaries and hospitals are located, and where they have limited privileges, and where their friends congregate. Therefore, there is, and has been for many years, an active market for lands suitable for building purposes in and around Panama City and Colon. As a matter of fact, a large portion of the population of the Republic of Panama is gathered in and around the Canal Zone and the two cities named.

The population of Colon in 1908 was over 17,000; in 1914, 27,000; in 1940, more than 44,000; today so we understand, it is in excess of 50,000. In 1912, Cristobal had a population of 3,500; today there are about 10,000 people in Cristobal, which includes the labor camp known as Camp Bierd and the West Indian community of Silver City, residents of which are employed by the Canal or Railroad. In other words, there are more than 60,000 people living on what was once the Island of Manzanillo, and, considering its small area, shows a very dense population. It should be noted, however, that Camp Bierd and Silver City have largely been constructed on what was once the slough or swamp lands between the island and the mainland. The population as shown above does not include or take into consideration the personnel of the armed forces but might include some of the civilian employees of same.

The lands in controversy can not be more than a mile and a half from Colon and Cristobal, as is plainly shown on the map. Considering the location and the character of the lands, even though they were never used for sites for building wharves, warehouses, coaling stations or oil tanks, they could have been used for building sites for residences and would have been very attractive for that purpose. The Court believes it is a matter of common knowledge, and the situation so shows, that they would have been very much in demand in 1912, and since then, they could have been used very properly for building sites for residences.

If the Government of the United States wanted to take these lands and convert them into a military reservation and not use them for any other purpose, it should have been willing to pay for them at their reasonable market value for any purpose for which they were adapted.

We do not believe that, in determining the market value of the lands in controversy in this action or any other lands in and around the ports of the Atlantic and the Pacific terminals, it would be very helpful to consider the value or amounts paid by the Joint Land Commission, or others, for lands in the interior of the Isthmus. There is no reasonable comparison that could be applied.

The Court has heretofore stated that there were not many sales of land on Toro Point, or in and around Colon and Cristobal, which could be applied as a measure to fix the value of these lands. We think it is natural to assume that the reason there weren't sales of land on the Toro Point Peninsula was because those representing the Isthmian Canal Commission and the Panama Railroad Company were so vehement in what we believe to be their unjust claim that the plaintiffs and others had no title to the property. However, there was a bona fide sale of seven acres for a consideration of five thousand dollars cash, and it is also shown that, owing to the purchaser's doubt of the title, and the fact that the plaintiffs were unable to place him in possession of the lands, the plaintiffs had to repay to him not only the considera-

tion but interest on same amounting to $980.

We have examined with a great deal of interest the letters written by General Counsel for the Panama Railroad Company to this purchaser. (See defendant's exhibit 24.)

Counsel for the Government contends that the market value of these lands should be fixed and assessed as of the date of the Treaty, 1903. Counsel for the plaintiffs contends that they should be valued as of February 1, 1912, the date of the taking. As heretofore expressed in this opinion, we do not believe that Panama had the right, moral or legal, to convey private lands, or any interest in same, to any succeeding government by treaty or otherwise. We believe it would be a very harsh and unfair construction of the Treaty to say that the United States Government, ten years after the Treaty and without any previous indication that it would later acquire all the lands in the Canal Zone, could take the plaintiffs' lands as of their value in 1903. If they could do this, it could take them at any time in the future, for example, a hundred years afterwards. Furthermore, we believe the Supreme Court of the United States has made it plain in many opinions that such a policy could not be followed.

In the case of Strother v. Lucas, 37 U.S. 410, 12 Pet. 410, 9 L.Ed. 1137, the Court stated:

"* * * This court has defined *property* to be any right, legal or equitable, inceptive, inchoate or perfect, which before the treaty with France in 1803, or with Spain in 1819, had so attached to any piece or tract of land, great or small, as to affect the conscience of the former sovereign 'with a trust', and make him a trustee for an individual, according to the law of nations, of the sovereign himself, the local usage or custom of the colony or district, according to the principles of justice and rules of equity. * * *"

The recent case of Tigertail Quarries, Inc., v. United States, 143 F.2d 110, 111, decided on June 20, 1944, Circuit Court of Appeals of the Fifth Circuit, supports our conclusion. The Court said:

"* * * If a distinct tract of land is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. *Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity.* 'If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.'" United States v. Miller, 317 U.S. 369, 376, 677, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. (Italics supplied.)

In the case of United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 281, 87 L.Ed. 336, 147 A.L.R. 55, the Supreme Court stated:

"* * * The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities. * * *"

The law recited above, as announced by the Circuit Court of Appeals of the Fifth Circuit and the Supreme Court, if applied to the facts and premises of this case, results in the indisputable conclusion that the valuation of these lands must be fixed as of February 1, 1912, for the following reasons:

As previously stated, the Canal Zone was an altogether new thing in history. The

President's Order of 1904 provided for the purchase of, or, through proper expropriation proceedings, for the acquisition of private lands essential to the excavation and completion of the Canal and that the inhabitants of the Canal Zone were entitled to security in their property and that the people should be disturbed as little as possible.

There is no proof in this case that, prior to 1912 and up to the present hour, the lands in controversy have ever been needed or used, nor were they essential to the excavation and completion of the Canal. Not until 1912 was there any indication that the United States was going to acquire all the lands in the Canal Zone. Until that time, private enterprise, bartering and selling was going on and lands were being bought and sold in the Canal Zone. This is shown conclusively in this record by the laws enacted by the Isthmian Canal Commission, and it is also shown that Colonel Goethals, Chairman of the Commission, and Judge Feuille, as late as 1912, did not anticipate anything of the kind. To the contrary, it is indicated that they believed otherwise and were agreeing to exchange lands in the Canal Zone with the plaintiffs herein.

As also heretofore stated, the United States never did undertake to avail itself of the provisions of the Treaty of 1903, or the Act of 1912 and the President's Executive Order thereunder to take these lands and fix the value of same in accordance with the Treaty, but, on the other hand, it possesses these lands by reason of the unlawful and unwarranted acts of its predecessor in title, and counsel for the Panama Railroad Company, and the Isthmian Canal Commission for thirty-seven years in many cases advanced their fanciful theories forcibly and vehemently one day and often retracted them the next day as to the title to the land. But now, after all their fine-spun theories have been dissolved, counsel for the Government contends that, after making a laboratory out of the courts of the Canal Zone for thirty-seven years to "guinea pig" their theories, seemingly unmindful that a great nation must preserve its faith as well as protect its property and maintain the integrity of its courts and its judicial system, and that although

it did not do what it could and should have done in 1912, viz., institute the proper expropriation proceedings under the laws made and provided (Act No. 6, Laws of the Canal Zone p. 22), it now has the right to use the machinery provided by the Treaty and the laws, all of which it ignored, to fix, just compensation herein.

We can not follow any such fantastic reasoning, because this is now a judicial and not an administrative or legislative question. We therefore hold that the market value of these lands should be fixed as of February 1, 1912, when the plaintiffs were unlawfully and forcibly deprived of the possession of their lands.

We have carefully considered the record and the evidence herein and the elements and factors set forth in this opinion which we believe should be considered in fixing the market value of the lands in controversy and assessing just compensation. Applying to them our general knowledge of the situation, it is our opinion that the value of the lands as of February 1, 1912, was as follows:

Two hundred and twenty-eight (228) acres on the seashore with a depth of 800 feet, $500 an acre, or ..............................$114,000
The balance of the land, or 3,049 acres, $10 an acre, or ............$30,490
The improvement on the land ....$20,000
Total value as of February 1, 1912 ........................$164,490

In our opinion, the market value of these lands as of the date of the Treaty of 1904 was substantially the same as shown above.

Having arrived at the fair, reasonable market value of these lands as of February 1, 1912, and as the defendant United States of America has agreed and acknowledged that it took the lands on February 1, 1912, we now decide and hold that just compensation for taking the lands is the sum of $164,490 with accrued interest at the rate of six (6) per cent from February 1, 1912 until March 2, 1945, amounting to the sum of $491,002.65. See Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1; United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331; Shoshone Tribe v. United States, 299 U.S.

476, 57 S.Ct. 244, 81 L.Ed. 360; Seaboard Air Line Ry. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664.

Either party in this action had the right to demand a jury to decide the issues herein and to assess and fix the market value of the lands, yet they expressly waived that right and submitted the matter to the arbitrament of this Court. If the Court has erred in fixing just compensation herein, we do not believe that counsel for the parties have any just complaint, certainly not that of the defendant.

The knowledge gained from our tenure of office of seven years as judge of this court and our residence in the Canal Zone for the same length of time prompts us to say that there are many men in the Canal Zone, Panama City, and Colon (many of them employed by The Panama Canal or the Panama Railroad Company) who have been here much longer than this Court and who knew the situation and adaptability of the lands in controversy and who would have been competent witnesses to testify as to the market value of same. Their integrity, intelligence, and judgment are unquestioned, and the Court would have appreciated very much the benefit of their knowledge as to the lands and their considered and honest judgment as to their value. But their testimony was not offered; therefore, the Court has necessarily had to apply the evidence and the record and its common knowledge and common sense to the question of value involved.

In concluding this opinion, we realize that we have included in it and in the memorandum much that was not necessary to a proper decision of this case, also that we have restated matters where it was not necessary to do so and that neither the opinion nor the memorandum is as well arranged for a reviewing court as it might have been. But again we say that this has been a tremendous task, calling for more time than the Court really had to devote to it.

As we have read it over hurriedly, we realize that we could have been a little more charitable and could have shown a little more judicial restraint in calling attention to what we believe to be the plain and obvious errors and mistakes which had unnecessarily prolonged the determination of related cases, but, after all, it was a matter calling for decisive action rather than pleasing platitudes.

If we have appeared somewhat arrogant in stating what we believe to be the plain law, we realize that we can be mistaken. We make no claim to infallibility, but we were interested from the first in passing upon every question that had arisen during the whole history of this litigation and in giving our reasons for same, so, if we are wrong in our conclusions, a reviewing court can correct us.